UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHUI W. KWONG; GEORGE GRECO; GLENN HERMAN; NICK LIDAKIS; TIMOTHY S. FUREY; DANIELA GRECO; NUNZIO CALCE; SECOND AMENDMENT FOUNDATION, INC.; and THE NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC., | No. 11 Civ. 2356 (JGK) (DCF) ECF Case |

Plaintiffs,

-against-

MICHAEL BLOOMBERG, in his Official Capacity as Mayor of the City of New York; and CITY OF NEW YORK,

Defendants,

-and-

ATTORNEY GENERAL OF THE STATE OF NEW YORK,

Intervenor.

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

David D. Jensen
*david@djensenpllc.com*

**DAVID JENSEN** PLLC
708 Third Avenue, Sixth Floor
New York, New York 10017
Tel: 212.380.6615
Fax: 917.591.1318

### TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................................... 1

THE PLAINTIFFS ......................................................................................................................... 2

    A)    Individual License Holders ................................................................................. 2

    B)    Second Amendment Foundation ......................................................................... 3

    C)    New York State Rifle & Pistol Association ......................................................... 3

LAWS AT ISSUE ......................................................................................................................... 4

    A)    Under State Law, Private Citizens Need Licenses to Possess Handguns in Their Homes ..................................................................................................... 4

    B)    Article 400 of the Penal Law Governs Handgun Licenses Throughout All of New York State ............................................................................................. 4

    C)    State Law Limits Localities from Imposing a License Fee of More than $10, But Exempts New York City Residents ...................................................... 5

    D)    The $340 Fee is Not Calculated to Defray Administrative Costs .......................... 8

    E)    New York City's $340 Fee Far Exceeds the Fees of Other Jurisdictions .............. 9

POINT I:  THE RIGHT TO KEEP AND BEAR ARMS IS A FUNDAMENTAL CIVIL RIGHT AND APPLIES "MOST NOTABLY" IN THE HOME ................................................................. 11

    A)    The Second Amendment Protects a Personal Right to Keep Firearms, Including Handguns ....................................................................................... 11

    B)    The Right to Keep and Bear Arms is a Fundamental Constitutional Right ......... 11

    C)    The Right to Keep and Bear Arms has its Zenith in the Home ........................... 12

    D)    Familiar Principles of Constitutional Review Supply the Rules of Scrutiny ........ 13

POINT II:  NEW YORK CITY'S $340 FEE IS PROHIBITIVE AND DOES NOT SERVE TO DEFRAY ADMINISTRATIVE COSTS ................................................................................ 14

    A)    Qualified Individuals are *Entitled* to Obtain Licenses ...................................... 14

    B)    The City Can Only Impose a *Nominal* Fee that Serves to Defray Attendant Administrative Cost ........................................................................ 15

    C)    The City's $340 Fee is Inherently Prohibitive ................................................... 16

    D)    The City's $340 Fee is Not a Permissible License Fee ....................................... 18

POINT III:  PENAL LAW § 400.00(14) DENIES EQUAL PROTECTION OF THE LAW TO RESIDENTS OF NEW YORK CITY ............................................................................... 19

    A)    The Scope, Severity, and Purpose of the Burden Determine the Level of Scrutiny ...................................................................................................... 19

    B)    The Equal Protection Clause Invalidates § 400(14)'s Disparate Burden ............. 21

CONCLUSION ......................................................................................................................... 25

## TABLE OF AUTHORITIES

<u>CASES</u>

Abate v. Mundt, 403 U.S. 182 (1971) ......................................................... 22

Anderson v. Celebrezze, 460 U.S. 780 (1983) ............................................ 22

Ashcroft v. ACLU, 542 U.S. 656 (2004) .................................................... 23

Board of Airport Commissioners v. Jews for Jesus, Inc., 482 U.S. 569 (1987) ........................... 13

Board of Estimate v. Morris, 489 U.S. 688 (1989) ..................................... 22

Boddie v. Connecticut, 401 U.S. 371 (1971) .............................................. 16

Bullock v. Carter, 405 U.S. 134 (1972) ...................................................... 17

Chesapeake B & M, Inc. v. Hartford County, 58 F.3d 1005 (4th Cir. 1995) ............... 17

Chwick v. Mulvey, 81 A.D.3d 161, 915 N.Y.S.2d 578 (2d Dep't 2010) ..................... 4

Citizens United v. FEC, 558 U.S. ___, 130 S. Ct. 876 (2010) ..................... 22

City of Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750 (1988) ................... 22

City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425 (2003) ....................... 25

Commonwealth v. Blanding, 20 Mass. 304 (1825) .................................... 20

District of Columbia v. Heller, 554 U.S. 570 (2008) .............................. *passim*

Eastern Connecticut Citizens Action Group v. Powers, 723 F.2d 1050 (2d Cir. 1983) ............. 18

Evans v. Cornman, 398 U.S. 419 (1970) ................................................... 22

Fly Fish, Inc. v. Cocoa Beach, 337 F.3d 1301 (11th Cir. 2003) ...................... 15

Follett v. McCormick, 321 U.S. 573 (1944) .............................................. 15

FW/PBS, Inc. v. Dallas, 493 U.S. 215 (1990) ............................................ 14

Grosjean v. Am. Press Co., 297 U.S. 233 (1936) ...................................... 16

Harper v. Va. Bd. of Elections, 383 U.S. 663 (1966) ............................... 16

Hull v. Petrillo, 439 F.2d 1184 (2d Cir. 1971) .................................... 15-16

Illinois State Board of Elections v. Socialist Workers Party, 440 U.S. 173 (1979) ............... 22-24

Lubin v. Panish, 415 U.S. 709 (1974) ....................................................... 16

M.L.B. v. S.L.J., 519 U.S. 102 (1996) ....................................................... 16

McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 431 (1819) ...................... 15

McDonald v. Chicago, 561 U.S. ___, 130 S. Ct. 3020 (2010) ..................... *passim*

Murdock v. Pennsylvania, 319 U.S. 105 (1943) ....................................... 15

New York City Transit Authority v. Beazer, 440 U.S. 568 (1979) .............. 19

National Awareness Foundation v. Abrams, 50 F.3d 1159 (2d Cir. 1995) ................... 16

National Awareness Foundation v. Abrams, 812 F. Supp. 431 (S.D.N.Y. 1993), aff'd
    50 F.3d 1159 (2d Cir. 1995)......................................................................... 16

Nordlinger v. Hahn, 505 U.S. 1 (1992)........................................................... 19

Nordyke v. King, no. 07-15763, 2011 U.S. App. LEXIS 8906 (9th Cir. May 2, 2011)......... 13, 23

People ex rel. Darling v. Warden, 154 A.D. 413, 139 N.Y.S.2d 277 (1st Dep't 1913)................. 4

Renton v. Playtime Theaters, Inc., 475 U.S. 41 (1986) .................................... 25

Respublica v. Oswald, 1 U.S. (1 Dall.) 319 (Pa. 1788) ..................................... 20

Rock Against Racism v. Ward, 658 F. Supp. 1346 (S.D.N.Y. 1987), aff'd in part and rev'd
    in part 848 F.2d 367 (2d Cir. 1988), rev'd 491 U.S. 781 (1989)........................... 18

Schneider v. State, 308 U.S. 147 (1939)......................................................... 15

Shuttlesworth v. Birmingham, 394 U.S. 147 (1969) ........................................ 14

Simon & Schuster, Inc. v. New York State Crime Victims Bd., 502 U.S. 105 (1991) ............... 23

Staub v. Baxley, 355 U.S. 313 (1958) ............................................................ 14

Turley v. New York City Police Dep't, 988 F. Supp. 667 (S.D.N.Y. 1997), aff'd in part
    and rev'd in part on other grounds, 167 F.3d 757 (2d Cir. 1999)......................... 18

United States Labor Party v. Codd, 527 F.2d 118 (2d Cir. 1975) ............................ 18

United States v. Barton, 633 F.3d 168 (3d Cir. 2011) ...................................... 12

United States v. Chester, 628 F.3d 673 (4th Cir. 2010)........................... 13, 20-21, 23

United States v. Fincher, 538 F.3d 868 (8th Cir. 2008)................................... 13

United States v. Marzzarella, 614 F.3d 85 (3d Cir. 2010) ............................... 20-23

United States v. Masciandaro, 638 F.3d 458, ___, 2011 U.S. App. LEXIS 5964
    (4th Cir. 2011)............................................................................. 12, 21

United States v. Playboy Entertainment Group, 529 U.S. 803 (2000) ....................... 22

United States v. Reese, 627 F.3d 792 (10th Cir. 2010) .................................. 13, 20, 23

United States v. Seay, 620 F.3d 919 (8th Cir. 2010) ..................................... 12

United States v. Tooley, 717 F. Supp. 2d 580 (S.D.W. Va. 2010) ............................ 21

Vacco v. Quill, 521 U.S. 793 (1997) ............................................................ 19

**NEW YORK STATE LAWS, REGULATIONS, AND LEGISLATIVE MATERIALS**

N.Y. Exec. Law § 837................................................................................ 5

N.Y. Penal Law § 1897 (1909) .................................................................. 4

N.Y. Penal Law § 265.01 ......................................................................... 4

N.Y. Penal Law § 265.20 ......................................................................... 4

N.Y. Penal Law § 400.00 .................................................................. *passim*

1911 N.Y. Laws ch. 195 ......................................................................................... 4

1922 N.Y. Laws ch. 198 ......................................................................................... 6

1938 N.Y. Laws ch. 374 ......................................................................................... 6

1947 N.Y. Laws ch. 147 ......................................................................................... 7

9 NYCRR 6051.3 ................................................................................................... 5

1938 N.Y. "Bill Jacket," A. 1526-1382 (N.Y. 1938). ........................................... 6

1947 N.Y. "Bill Jacket," A. 499-497 (N.Y. 1947) ............................................ 7, 8

## OTHER STATE LAWS AND REGULATIONS

Cal. Penal Code § 12076 ....................................................................................... 10

Conn. Gen. Stat. § 29-28 ................................................................................... 4, 10

1967 Ill. Laws 2600 ................................................................................................ 4

430 Ill. Comp. Stat. 65/2 ................................................................................... 4, 9

430 Ill. Comp. Stat. 65/5 ........................................................................................ 9

430 Ill. Comp. Stat. 65/7 ........................................................................................ 9

Mass. Gen. L. ch. 140, § 131 ............................................................................... 10

Mass. Gen. L. ch. 269, § 10 ............................................................................. 4, 10

Md. Code Ann., Crim. Law § 4-203 ...................................................................... 4

Md. Code Ann., Pub. Safety § 5-117 ................................................................... 10

Md. Code Ann., Pub. Safety § 5-118 ................................................................... 10

N.J. Stat. § 2C:39-6 ................................................................................................ 4

N.J. Stat. § 2C:58-3 .............................................................................................. 10

N.J. Admin. Code § 13:59-1.3 ............................................................................. 10

N.J. Admin. Code § 13:54-1.4 ............................................................................. 10

## NEW YORK CITY LAWS AND LEGISLATIVE MATERIALS

N.Y.C. Admin. Code § 10-131 ........................................................................... 1, 5

N.Y.C. Admin. Code § 13-203 ............................................................................... 8

N.Y.C. Admin. Code § 436-5.0 (1938) .................................................................. 7

N.Y.C. Admin. Code § B18-1.0 (1938) ................................................................. 8

N.Y.C. Charter § 353 (1906) .................................................................................. 8

N.Y.C. L. No. 32-1948 ........................................................................................... 8

N.Y.C. L. No. 37-2004 ........................................................................................... 8

38 RCNY 5-01 ........................................................................................................ 5

38 RCNY 5-23 ............................................................................................................ 5

N.Y.C. Int. 313-2010 ............................................................................................... 9

Committee Report, Introduction 313-2010 (N.Y.C. Council Sept. 15, 2010).............................. 9

Fiscal Impact Stmt., Introduction 385 (N.Y.C. Council Jun. 24, 2004) ........................................ 8

Minutes, Introduction 385 (N.Y.C. Council Jun. 24 2004) ............................................................ 8

## OTHER MUNICIPAL LAWS

Chicago Code § 8-20-130 ........................................................................................ 10

Chicaco Code § 8-20-145 ........................................................................................ 10

Chicaco Code § 8-20-150 ........................................................................................ 10

CDCR § 24-2320.3 ................................................................................................... 10

D.C. Code § 7-2502.03 ............................................................................................ 10

D.C. Code § 7-2502.05 ............................................................................................ 10

D.C. Code § 7-2502.07 ............................................................................................ 10

## OTHER AUTHORITIES

C. Kevin Marshall, Why Can't Martha Stewart Have a Gun?, 32 Harv. J.L. & Pub. Pol'y 695
    (2009)................................................................................................................ 4

Edward Lee, Guns and Speech Technologies:  How the Right to Bear Arms Affects
    Copyright Regulation of Speech Technologies, 17 Wm. & Mary Bill of Rts. J. 1037
    (2009)................................................................................................................ 20

David Goldberger, A Reconsideration of Cox v. New Hampshire:  Can Demonstrators Be
    Required to Pay the Costs of Using America's Public Forums?, 62 Tex. L. Rev. 403
    (1983)................................................................................................................ 16

Jo Craven McGinty, "The Rich, the Famous, the Armed," N.Y. Times (Feb. 20, 2011)............... 2

United States Department of Justice, Office of Juvenile Justice & Delinquency Programs,
    Getting Guns Off the Streets (1994-2008).............................................................. 2

<u>**INTRODUCTION AND SUMMARY OF ARGUMENT**</u>

New York City's $340 fee for a 3-year "Residence Premises" handgun license far exceeds the fee charged by any other U.S. jurisdiction for comparable licensure.  Even within the State of New York, most other residents pay no more than $10 for a handgun license – but State law exempts residents of New York City from this protection, instead authorizing the City to impose fees without limit.  The only apparent purpose for this disparate State-law treatment is to permit the City to use prohibitive license fees to *discourage* people from exercising their constitutional right to keep and bear arms.  However, the purpose of suppressing the exercise of a constitutional right is no legitimate purpose at all.  New York City's $340 fee is unconstitutionally excessive in its own right, and the New York State law that exempts City residents from its protection against prohibitive fees violates the Equal Protection Clause.

Point I explains that the right to keep a handgun in the home for self-defense is part of the "core" of the Second Amendment's protections – and one that the Amendment "elevates above all other interests."  <u>District of Columbia v. Heller</u>, 554 U.S. 570, 635 (2008).  In addition, the right to arms is a "fundamental" right that "is fully applicable against the States."  <u>McDonald v. Chicago</u>, 561 U.S. ___, 130 S. Ct. 3020, 3042, 3026 (2010).  Simply put, the Supreme Court's decisions in <u>Heller</u> and <u>McDonald</u> subject New York's handgun licensing laws to a much more rigorous standard of scrutiny than they have faced in the past.

Point II shows that the $340 fee, N.Y.C. Admin. Code § 10-131(a)(2), is impermissible standing on its own.  The recurring $340 fee is not nominal when viewed in its personal and non-commercial context.  Moreover, even if the fee amount *were* nominal, the City set the fee without regard to administrative costs – and plainly, the fee is not calculated to defray them.

Point III explains that the provision of State law that authorizes the City to impose its prohibitive fee, N.Y. Penal Law § 400.00(14), violates the Equal Protection Clause to the extent it

authorizes the City to set a fee higher than $10.  This classification triggers strict scrutiny because it substantially burdens the ability to keep a handgun in one's home – which is a recognized "core" of the Second Amendment's protection – and also because it reflects the impermissible legislative purpose of discouraging lawful gun ownership.  There is no compelling interest that could justify the decision to protect most State residents with a $10 fee limit, while providing no protection at all to residents of New York City.  And even if there were, the very existence of less-restrictive approaches shows that the disparate burden is not narrowly tailored.

New York City is home to about 2 million guns – most of which are unlawful.[1]  About 37,000 people hold licenses that allow them to possess a total of 41,164 handguns in New York City.[2]  This lawsuit concerns only the rights of these law-abiding gun owners.

## THE PLAINTIFFS

### A)  Individual License Holders

The individual Plaintiffs in this action represent a sampling of New York City residents who choose to own handguns.  Like the City itself, they represent a diverse array of backgrounds, occupations, and interests.  Plaintiff Shui W. Kwong is a union electrical contractor, husband, and father who immigrated to the United States from Hong Kong.  Plf. 56.1[3] ¶ 1.  Plaintiff Nick Lidakis is a first-generation Greek American who serves the City as a paramedic, and Plaintiff Nunzio Calce is a first-generation Italian American who is a father and certified public accountant.  Id. ¶¶ 2-3.  George and Daniela Greco have been married for 24 years and have two children.  Id. ¶ 4.  Mr. Greco operates a successful third-generation family woodworking business, and Mrs. Greco is a New York City public school teacher.  Id. ¶¶ 5-6.  Glenn Herman is married and is a certified

---

[1] United States Dept. of Justice, Office of Juvenile Justice & Delinquency Programs, <u>Getting Guns Off the Streets</u> (1994-2008), available at http://ojjdp.ncjrs.org/pubs/gun_violence/profile19.html (last visited Jun. 22, 2011).
[2] <u>See generally</u> Jo Craven McGinty, "The Rich, the Famous, the Armed," <u>N.Y. Times</u> (Feb. 20, 2011), available at http://www.nytimes.com/2011/02/20/nyregion/20guns.html?scp=5&sq=handgun%20license&st=cse (last visited Jun. 22, 2011).
[3] Plaintiffs' Statement of Undisputed Material Facts, submitted herewith.

firearms safety instructor.  Id. ¶ 7.  Timothy Furey is an investment professional who serves clients throughout the world.  Id. ¶ 8.  Each Plaintiff paid the $340 fee, and each will need to pay the fee to renew their licenses in the future.  Id. ¶¶ 9-15.

### B)  Second Amendment Foundation

Plaintiff Second Amendment Foundation, Inc. ("SAF") is a nationwide non-profit member organization that promotes the right to keep and bear arms throughout the United States.  SAF sponsored and was a party to the McDonald v. Chicago litigation.  Plf. 56.1 ¶¶ 17, 20.  SAF continues to sponsor carefully selected lawsuits that vindicate the constitutional rights of law-abiding gun owners throughout the country.  Id. ¶ 20.  SAF has over 650,000 members and supporters nationwide, including in the City and State of New York.  Id. ¶ 18.  The purposes of SAF include promoting the exercise of the right to keep and bear arms, as well as education, research, publishing, and legal action on the constitutional right to privately own and possess firearms.  Id. ¶ 19.  Plaintiffs Nick Lidakis and Glenn Herman are members of SAF.  Id. ¶ 21.

### C)  New York State Rifle & Pistol Association

Plaintiff New York State Rifle & Pistol Association, Inc. ("NYSRPA") is a non-profit member organization first organized in 1871 in New York City.  Plf. 56.1 ¶¶ 22, 24.  NYSRPA is the oldest firearms advocacy organization in the country, and it is the largest firearms organization in the State of New York.  Id. ¶¶ 23-24.  NYSRPA provides education and training in the safe and proper use of firearms, promotes the shooting sports, and supports the right to keep and bear arms through both legislative and legal action.  Id. ¶ 25.  Plaintiffs Daniela Greco and Glenn Herman are members of NYSRPA, and Plaintiff George Greco is a NYSRPA board member.  Id. ¶ 26.

## LAWS AT ISSUE

### A) Under State Law, Private Citizens Need Licenses to Possess Handguns in Their Homes

State law makes it illegal to possess a handgun, including within one's home, without a license.  N.Y. Penal Law §§ 265.01(1), 265.20(a)(3).  The broad sweep of New York's handgun law is unique.  Only one other State (Illinois) requires a qualified adult to obtain a license to possess a handgun in the home – and the 10-year license costs $10.[4]  Connecticut, Maryland, Massachusetts, and New Jersey – which all have relatively strict handgun laws – require permits to purchase and/or carry handguns, but not to merely keep handguns in the home.[5]

New York first criminalized the unlicensed possession of handguns when it enacted the "Sullivan Law" on May 25, 1911.  Ex. 11, 1911 N.Y. Laws ch. 195, sec. 1, § 1897.  Before 1911, New York had prohibited the unlicensed carry of concealed handguns in public, but adults did not need licenses to possess handguns in their homes.  Ex. 12, N.Y. Penal Law § 1897 (1909); see also People ex rel. Darling v. Warden, 154 A.D. 413, 416-17, 139 N.Y.S.2d 277, 281 (1st Dep't 1913). New York's determination to prohibit the unlicensed *possession* of guns was unprecedented – other States opted to regulate activities such as the purchase of handguns and their carry in public.  See generally C. Kevin Marshall, Why Can't Martha Stewart Have a Gun?, 32 Harv. J.L. & Pub. Pol'y 695, 701-04 (2009).  Illinois did not require a license until 1967.  See 1967 Ill. Laws 2600.

### B) Article 400 of the Penal Law Governs Handgun Licenses Throughout All of New York State

Penal Law Article 400 is a comprehensive and exclusive scheme that governs the issuance of handgun licenses statewide.  See Chwick v. Mulvey, 81 A.D.3d 161, 170-71, 915 N.Y.S.2d 578, 586 (2d Dep't 2010).  The Article creates several different types of handgun licenses, including

---

[4] 430 Ill. Comp. Stat. 65/2(a)(1), 65/5.
[5] See Conn. Gen. Stat. § 29-28(b); Md. Code Ann., Crim. Law § 4-203(b)(6); Mass. Gen. L. ch. 269, § 10(a)(1)-(3); N.J. Stat. § 2C:39-6(e).

licenses to possess and carry handguns in various places and under various circumstances. See N.Y. Penal Law § 400.00(2). The only license pertinent to this action authorizes the bearer to "have and possess [a handgun] in his dwelling." Id. § 400.00(2)(a). The City issues "Residence Premises" handgun licenses pursuant to this statute. N.Y.C. Admin. Code § 10-131(a)(1); 38 RCNY 5-02. Police Rules authorize Residence Premises license holders to possess and carry handguns within a specified residence, and also to transport handguns (locked, cased, and unloaded) directly to and from a target range. See 38 RCNY 5-23(a). A Residence Premises license is the only license that a resident can obtain without showing special "need" or "cause." See 38 RCNY 5-01.

Anyone seeking a handgun license in the State of New York must submit an application and fingerprints to a designated "licensing officer," who then forwards the fingerprints to the New York State Division of Criminal Justice Services ("DCJS") for investigation. N.Y. Penal Law § 400.00(3)-(4). DCJS conducts a background investigation of the applicant, in conjunction with the FBI, and reports the results of the investigation back to the licensing officer. Id. § 400.00(4). The applicant pays a separate fee of $94.25 to cover the cost of the DCJS investigation. See N.Y. Exec. Law § 837(8-a); 9 NYCRR 6051.3(a)-(b); Plf. R. 56.1 ¶¶ 29-30 & ex. 13. A license cannot be issued to a person who, *inter alia*, has been convicted of a felony or "serious offense" or is under the age of 21. See N.Y. Penal Law § 400.00(1)(a), (c).

### C) State Law Limits Localities from Imposing a License Fee of more than $10, But Exempts New York City Residents

Article 400 authorizes localities to set their own license fees, and it limits those fees to a maximum of $10 – for most State residents. However, the statute exempts residents of New York City (and Nassau County) from *any* protection against the imposition of excessive fees:

> In such city, *the city council* and in the county of Nassau the Board of Supervisors *shall fix the fee to be charged* for a license to carry or possess a

pistol or revolver and provide for the disposition of such fees. *Elsewhere in the state*, the licensing officer shall collect and pay into the county treasury . . . *not less than three dollars nor more than ten dollars* as may be determined by the legislative body of the county[.] . . .

N.Y. Penal Law § 400.00(14) (emphasis added).  Thus, while State law authorizes all localities to set their own license fees, it provides a protective "cap" on that fee for all State residents who do not live in New York City (or Nassau County).

The New York legislature first addressed license fees in 1922, when it limited the fee to "fifty cents for each license issued."  Ex. 14, 1922 N.Y. Laws ch. 198, sec. 1.  This original limitation applied equally throughout all of New York State.  See id.  Adjusted for inflation, the original license fee is equivalent to about $6.73 today.[6]  The 1922 legislation reflected the understanding that not all costs would be defrayed by the fee, as it directed that "[t]he expense of providing . . . amended blank applications, licenses and record books for carrying out the provisions of this section shall be a charge against the county, or the city of New York."  Id.  This "expense" provision remains in force today.  See N.Y. Penal Law § 400.00(13).

Some (but not all) localities demanded the ability to raise the fee to an amount greater than $0.50, and in 1938 the legislature responded by amending the law to provide a *range* of permissible fees, from the then-applicable fee of $0.50, up to a maximum of $1.50.  See Ex. 15, 1938 N.Y. Laws ch. 374, sec. 1.  The Sponsor's Memorandum explained that the amendment would permit localities the option of raising their fees up to the new maximum, if they so chose.  See Ex. 16, A. 1526-1382, at 5 (N.Y. 1938).  Significantly, while the Memorandum cited the need to cover administrative costs, it *also* observed that an increased license fee could serve the (purportedly) laudable purpose of discouraging people from lawfully keeping and bearing arms.  See id.  The

---

[6] Plf. 56.1 ¶ 32.

1938 Administrative Code duly reflected a handgun license fee of $1.00, Ex. 17, N.Y.C. Admin. Code § 436-5.0(2) (1938), which is equivalent to about $16.03 today.[7]

In 1947 the legislature revised the fee provision to exempt residents of the City – alone – from *any* protection against prohibitive fees, adopting the present language that permits the City to "fix the amount of license fee to be charged, and provide for the disposition of such fees."  Ex. 18, 1947 N.Y. Laws ch. 147, sec. 1.  The Sponsor's Memorandum reasoned that the City needed "flexibility" to adjust the fee in order to reflect cost variances, and that because of cost variances, "to arbitrarily fix the rate would defeat the basic purpose of the Act."  Ex. 19, A. 499-497, at 7 (N.Y. 1947).  However, the Sponsor offered no explanation of why this same consideration would not apply equally in other parts of the State.  The Sponsor's Memorandum also did not address the availability of alternative approaches that could address the City's claimed cost variances, while still protecting City residents from prohibitive fees – such as the "range" approach taken in 1938.

Other materials in the "Bill Jacket" belie the Sponsor's appeal to the need to cover costs. The State Comptroller observed that the language authorizing the City to "provide for the disposition" of license fees actually authorized the City to bypass review by the Board of Estimate, meaning that the fees could be imposed without this budgetary check.  See id. at 5.

The Sponsor's Memorandum disclosed only one legislative purpose that was actually unique to New York City:  that the City could use a high fee to "discourage" the keeping and bearing of arms, particularly within certain "class[es]":

> Another reason for the institution of this bill is the feeling that a higher fee, if the City Council considers it wise to impose same, *will tend to discourage a great number of possible applicants* who are better off, both as concerns themselves and the welfare of this City as a whole, without the possession of fire-arms.  In this way the additional fee as well as covering the costs of investigation, thereby insuring their continued high caliber, would, of itself, *eliminate a certain percentage of applications, principally in that class*

---

[7] Plf. 56.1 ¶ 36.

> where the possession of fire-arms is desired for reasons of bravado and like dangerous reasons.
>
> Finally, it is considered that the possession of fire-arms for personal use is in the form of *a non-essential grant which may be made the basis for revenue raising taxes.*

Id. at 7-8 (emphasis added).  Of course, the unstated assumption – that those deterred by a prohibitive fee are also those who would seek firearms "for reasons of bravado and like dangerous reasons" – is suspect.  (The balance of the statement is not good law.)

The City Council exercised its new power promptly, raising the fee *ten-fold*, to $10, in 1948. Ex. 20, N.Y.C. L. No. 32-1948, sec. 1, § 436-5.0(2).  This fee is equivalent to about $93.76 today.[8] The City has continued to increase the license fee ever since.  The City adopted the $340 fee in 2004 at the request of Mayor Bloomberg.  Ex. 21, N.Y.C. L. No. 37-2004, sec. 1.

**D) The $340 Fee is Not Calculated to Defray Administrative Costs**

The Fiscal Impact Statement for the 2004 fee increase *did not address* the administrative costs attendant licensing – instead offering the sole justification that "[t]he existing fee structure for handgun licenses . . . has not increased since July of 1992."  Ex. 22, Fiscal Impact Stmt., Int. 385 (N.Y.C. Council Jun. 24, 2004).  The only legislative debate was one member's statement, "I know where I'm going to vote."  Ex. 23, Comm. Minutes, Int. 385, at 32:25-33:2 (N.Y.C. Council Jun. 24 2004).  The Council voted unanimously.  See Ex. 21, N.Y.C. L. No. 37-2004.

Incredibly, the license fees are not in fact used to defray administrative costs, but are instead deposited – in their entirety – to the Police Department's Pension Fund.  See N.Y.C. Admin. Code § 13-203(6) ("*All* moneys received or derived from the granting or issuing of licenses . . ." (emphasis added)).  The City has used gun license fees for the (sole) purpose of enhancing the Police Pension Fund since the earliest days of the Sullivan Law.  See Ex. 17, N.Y.C. Admin. Code § B18-1.0(7) (1938); Ex. 24, N.Y.C. Charter § 353(7) (1906).

---

[8] Plf. 56.1 ¶ 40.

-8-

Perhaps more telling are the City's own actions during the period leading up to the McDonald decision.  Shortly before the decision, Mayor Bloomberg requested the Council to *decrease* the fee to $70 for an initial license (79% reduction) and $25 for a renewal (93% reduction).  See Ex. 25, N.Y.C. Int. 313-2010, sec. 1, § 2(a)-(b).  The Committee on Public Safety concluded that that decrease was needed "so that the fees more accurately reflect the cost to the City for issuing the various types of permits and licenses."  Ex. 26, Comm. Report, Int. 313-2010, at 3 (N.Y.C. Council Sept. 15, 2010).  However, the Council did not enact the Introduction.

### E)  New York City's $340 Fee Far Exceeds the Fees of Other Jurisdictions

Most States and municipalities do not require the payment of *any* fee in connection with the purchase or possession of a handgun.  Nonetheless, the fees of the minority of jurisdictions that require them are *much* less than the fees that New York City requires.  No other Americans face handgun license fees that are remotely as high.

Most State residents pay only $10, plus the $94.25 DCJS fingerprinting fee, to obtain a handgun license – and their licenses do not expire.  See N.Y. Penal Law § 400.00(10), (14).  A New York City license expires after 3 years, and the (recurring) fee is *34 times higher*.

Nassau County residents also pay more than $10 – specifically, $200 for each 5-year license.[9]  Still, the annualized cost of a New York City license is almost *3 times higher*.

The only other State that requires people to obtain licenses to keep handguns in their homes is Illinois, and the $10 permit is valid for 10 years.[10]  The annualized cost of a New York City handgun license is *113 times higher*.

---

[9] Plf. 56.1 ¶¶ 47-48 & ex. 27.
[10] See 430 Ill. Comp. Stat. 65/5, 65/7.

Another useful analogy lies in Massachusetts, where a person can obtain a 6-year License to Carry – which authorizes the purchase, general possession, and carry of a handgun – for $100.[11] The annualized cost of a New York City license is *7 times higher*.

Two cities require people to pay license fees in order to keep handguns in their homes. Although both cities adopted their fees in response to Supreme Court decisions holding their handgun *bans* unconstitutional, the adopted fees are still much less than New York City's. The District of Columbia requires $25 to register a handgun for 3 years, plus $35 for fingerprinting and background checks.[12] New York City's annualized cost is almost *6 times higher*.

As a result of McDonald, the City of Chicago now issues a Chicago Firearms Permit and charges a fee of $100 for the 3-year license.[13] A person must also pay $15 to register a handgun for 3 years.[14] The annualized cost of a New York City license is *3 times higher*.

Finally, there are a few States that charge a fee in connection with the purchase of a handgun (but not its mere possession). New Jersey requires a permit to purchase a handgun, and the cost of this permit is $2.[15] A person applying for the first time must submit fingerprints for an FBI background check, which costs an additional $60.25.[16] Maryland requires one to submit an application form and pay a $10 application fee.[17] And, California requires a person to pay fees totaling $25 for additional State background checks any time they purchase a handgun.[18]

---

[11] Mass. Gen. L. ch. 140, § 131(i). Massachusetts exempts possession in the home. See id. ch. 269, § 10(a)(1)-(3).
[12] See D.C. Code §§ 7-2502.03(d), 7-2502.05(b); 7-2502.07a(a); CDCR § 24-2320.3(c)(3), (g).
[13] Chicago Code § 8-20-130(a)-(b).
[14] See id. §§ 8-20-145(b), 8-20-150(a).
[15] N.J. Stat. Ann. § 2C:58-3(f).
[16] See N.J. Admin. Code §§ 13:54-1.4(d) & (g), 13:59-1.3; Plf. 56.1 ¶¶ 49-50 & ex. 28.
[17] See Md. Code Ann., Pub. Safety §§ 5-117, 5-118(a)(2).
[18] See Cal. Penal Code § 12076(e); Plf. 56.1 ¶¶ 51-52 & ex. 29 at 13.

# ARGUMENT

## POINT I

### THE RIGHT TO KEEP AND BEAR ARMS IS A FUNDAMENTAL CIVIL RIGHT AND APPLIES "MOST NOTABLY" IN THE HOME

#### A) The Second Amendment Protects a Personal Right to Keep Firearms, Including Handguns

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const. Amend. II. In District of Columbia v. Heller, 554 U.S. 570 (2008), the Supreme Court found that the words of the Second Amendment "guarantee the individual right to possess and carry weapons in case of confrontation," and it accordingly struck down several D.C. laws that effectively prohibited the possession and carry of handguns within the home. Id. at 592, 635.

The Heller Court specifically found that the Second Amendment protects an individual right to keep *handguns*, which are "overwhelmingly chosen by American society" to exercise the "inherent right of self-defense." Id. at 628; see also id. at 629 ("the American people have considered the handgun to be the quintessential self-defense weapon"). The Court rejected Justice Breyer's suggestion that the District might permissibly ban handguns if it left people free to possess rifles and shotguns. See id. at 631 & 708 (Breyer, J., dissenting).

#### B) The Right to Keep and Bear Arms is a Fundamental Constitutional Right

In McDonald v. Chicago, 561 U.S. ___, 130 S. Ct. 3020 (2010), the Supreme Court "h[e]ld that the Second Amendment right is fully applicable to the States." Id. at 3026. While the Court's majority split on the precise mechanics of incorporation, compare id. at 3044-48 (plurality op.) with id. at 3058-88 (Thomas, J., concurring), all agreed that "the right to keep and bear arms [is] among those fundamental rights necessary to our system of ordered liberty," id. at 3042. Justice Thomas emphasized this in his concurring opinion. See id. at 3059 (Thomas, J., concurring) ("the plurality opinion concludes that the right to keep and bear arms applies to the States through the Fourteenth

Amendment's Due Process Clause because it is 'fundamental' to the American 'scheme of ordered liberty[.]' . . . I agree with that description of the right.").

The Court explained that the right to keep and bear arms "is deeply rooted in this Nation's history and tradition" and is one of the rights that Blackstone identified as "fundamental." Id. at 3036. One rationale underlying the ratification of the Fourteenth Amendment was ensuring that *all* citizens – not just privileged citizens – would be able to keep and bear arms for their protection. See id. at 3041; see also id. at 3088 (Thomas, J., concurring) ("The use of firearms for self-defense was often the only way black citizens could protect themselves from mob violence.").

Accordingly, "there now exists a clearly-defined fundamental right to possess firearms for self-defense within the home." United States v. Masciandaro, 638 F.3d 458, ___, 2011 U.S. App. LEXIS 5964 at *23 (4th Cir. 2011); see also United States v. Seay, 620 F.3d 919, 924 (8th Cir. 2010) ("as a fundamental right, the Second Amendment is applicable to the states").

### C) The Right to Keep and Bear Arms has its Zenith in the Home

The decisions in both Heller and McDonald both concerned claims for relief that were confined to the home. See McDonald, 130 S. Ct. at 3026; Heller, 554 U.S. at 575-76. The present case likewise concerns the basic right to keep a handgun within one's home.

In Heller, the Court explained that "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." Heller, 554 U.S. at 635. In McDonald, the Court explained that the Second Amendment applies "*most notably* for self-defense within the home." McDonald, 130 S. Ct. at 3044 (plurality op.) (emphasis added).

There is no room for dispute that "the 'core' of the Second Amendment is the right of 'law-abiding, responsible citizens to use arms in defense of hearth and home.'" United States v. Barton, 633 F.3d 168, 170 (3d Cir. 2011) (quoting Heller, 554 U.S. at 635); see also Nordyke v. King, no.

07-15763, 2011 U.S. App. LEXIS 8906, *12-13 (9th Cir. May 2, 2011); United States v. Chester, 628 F.3d 673, 676 (4th Cir. 2010); United States v. Reese, 627 F.3d 792, 800 (10th Cir. 2010); United States v. Skoien, 614 F.3d 638, 639 (7th Cir. 2010) (en banc); United States v. Fincher, 538 F.3d 868, 873 (8th Cir. 2008).

### D) Familiar Principles of Constitutional Review Supply the Rules of Scrutiny

The Supreme Court did not need to resort to any particular rule of scrutiny to decide the controversy presented in Heller.  The Court explained simply that the handgun ban was invalid "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." Heller, 554 U.S. at 635.  In McDonald, it was sufficient to reiterate that "citizens must be permitted 'to use [handguns] for the core lawful purpose of self-defense.'"  McDonald, 130 S. Ct. at 3036 (quoting Heller, 554 U.S. at 630) (alteration in source).

When the Court rules a law unconstitutional without regard to the standard of scrutiny, it necessarily rules that people have a right to actually engage in the activity at issue.  The restriction is invalid because it prohibits something that may not be prohibited – the exercise of constitutional rights deemed fundamental.  For example, in Board of Airport Commissioners v. Jews for Jesus, Inc., 482 U.S. 569 (1987), the Court struck down an LAX airport policy that prohibited (literally) all "First Amendment activities" on LAX property.  See id. at 575.  The unanimous Court declined to address the standard of review, explaining simply that "no conceivable governmental interest would justify such an absolute prohibition of speech."  Id.

Both Heller and McDonald concerned legislative attempts to *preclude* the exercise of rights protected by the Constitution – rather than to *regulate* their exercise.  Because it is impermissible to ban things that the Constitution affirmatively protects, the Court did not need to apply any particular standard of scrutiny to resolve these cases.

This case concerns a license fee – which is a burden on the keeping of handguns, but not a ban (for those who can pay). Unlike the controversies presented in <u>Heller</u> and <u>McDonald</u> (and <u>Board of Airport Commissioners</u>), the Court must apply rules of scrutiny in order to resolve this case. The questions presented trigger the application of well-established rules of scrutiny.

**POINT II**

**NEW YORK CITY'S $340 FEE IS PROHIBITIVE AND
DOES NOT SERVE TO DEFRAY ADMINISTRATIVE COSTS**

**A)  <u>Qualified Individuals are *Entitled* to Obtain Licenses</u>**

People have a constitutional right to keep and bear arms, and hence, they have a constitutional right to obtain any licenses or registrations that are necessary to lawfully possess firearms. The relief that the Supreme Court ordered in <u>Heller</u> makes this clear. The laws at issue in <u>Heller</u> prohibited the possession of unregistered guns, the registration of non-grandfathered handguns, and the acts of carrying a gun or keeping it loaded (including within the home). <u>See</u> <u>Heller</u>, 554 U.S. at 574-75. After concluding that the District of Columbia could not prohibit these activities, the Court ordered it to issue Heller the requisite licenses and registrations:

> Assuming that Heller is not disqualified from the exercise of Second Amendment rights, the District *must permit him to register* his handgun and *must issue him a license* to carry it in the home.

<u>Id.</u> at 635 (emphasis added).

This relief accords with the well-established principle that laws that condition the exercise of constitutional rights on a grant of official permission – *viz.*, prior restraints – trigger special standards of judicial scrutiny. Among other things, objective and non-discretionary factors must govern the issuance of licenses, and there must be firm time limits that require a decision-maker to act. <u>See, e.g.</u>, <u>FW/PBS, Inc. v. Dallas</u>, 493 U.S. 215, 225-26 (1990); <u>Shuttlesworth v. Birmingham</u>, 394 U.S. 147, 151 (1969); <u>Staub v. Baxley</u>, 355 U.S. 313, 322 (1958). These procedural safeguards

-14-

reflect the basic premise that people have a substantive right to obtain any licenses that are needed to exercise their constitutional rights.

**B) The City Can Only Impose a *Nominal* Fee that Serves to Defray Attendant Administrative Cost**

American jurisprudence has long recognized that "the power to tax involves the power to destroy." McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 431 (1819).  Because "[t]he power to tax the exercise of a privilege is the power to control or suppress its enjoyment," limitations apply when governments impose fees imposed on constitutionally protected activities.  Murdock v. Pennsylvania, 319 U.S. 105, 112 (1943).  The Court of Appeals for the Eleventh Circuit has aptly observed that "[i]f government may not ban [an activity], we fail to see how it may tax that activity without constitutional limit."  Fly Fish, Inc. v. Cocoa Beach, 337 F.3d 1301, 1315 (11th Cir. 2003).

The Supreme Court's seminal decision in Murdock v. Pennsylvania explains that States and localities can permissibly impose "a *nominal* fee [ ] as a regulatory measure to defray the expenses of policing the activities in question," but that "a flat license tax levied and collected as a condition" of exercising one's constitutional rights is not permissible.  Murdock, 319 U.S. at 113-14 (emphasis added); accord Hull v. Petrillo, 439 F.2d 1184, 1186 (2d Cir. 1971); see also Follett v. McCormick, 321 U.S. 573, 575 (1944).  This is true regardless of whether the charge in fact acts to suppress the exercise of a right.  See Murdock, 319 U.S. at 112-13.

The constitutional protection of an activity places substantial limits on the ability of State and local governments to recoup costs by means of user fees.  Four years before it decided Murdock, the Court invalidated municipal ordinances that prohibited the distribution of handbills and leaflets in Schneider v. State, 308 U.S. 147, 162-63 (1939).  The Court rejected the claim that litter removal costs could justify the ordinances, explaining that the "burden imposed upon the city authorities in cleaning and caring for the streets as an indirect consequence of such distribution *results from the constitutional protection of the freedom of speech and press*."  Id. at 162 (emphasis

added); see also David Goldberger, A Reconsideration of Cox v. New Hampshire: Can Demonstrators Be Required to Pay the Costs of Using America's Public Forums?, 62 Tex. L. Rev. 403, 409-10 (1983) (concluding that user fees may not be "oppressive or completely preclusive").

Consistent with this theme, States and localities may not impose *any* fees on the exercise of the rights to vote, publish, and speak on public sidewalks.  See Harper v. Va. Bd. of Elections, 383 U.S. 663, 668 (1966); Grosjean v. Am. Press Co., 297 U.S. 233, 249 (1936); Hull, 439 F.2d at 1186. Yet, it could hardly be denied that one's decision to engage in these activities imposes costs on society at large – such as the costs of operating polling stations, removing litter, and providing crowd control.  Just the same, States and localities may not impose user fees on indigents who lack the ability to pay them.  See M.L.B. v. S.L.J., 519 U.S. 102, 128 (1996) (appeals of custody determinations); Lubin v. Panish, 415 U.S. 709, 718 (1974) (candidate filing fees); Boddie v. Connecticut, 401 U.S. 371, 380-81 (1971) (divorce petition filing fees).  But again, there is no doubt that appeals, political campaigns, and divorce proceedings impose significant costs on society.

### C)  The City's $340 Fee is Inherently Prohibitive

The Court of Appeals for the Second Circuit has upheld "a *nominal* fee that serves the legitimate purpose of defraying the expenses incident to the administration and enforcement of" the regulation at issue.  Nat'l Awareness Found. v. Abrams, 50 F.3d 1159, 1166 (2d Cir. 1995) (emphasis added).  There is no "hard and fast definition" of whether a fee is "nominal," and the question depends upon a relative assessment of "how substantial [the fee] is when viewed in its context."  Nat'l Awareness Found. v. Abrams, 812 F. Supp. 431, 433 (S.D.N.Y. 1993), aff'd 50 F.3d 1159 (2d Cir. 1995).  In National Awareness, the court found that an $80 annual registration fee was "nominal" in its context – that of professional charitable fundraising.  See id.

Bullock v. Carter, 405 U.S. 134 (1972), provides important insight into inherently prohibitive fees.  Bullock concerned candidate filing fees – ranging from $1,000 to $6,300 – that

Texas law authorized local election boards to impose as a condition of participating in primaries for local offices. Id. at 135-36. The Court focused its analysis on the State's filing fees for other (non-local) offices, which were generally significantly less, as well on the wide disparity in local office filing fees imposed in different localities throughout the State. See id. at 138-40. The Court also considered the relationship between the filing fee and the salary for the office at issue. See id. at 138 & n.10. The Court's conclusion was that the "*the very size* of the fees imposed under the Texas system gives it a *patently exclusionary character*." Id. at 143 (emphasis added). Simply put, some fees can be impermissible simply because they are so large that they are inherently prohibitive. The Court of Appeals for the Fourth Circuit has explained that "[a] licensing scheme may adequately fetter the licensor's discretion and provide adequate procedural safeguards yet contain specific licensing or regulatory provisions that do not further a substantial governmental interest (e.g., *an outrageously high licensing fee* or an unreasonable restriction on the hours of operation)." Chesapeake B & M, Inc. v. Hartford County, 58 F.3d 1005, 1013 (4th Cir. 1995) (emphasis added).

The recurring $340 fee is plainly exclusionary and prohibitive because it far exceeds the comparable license fees charged by *all* other New York localities – and for that matter, by *all* other U.S. jurisdictions. A New York City resident who seeks to exercise his or her right to keep and bear arms by keeping a handgun at home must pay a total of $434.25 to obtain a license, which is equivalent to over 60 hours of work at the $7.25 minimum wage. Indeed, the license fee itself exceeds the cost of many well-made handguns. A person who seeks to own a $300 handgun for 10 years is forced to pay the City of New York a total of $1,454.25 – that is, 4 times $340, plus $94.25 – which is almost 5 times the value of the gun itself. Plainly, a fee that exceeds the cost of engaging in the activity at issue is not "nominal," but is instead "prohibitive."

**D)  The City's $340 Fee is Not a Permissible License Fee**

A *nominal* fee is permissible only if it is calculated to be equal or less than the costs incurred in administering the regulatory law at issue.  See E. Conn. Citizens Action Group v. Powers, 723 F.2d 1050, 1056 (2d Cir. 1983); U.S. Labor Party v. Codd, 527 F.2d 118, 119 (2d Cir. 1975); Turley v. N.Y. City Police Dep't, 988 F. Supp. 667, 672 (S.D.N.Y. 1997), aff'd in part and rev'd in part on other grounds, 167 F.3d 757 (2d Cir. 1999); Rock Against Racism v. Ward, 658 F. Supp. 1346, 1355 (S.D.N.Y. 1987), aff'd in part and rev'd in part 848 F.2d 367 (2d Cir. 1988), rev'd 491 U.S. 781 (1989).  A State or locality that imposes a fee "has the burden of proving that the fee equals the costs associated with the regulatory scheme."  Turley, 988 F. Supp. at 674; see also E. Conn. Citizens, 723 F.2d at 1056.

Although the $340 fee is manifestly not "nominal," it is also impermissible because it does not actually serve to defray the costs of issuing Residence Premises handgun licenses.  On the contrary, the legislative history of the $340 fee includes *no discussion whatsoever* of the attendant administrative costs, instead showing that the City adopted the fee increase merely because it had been 12 years since its last fee increase.  And, the legislative history of the State law that authorizes the City to impose its exorbitant fee shows that a primary consideration was to discourage people from lawfully owning guns – that is, to discourage people from exercising their constitutional rights.  There can be no dispute that fee is used not to defray the costs of issuing licenses and has never served this purpose.  Rather, the license fees serve to enhance the Police Department's pension fund.[19]

Any doubt as to the *absence* of a permissible basis for the $340 fee is dispelled by the Committee on Public Safety's (September 2010) conclusion that the fee needed to be reduced to $70 for an initial license, and $25 for a renewal license, so that "the fees more accurately reflect the

---

[19] This might be a laudable end use, but laudable ends do not excuse the infringement of constitutional rights.

cost to the City for issuing the various types of permits and licenses." Plf. 56.1 ¶ 46 & ex. 26 at 3. Even if the City were to identify (contradictory) evidence that the $340 fee bears some relationship to administrative costs, there can be no dispute that the fee was not adopted for the purpose of defraying these costs.

**POINT III**

**PENAL LAW § 400.00(14) DENIES EQUAL PROTECTION
OF THE LAW TO RESIDENTS OF NEW YORK CITY**

### A) The Scope, Severity, and Purpose of the Burden Determine the Level of Scrutiny

Equal protection concerns come into play "when a governmental unit adopts a rule that has a special impact on less than all the persons subject to its jurisdiction." N.Y. City Transit Authority v. Beazer, 440 U.S. 568, 587-88 (1979). The Equal Protection Clause "embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly." Vacco v. Quill, 521 U.S. 793, 799 (1997). Heightened judicial scrutiny applies to classifications that rely on "suspect" characteristics or that burden the exercise of fundamental constitutional rights. See Nordlinger v. Hahn, 505 U.S. 1, 10 (1992).

The precise application of equal protection standards to laws that burden the right to own a gun is relatively uncharted in the Second Circuit. Heller teaches that the "rational basis" standard generally does not apply to the protections of the Second Amendment. See Heller, 554 U.S. at 628 n.27. Notwithstanding the lack of Second Circuit guidance, several other Circuits have come to a rough consensus on an analytic approach that relies primarily upon principles developed in the First Amendment context. Under this approach, the level of scrutiny that applies to a law that burdens the Second Amendment depends upon the conduct that the law burdens, the level of burden imposed, and the apparent purpose of the classification. See United States v. Marzzarella, 614 F.3d

85, 96-97 (3d Cir. 2010); see also United States v. Chester, 628 F.3d 673, 682-83 (4th Cir. 2010); United States v. Reese, 627 F.3d 792, 801 (10th Cir. 2010).

It makes sense to rely on First Amendment principles because the First Amendment is the most analogous protection to the Second Amendment.  Among the original protections of the Bill of Rights, it is only the First and Second Amendments that protect the ability to engage in *affirmative* acts – to speak, to petition, to assemble, to exercise a religion, and to keep and bear arms.  These two Amendments are also the only guarantees that protect particular physical objects – specifically, expressive materials and weapons.[20]  The remainder of the first eight Amendments protect different types of interests.  The Third and Fourth Amendments protect people from certain forms of governmental intrusion, while the Fifth, Sixth, Seventh, and Eighth Amendments establish basic requirements for the conduct of civil and criminal proceedings, and for the protection of life, liberty, and property from unjust deprivation.  Courts have long recognized the basic connection between the protections of the First and Second Amendments.  See Commonwealth v. Blanding, 20 Mass. 304, 314 (1825) ("The liberty of the press was to be unrestrained, but he who used it was to be responsible in case of its abuse; like the right to keep fire arms, which does not protect him who uses them for annoyance or destruction."); Respublica v. Oswald, 1 U.S. (1 Dall.) 319, 330 n.* (Pa. 1788) ("The right of publication, like every other right, has its natural and necessary boundary; for, though the law allows a man the free use of his arm, or the possession of a weapon, yet it does not authorize him to plunge a dagger in the breast of an inoffensive neighbour.").

The Supreme Court *repeatedly* analogized the protections of the Second Amendment to those of the First in both Heller and McDonald.  See McDonald, 130 S. Ct. at 3031, 3043, 3045, 3054 n.5, 3055, 3056; Heller, 554 U.S. at 591-92, 595, 606, 620 n.23, 625-26, 635.  In United States

---

[20] Cf. Edward Lee, Guns and Speech Technologies:  How the Right to Bear Arms Affects Copyright Regulation of Speech Technologies, 17 Wm. & Mary Bill of Rts. J. 1037, 1040 (2009) ("Remarkably, only two technologies were considered so essential to liberty to merit express, constitutional protection during the founding of the Republic:  guns and speech technologies.").

v. Marzzarella, 614 F.3d 85 (3d Cir. 2010), the Court of Appeals for the Third Circuit followed the

Supreme Court's lead and concluded that in "look[ing] to other constitutional areas for guidance in

evaluating Second Amendment challenges[,] . . . the First Amendment is the natural choice" and

that "the structure of First Amendment doctrine should inform our analysis of the Second

Amendment." Id. at 89 n.4 (3d Cir. 2010).  The Fourth Circuit has also counseled looking to "the

analogous First Amendment context" to determine the standards to apply to laws burdening the

Second Amendment.  Chester, 628 F.3d at 682; see also United States v. Tooley, 717 F. Supp. 2d

580, 587 n.5 (S.D.W. Va. 2010).

**B) The Equal Protection Clause Invalidates § 400(14)'s
Disparate Burden**

Section 400(14)'s exemption of New York City residents triggers strict scrutiny because the

disparate treatment substantially burdens the right to keep a handgun in one's home – which is the

"*core*" Second Amendment protection that the Court upheld in both Heller and McDonald.  Indeed,

the Fourth Circuit recently observed that just as "any law regulating the content of speech is subject

to strict scrutiny, we assume that any law that would burden the 'fundamental,' core right of self-

defense in the home by a law-abiding citizen would be subject to strict scrutiny."  United States v.

Masciandaro, 638 F.3d 458, ___, 2011 U.S. App. LEXIS 5964 at *33 (4th Cir. 2011).  The apparent

legislative purpose of the disparate fee structure – to permit the City to discourage lawful gun

ownership with prohibitive fees – also compels the application of strict scrutiny.  The legislative

purpose of suppressing rights is inherently suspect.

Strict scrutiny applies in the First Amendment when laws significantly burden "core"

activities, such as by restricting the ability to speak.  See Citizens United v. FEC, 558 U.S. ___, 130

S. Ct. 876, 898 (2010).  Strict scrutiny also applies when laws draw classifications based on a

speaker's viewpoint or content.  See United States v. Playboy Entertainment Group, 529 U.S. 803,

813 (2000).  Applying strict scrutiny to these types of laws reflects the core protections and

animating concerns of the First Amendment itself – specifically, protecting freedom of expression, and guarding against the risk of censorship.  See City of Lakewood v. Plain Dealer Pub'g Co., 486 U.S. 750, 757 (1988).[21]

Of course, the Second Amendment's protections and concerns are unique from those of the First Amendment, and concepts such as "content" and "viewpoint" have little direct bearing. Instead, "the inherent right of self-defense [is] central to the Second Amendment right," Heller, 554 U.S. at 628; accord McDonald, 130 S. Ct. at 3023, 3036, and the Second Amendment protects against the core risk of *disarmament*, see Heller, 554 U.S. at 598-99.

By analogy, strict scrutiny should apply to classifications that impose *significant burdens* on *core Second Amendment activities*, and also to classifications that serve the *impermissible purpose* of *civilian disarmament*.  In contrast, intermediate scrutiny should apply to laws that impose reasonable and non-preclusive regulations that do not serve the purpose of disarmament.

The Third Circuit used this basic approach to review a federal law that prohibits firearms with obliterated serial numbers.  See United States v. Marzzarella, 614 F.3d 85, 96-97 (3d Cir. 2010).  The court observed that "the right to free speech, an undeniably enumerated fundamental right, is susceptible to several standards of scrutiny, depending upon the type of law challenged and the type of speech at issue," and it concluded there was "no reason why the Second Amendment would be any different."  Id.  The Third Circuit found that intermediate scrutiny applied to the prohibition on obliterated serial numbers for two reasons.  First, intermediate scrutiny applied

---

[21] Another useful analogy lies in the right to vote, which is also a right to engage in "affirmative" conduct.  Strict scrutiny applies when laws impose substantial burdens on the ability to vote or access the ballot.  See Ill. State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 184-85 (1979); Evans v. Cornman, 398 U.S. 419, 422 (1970). Whether a burden is sufficiently substantial to trigger strict scrutiny depends upon "the character and magnitude of the asserted injury to the rights protected" and "the precise interests put forward by the State as justifications."  Anderson v. Celebrezze, 460 U.S. 780, 789 (1983).  The Court also applies a strict scrutiny standard to representational schemes that violate the "one-person, one-vote" standard, rejecting all proffered justifications to strict equality where there are significant deviations in voter influence.  Compare Bd. of Estimate v. Morris, 489 U.S. 688, 697-99 (1989) with Abate v. Mundt, 403 U.S. 182, 185 (1971).  The basic premise is – again – that the utmost judicial scrutiny applies to laws that impose significant burdens on the exercise of a right, or that advance rationales antithetical to a right's core concerns – such as equal representation.

because "[t]he burden imposed by the law does not severely limit the possession of firearms" and "leaves a person free to possess any otherwise lawful firearm he chooses—so long as it bears its original serial number." Id. at 97.  Second, "the legislative intent behind [the restriction] was not to limit the ability of persons to possess any class of firearms."  Id.

The Courts of Appeal for the Fourth and Tenth Circuits have also concurred in this approach.  See United States v. Chester, 628 F.3d 673, 682-83 (4th Cir. 2010); United States v. Reese, 627 F.3d 792, 801 (10th Cir. 2010).  The Court of Appeals for the Ninth Circuit also recently concluded – somewhat more generically – that whether or not "heightened scrutiny" applies depends upon whether a Second Amendment burden is "substantial."  See Nordyke v. King, no. 07-15763, 2011 U.S. App. LEXIS 8906, *22 (9th Cir. May 2, 2011).

The strict scrutiny standard invalidates all legislative classifications that do not serve as the least restrictive means of achieving a compelling government interest.  See Ashcroft v. ACLU, 542 U.S. 656, 666 (2004); Simon & Schuster, Inc. v. N.Y. State Crime Victims Bd., 502 U.S. 105, 118 (1991).  A disproportionate burden can only be upheld if it is the least restrictive means of achieving a compelling government interest.  See Ill. State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 184-85 (1979); see also Simon & Schuster, 502 U.S. at 118.  The application of these principles is straightforward:  no compelling interest could justify protecting one class of citizens from excessive fees, while allowing their limitless imposition on another.

The Court's decision in Illinois State Board of Elections v. Socialist Workers Party, 440 U.S. 173 (1979), provides an instructive analytic example.  The case concerned Illinois State election laws that (by historical accident) required new political parties and independent candidates to meet different signature requirements in order to appear on the ballot in statewide and Chicago elections.  See id. at 175-76.  Specifically, a new political party or independent candidate needed 25,000 signatures to appear on the statewide ballot, but the same party or candidate would need

more than 35,947 signatures to be listed in Chicago.  See id. at 176-78.  The Court invalidated the State-law provisions to the extent they required a candidate or party to supply more than 25,000 signatures to appear in Chicago.  Id. at 187.

The Court reasoned that because the laws disparately burdened the exercise of "fundamental" rights, the State needed to show that "its classification [was] necessary to serve a compelling interest."  Id. at 184.  While the Court conceded "a legitimate interest in regulating the number of candidates on the ballot," this interest did not justify the *disparate* burden because "a State may not choose means that unnecessarily restrict constitutionally protected liberty," but must instead "adopt the least drastic means to achieve [its] ends."  Id. at 184-85 (quotation omitted).  The State law imposing a greater burden on Chicago candidates could not pass Equal Protection scrutiny because the "heightened" requirement for being listed on the ballot in Chicago was "plainly not the least restrictive means" of controlling access to the ballot.  Id. at 186.  And, there was no "compelling" reason "why the State needs a more stringent requirement for Chicago."  Id.  It is significant that the Court did *not* address whether either signature requirement, standing alone, was permissible.  Rather, the issue was whether the State could justify its disparate treatment.

This lawsuit does not contend that all localities must charge the same licensing fee.  Certainly, geographic cost variances might justify a scheme that (for example) set different fees for different localities, or that allowed all localities the discretion to set license fees within a bounded range – but this is not the question presented.  Rather, the question presented is whether there is a permissible justification for limiting fees to a nominal $10 for one class of people, while allowing their *unlimited* imposition on another – where both classes seek to exercise the same fundamental right, and both apply for licenses pursuant to the same comprehensive State-law scheme.  No compelling interest could justify this disparity.

Section 400(14) would also fail intermediate scrutiny review.  Intermediate scrutiny requires a classification to "serve a substantial governmental interest and allow[] for reasonable alternative avenues of communication."  Renton v. Playtime Theaters, Inc., 475 U.S. 41, 50 (1986).  In the First Amendment context, the standard applies to laws that regulate the time, place and manner of speech in a content-neutral manner.  See City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 443 (2003).  The basic rationale is that "[t]here is less reason to be concerned that municipalities will use these ordinances to discriminate against unpopular speech."  Id. at 440.  Of course, these very parameters show why the intermediate scrutiny standard does not apply – the $340 fee is not a *regulation* because there is no alternative to paying the fee, and the apparent purpose of the law is not "neutral," but is instead to discourage lawful gun ownership.  Just the same, the fact that there are *no* alternatives to paying the (prohibitive) fee shows that the classification does not leave open "adequate" alternatives.  It does not leave open *any* alternatives.

## CONCLUSION

The City's $340 fee is inherently prohibitive and serves the impermissible purpose of discouraging the exercise of constitutional rights.  While the City can charge a nominal fee to defray costs, the $340 fee is not nominal, and has never been calculated to defray costs.

The Equal Protection Clause also invalidates N.Y. Penal Law § 400.00(14), as-applied to aauthorize the City to impose a fee in excess of $10.  There is no justification for protecting one class of citizens from substantial fees, while allowing their limitless imposition against another – and plainly, the approach is not the least restrictive one available.  The apparent legislative purpose of discouraging lawful keeping and bearing of arms is constitutionally impermissible.

Dated:  New York, New York
        June 22, 2011

                                **DAVID JENSEN** PLLC


                                By: _____
                                     David D. Jensen, Esq.
                                708 Third Avenue, Sixth Floor
                                New York, New York  10017
                                Tel:  212.380.6615
                                Fax:  917.591.1318
                                david@djensenpllc.com
                                *Attorney for Plaintiffs*