UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------- X

SHUI W. KWONG; GEORGE GRECO; GLENN
HERMAN; NICK LIDAKIS; TIMOTHY S. FUREY;
SECOND AMENDMENT FOUNDATION, INC.; and
THE NEW YORK STATE RIFLE & PISTOL
ASSOCIATION, INC.,

                               Plaintiffs,

                    -against-

MICHAEL BLOOMBERG, in his Official Capacity as
Mayor of the City of New York; CITY OF NEW YORK;
and ERIC SCHNEIDERMAN, in his Official Capacity as
Attorney General of the State of New York,

                              Defendants.

--------------------------------------------------------------------- X

11 Civ. 2356 (JGK)
ECF Case

## CITY DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

                         MICHAEL A. CARDOZO
                         Corporation Counsel of the City of New York
                         Attorney for City Defendants
                         100 Church Street, 5th Floor
                         New York, New York  10007
                         (212) 788-0758

July 28, 2011

GABRIEL TAUSSIG,
MICHELLE GOLDBERG-CAHN,
                 Of counsel.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................... iii

PRELIMINARY STATEMENT ......................................................................... 1

RELEVANT STATUTES AND FACTS ............................................................. 2

    A.  The License Division's Role in Processing Issuance and Renewal Applications for Premises Residences Handgun Licenses ............................................. 2

    B.  City Council Authority to Set Fees for Premises Residence Handgun Licenses ................................................. 6

    C.  Legislative History of Handgun Fees in New York City ......................................................................... 7

        (1)  Local Law 32 of 1948 ............................................. 7

        (2)  Subsequent Local Law Changes to the License Fees............................................................. 8

        (3)  Allocation of Fees Collected to the NYPD General Fund............................................................. 9

        (4)  Local Law 37 of 2004 ............................................. 10

    D.  The City's 2010 User Cost Analysis for Handgun Licenses............................................................... 11

ARGUMENT ................................................................................................. 13

    Standard for Summary Judgment........................................... 13

    POINT I

    NEW YORK CITY'S LICENSE FEE IS USED TO DEFRAY ADMINISTRATIVE COSTS AND IS CONSTITUTIONALLY VALID ............................................. 15

    A.  Heller and McDonald Permit Handgun Licensing Schemes ................................................... 15

**Cases**                                                                    **Pages**

    B.  License Fees, Even for the Exercise of a
        Constitutional Right, Are Permissible ................................. 16

    C.  The Fee for Premises Residence Firearms
        Licenses Was Established to Defray the Costs
        of Licensing and Continues to Cover Only a
        Portion of Those Costs ........................................................... 19

POINT II

    THE LICENSE FEE AT ISSUE HERE DOES NOT
    INFRINGE ON PLAINTIFFS' SECOND
    AMENDMENT RIGHTS ........................................................ 22

    A  This Court Need Not Engage in a
       Constitutional Scrutiny Analysis to Uphold the
       Validity of the Fee Provision in Admin. Code §
       10-131(a)(2) As Applied to Premises Residence
       Licenses ................................................................................. 22

    B  If a Scrutiny Analysis is Required, Intermediate
       Scrutiny is Applicable to the Fee Challenge ...................... 24

    C  The License Fee Passes Intermediate Scrutiny .................. 27

    D  The Fee Statute Also Survives the "Substantial
       Burden" Test ......................................................................... 29

    E  Admin. Code § 10-131(a)(2) Survives Strict
       Scrutiny Analysis ................................................................. 32

POINT III

    PENAL LAW § 400.00(14) DOES NOT VIOLATE
    PLAINTIFFS' EQUAL PROTECTION RIGHTs ................... 33

CONCLUSION ................................................................................... 35

# TABLE OF AUTHORITIES

**Cases**                                                                         **Pages**

729, Inc. v. Kenton County Fiscal Court,
402 Fed. Appx. 131 (6th Cir. 2010) .................................................................. 21, 22

Allen v. Coughlin,
64 F.3d 77 (2d Cir. 1995) ............................................................................. 14

American Ass'n of Bioanalysts v. N.Y. State Dep't of Health,
859 N.Y.S.2d 892 (N.Y. Sup. Ct., Albany County 2005),
aff'd , 33 A.D.3d 1138 (3d Dep't 2006) ........................................................ 19

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) .................................................................................. 14

Bach v. Pataki,
408 F.3d 75 (2d Cir. 2005) ............................................................................ 4

Board of Estimate v. Morris,
489 U.S. 688 (1989) .................................................................................... 7

Board of Trustees of State University of New York v. Fox,
492 U.S. 469 (1989) ................................................................................... 30

Chesapeake B & M, Inc. v. Hartford County,
58 F.3d 1005 (4th Cir. 1995) ...................................................................... 21

Clark v. Cmty. for Creative Non-Violence,
468 U.S. 288, 104 S. Ct. 3065, 82 L. Ed. 2d 221 (1984) ............................. 29, 30

Clark v. Jeter,
108 S. Ct. 1910 (1988) ............................................................................... 27

Coe v. Town of Blooming Grove,
567 F. Supp. 2d 543 (S.D.N.Y. 2008) ......................................................... 25

Cox v. New Hampshire
312 U.S. 569 (1941) ..................................................................... 16, 17, 24

In re Dana Corp.,
574 F.3d 129 (2d Cir. 2009) ....................................................................... 13

Eastern Conn. Citizens Action Group v. Powers,
723 F.2d 1050 (2d Cir. 1983) ................................................................ 16, 25

**Cases**                                                                    **Pages**

Ezell v. City of Chicago,
    2011 U.S. App. LEXIS 14108 (7th Cir. July 6, 2011)............................................ 32, 33

Forsyth County v. Nationalist Movement,
    505 U.S. 123 (1992)............................................................................................ 24, 25

Gasparo v. City of New York,
    16 F. Supp.2d 198 (S.D.N.Y. 1998)................................................................... 16, 17

Goenaga v. March of Dimes Birth Defects Found,
    51 F.3d 14 (2d Cir. 1995).......................................................................................... 14

Gonzales v. Carhart,
    550 U.S. 124 (2007)................................................................................................... 30

Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.,
    452 U.S. 640 (1981)................................................................................................... 25

Heller v. District of Columbia,
    554 U.S. 570 (2008)............................................................... 15, 23, 26, 30, 32

Heller v. District of Columbia, (Heller II)
    698 F.Supp.2d 179 (D.D.C. 2010) ................................................................15-16, 26

Lederman v. N.Y.P.D. License Division
    2011 NY Slip Op 307654; 2011 N.Y. Misc. LEXIS 1343
    (Sup. Ct., N.Y. County, Mar. 31, 2011)............................................................. 23, 24

Lorillard Tobacco Co. v. Reilly,
    533 U.S. 525, 121 S. Ct. 2404, 150 L. Ed. 2d 532 (2001)....................................... 27

Mastrovincenzo v. City of New York,
    435 F.3d 78 (2d Cir. 2006)........................................................................................ 17

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
    475 U.S. 574 (1986)................................................................................................... 14

McDonald v. City of Chicago,
    - U.S. -, 130 S. Ct. 3020 (2010) ................................................................ 15, 16, 23, 30

Mobile Sign, Inc. v. Town of Brookhaven,
    670 F. Supp. 68 (E.D.N.Y. 1987) ...................................................................... 17, 21

Murdock v. Pennsylvania,
    319 U.S. 105 (1943)................................................................................................... 17

**Cases**                                                                 **Pages**

National Awareness Foundation v. Abrams,
    50 F.3d 1159 (2d Cir. 1995)............................................................. 16, 17, 18, 21

Nitkin v. Admin. of Health Svcs. Admin.,
    399 N.Y.S.2d 162 (N.Y. Sup. Ct., N.Y. County 1975),
    aff'd, 55 A.D.2d 566 (1st Dep't 1976),
    aff'd, 43 N.Y.2d 673 (1977) ............................................................. 19

Nnebe v. Daus,
    2011 U.S. App. LEXIS 6033 (2d Cir. Mar. 30, 2011)........................ 6

Nordlinger v. Hahn,
    505 U.S. 1 (1992)............................................................................. 33

Nordyke v. King,
    2011 U.S. App. LEXIS 8906 (9th Cir. May 2, 2011) ................... 29, 30, 33

Osterweil v. Bartlett,
    2011 U.S. Dist. LEXIS 54196 (N.D.N.Y. May 20, 2011)............... 4, 26-27

Parker v. District of Columbia,
    478 F.3d 370 (D.C. Cir. 2007)......................................................... 30

Patterson v. County of Oneida,
    375 F.3d 206 (2d Cir. 2004)............................................................ 14

Planned Parenthood of Se. Pa. v. Casey,
    505 U.S. 833, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992)................ 29, 30

Romer v. Evans,
    517 U.S. 620 (1996)........................................................................ 33

Scott v. Harris,
    550 U.S. 372 (2007)........................................................................ 14

Suffolk County Builders Ass'n v. County of Suffolk,
    46 N.Y.2d 613 (1979) ..................................................................... 18-19

Turley v. New York City Police Department,
    988 F. Supp. 667 (S.D.N.Y. 1998),
    aff'd in part, rev'd in part, 167 F.3d 757, (2d Cir. 1998)................ 17, 21

Turner Broad Sys.,
    512 U.S. at 662 114 S.Ct. 2445....................................................... 27

**Cases**                                                           **Pages**

United States v. Chester,
    628 F.3d 673 (4th Cir. 2010),
    cert. denied, 2011 LEXIS 2138 (Mar. 21, 2011) ........................................ 26

United States v. Elkins,
    2011 U.S. Dist. LEXIS 47105 (W.D. Va. May 2, 2011) ........................... 28

United States v. Marzzarella,
    614 F.3d 85 (3d Cir. 2010)................................................................. 26, 27-28

United States v. Masciandaro,
    638 F.3d 458 (4th Cir. 2011) ..................................................................... 29

United States v. Oppedisano,
    2010 U.S. Dist. LEXIS 127094 (E.D.N.Y. Nov. 30, 2010)....................... 26

United States v. Reese,
    627 F.3d 792 (10th Cir. 2010), cert. denied,
    179 L.Ed 2d 1214; 2011 U.S. LEXIS 3768 (May 16, 2011) .......... 25, 26, 28

United States v. Salerno,
    481 U.S. 739, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987)........................... 29

United States v. Skoien,
    614 F.3d 638 (7th Cir. 2010) ............................................................... 25-26

Ward v. Rock Against Racism,
    491 U.S. 781 (1989).............................................................................. 25, 27


**Statutes**

38 RCNY § 1-02 .......................................................................................... 3

38 RCNY § 5-01(a) .................................................................................. 3, 33

38 RCNY § 5-01 ........................................................................................... 3

38 RCNY § 5-22(a)(14) ............................................................................ 3, 33

Local Law 32 of 1948 ............................................................................... 7, 8

Local Law 37 of 1985 .................................................................................. 9

Local Law 37 Of 2004 ........................................................................... 10, 11

Local Law 42 of 1979 .................................................................................. 9

**Statutes**                                                                 **Pages**

Local Law 47 of 1962 ............................................................................................ 9

Local Law 51 of 1989 ............................................................................................ 9

Local Law 78 of 1973 ............................................................................................ 9

N.Y. Agric. & Mkts. Law § 96(b) (Consol. 2011) ........................................... 34

N.Y. Alco. Bev. Cont. Law § 83 (Consol. 2011) ............................................. 34

N.Y. County Law § 308(a) (Consol. 2011) ....................................................... 34

N.Y. Crim. Proc. Law § 530.14 ............................................................................ 4

N.Y. Educ. Law § 305 (Consol. 2011) ............................................................... 34

N.Y. Gen. Mun. Law § 122 (Consol. 2011) ...................................................... 34

N.Y. Penal Law § 265.00(10) ................................................................................ 3

N.Y. Penal Law § 400.00 ........................................................................... 3, 4, 23

N.Y. Penal Law § 400.00(1) ................................................................................... 4

N.Y. Penal Law § 400.00(1)(g) .............................................................................. 4

N.Y. Penal Law § 400.00(4) ................................................................................... 4

N.Y. Penal Law § 400.00(14) ........................................................................ passim

N.Y. Tax Law § 1212(a) (Consol. 2011) ............................................................ 34

N.Y.C. Admin. Code § 10-131(a)(2) ................................................................ passim

N.Y.C. Admin. Code § 10-131(a)(6) ................................................... 2, 9, 19, 20

N.Y. C. Admin. Code § 13-203 ........................................................................... 10

N.Y.C. Admin. Code § 13-203(6) ................................................................. 10, 20

N.Y.C. Admin. Code § 13-213.1(3)(c) .............................................................. 10

N.Y.C. Admin. Code § 213.1(3)(c) .............................................................. 10, 20

Rule 56.1 ............................................................................................................ passim

Section 33(b) of the New York City Charter .................................................... 22

**CITY DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Defendants, Michael Bloomberg in his official capacity as Mayor of the City of New York, and the City of New York (collectively "City defendants"), by their attorney, Michael A. Cardozo, Corporation Counsel of the City of New York, submit this memorandum of law in support of their cross-motion for summary judgment on plaintiffs' claims, and in opposition to plaintiffs' motion for summary judgment.

## PRELIMINARY STATEMENT

Plaintiffs, individuals who have been issued licenses to possess a handgun in their home by the New York City Police Department ("NYPD") License Division ("License Division"), known as a Premises Residence license, along with the Second Amendment Foundation ("SAF") and the New York State Rifle & Pistol Association, Inc. ("NYSRPA), commenced this action challenging: (1) the $340 license fee charged by the License Division for Premises Residence licenses set forth in section 10-131(a)(2) of the New York City Administrative Code ("Admin. Code"); and (2) New York State Penal Law ("Penal Law") § 400.00(14) on equal protection grounds. Seeking a vast expansion of the right to bear arms provided by the Second Amendment to the U.S. Constitution and a severe limitation on the government's ability to regulate, plaintiffs immediately moved for summary judgment on all claims, having taken no discovery, and thus, having no support for their contention that the fee charged by the City for processing Premises Residence pistol license applications is not used to defray the costs incurred by the License Division thereof. Plaintiffs' motion is fundamentally flawed.

Plaintiffs' motion is premised upon fatal mistakes in both law and fact, none of which are genuinely disputed: First, in accordance with law, the license fees collected by the

NYPD License Division for Premises Residence handgun licenses are used to defray administrative costs associated with licensing.  Second, the fees collected are deposited into the City's General Fund, in accordance with Admin. Code § 10-131(a)(6), not the Police Department's Pension Fund.  The collection of the handgun license fees supports the critical work the City must do in reviewing applications to ensure that firearms stay out of the hands of dangerous persons, protecting the public safety.  Although City defendants dispute some of the facts plaintiffs assert, such disputes do not defeat City defendants' cross-motion for summary judgment, insofar as plaintiffs' motion is devoid of any facts and support; rendering any "disputes" as not genuine.   City defendants, on the other hand, have disputed plaintiffs' unsupported factual conclusions with evidence that cannot be refuted by plaintiffs.  There is no genuine issue of material fact that the $340 triennial fee for a Premises Residence license does not exceed the costs for its processing.  Moreover, under the well-established law on setting fees, the $340 fee is constitutionally permissible.  Although intermediate scrutiny is the appropriate level of analysis to plaintiffs' challenge to the license fee, the license fee does not violate plaintiffs' Second Amendment right under any level of scrutiny.   Finally, plaintiffs' equal protection claim fails insofar as there is a rational basis for the differential treatment in the Penal Law, which allows New York City to charge a different licensing fee than the rest of the state.

## RELEVANT STATUTES AND FACTS

**A.     The License Division's Role in Processing Issuance and Renewal Applications for Premises Residences Handgun Licenses**

In New York City, the License Division is responsible for processing handgun license applications, including those for residence handgun licenses.  See New York State Penal

Law ("Penal Law") § 400.00.[1]  Currently, there are 36,077 active licenses issued by the License Division for the possession of handguns in New York City, in addition to 20,806 permits for the possession of rifles and shotguns.  See Declaration of Commanding Officer Andrew Lunetta, dated July 28, 2011 ("Lunetta Dec."), ¶ 2.  There are different types of licenses and permits.  For example, there are licenses to possess a handgun in one's home, called Premises Residence licenses, licenses to carry concealed weapons on one's person, called Full Carry licenses, and permits for rifles and shotguns.  The various firearms licenses and permits issued by the License Division, along with a description of the license type are codified at title 38, chapter 5 of the Rules of the City of New York ("RCNY") (types of handgun licenses) and title 38, chapter 1 of the RCNY (rifle, shotgun, and long arm permits).  See 38 RCNY §§ 5-01; 1-02; see also http://www.nyc.gov/html/nypd/html/permit/handgun_licensing_information.shtml (last visited July 7, 2011).  The rules provide that holders of Premises Residence handgun licenses are restricted to possessing the licensed weapon at the specific home address designated on the license. See 38 RCNY § 5-01(a).  A Premises Residence licensee may also transport the licensed handgun directly to and from an authorized small arms range/shooting club, secured and unloaded in a locked container.  See 38 RCNY §§ 5-01(a); 5-22(a)(14). There is also a Premises Business license, which allows a licensee to possess a firearm at a specific business location. However, this case is not about those Premises Business licenses, rather, it is only about the fees for Premises Residence licenses.  See Complaint, ¶¶ 1, 5, 66-69, 74.

---

[1] Pursuant to Penal Law article 400, the "licensing officer" is responsible for processing all handgun applications.  In the City of New York, the licensing officer is the Police Commissioner (see Penal Law § 265.00(10)), who has delegated his authority to the License Division.  See Declaration of Andrew Lunetta, dated July 28, 2011 ("Lunetta Dec."), ¶ 2.

Under Article 400 of the Penal Law, "[n]o license shall be issued or renewed pursuant to this section except by the licensing officer, and then only after investigation and finding that all statements in a proper application for a license are true." Penal Law § 400.00(1). Penal Law § 400.00 details the duties of the licensing officer which include, inter alia, determining whether the applicant meets the eligibility requirements set forth under Penal Law 400.00(1);[2] inspecting mental hygiene records for previous or present mental illness; investigating the truthfulness of the statements in the application; and having the applicant's fingerprints forwarded for review against the records of the New York State Division of Criminal Justice Services ("DCJS") and the FBI "to ascertain any previous criminal record." See Bach v. Pataki, 408 F.3d 75, 78-82 (2d Cir. 2005); overruled in part on other grounds as stated in Osterweil v. Bartlett, 2011 U.S. Dist. LEXIS 54196, **32; 40-41 (N.D.N.Y May 20, 2011). A licensing authority must investigate each application, and the licensing officer may not approve the application if, inter alia, the applicant fails to meet any of the eligibility requirements set forth in Penal Law § 400.00(1). In ensuring an applicant meets the requirements of Penal Law § 400.00, the License Division conducts a thorough investigation. See Penal Law § 400.00(4). As set forth in the accompanying Lunetta Dec., License Division investigators review applications for completeness and accuracy, and investigate the information provided by the applicant License Division for an average of 2,612 new applications and 9,522 renewal applications each

---

[2] The eligibility criteria set forth in Penal Law § 400.00(1) require, inter alia, that an applicant: (1) be 21 years or older; (2) possess good moral character; (3) not be a felon or convicted of a serious offense; (4) must state whether or not s/he has ever suffered mental illness or been confined for mental illness; (5) not have had a license revoked, or not be under a suspension or ineligibility order under Criminal Procedure Law § 530.14 (temporary order of protection, order of protection); and (6) not otherwise provide good cause for the denial of the license.

year.[3]  Lunetta Dec. ¶ 3; 11-15.  For example, investigators reach out to various federal, state, and city agencies, and other third parties, for information about each applicants' history. Investigators often request additional documentation to support statements made in the application, request further information regarding any reported arrests or convictions, review the applicant's mental health history in detail, and interview the applicant.[4]  Id. Here, plaintiffs do not challenge the license requirements, the investigation conducted by the License Division, or that the Penal Law requires payment of a license application fee – they challenge the amount of that fee.  See Complaint, ¶ 8.

Contrary to plaintiffs' assertions, DCJS does not conduct a background investigation, it simply runs a fingerprint report for all arrests in the State of New York and then sends the fingerprints to the FBI to check for out-of-state arrests and warrants (see Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment, dated June 22, 2011 ["Pl. Mem."] at 5).[5]  See http://criminaljustice.state.ny.us/pio/fp_services.htm; Lunetta Dec. ¶ 13, Ex. "B."  DCJS provides identifying information of arrestees, dates and locations of arrests, arrest charges, and the Penal Law sections associated with the arrest.  Lunetta Dec., ¶ 13, Ex. "B." DCJS does not provide the License Division "with any of the factual bases and allegations

---

[3]  In addition, the License Division also processes an average of 973 applications annually for rifle and shotgun permits.  Lunetta Dec., ¶ 3.

[4]  The License Division must conduct its own thorough investigation of each applicant's mental health history, as federal reports provide insufficient detail to make an appropriate assessment about the applicants' mental fitness to possess firearms.  See Lunetta Dec., ¶¶ 13-14, Ex "I."

[5]  The $94.25 fingerprint fee that is remitted to DCJS is a one-time fee that an applicant is required to make only for their initial application – not for any renewals.  See Lunetta Dec., ¶ 9.

underlying the arrests." <u>Nnebe v. Daus</u>, 2011 U.S. App. LEXIS 6033, *6 (2d Cir. Mar. 30, 2011);

Lunetta Dec., ¶ 13.

**B.    City Council Authority to Set Fees for Premises Residence Handgun Licenses**

Penal Law § 400.00(14) authorizes the New York City Council to set the fees for

the issuance and renewals of all pistol licenses issued in the City of New York.  Penal Law §

400.00(14) provides, in relevant part, as follows:

> **Fees.**  In the city of New York and the county of Nassau, the
> annual license fee shall be twenty-five dollars for gunsmiths and
> fifty dollars for dealers in firearms. <u>In such city, the city council</u>
> and in the county of Nassau the Board of Supervisors <u>shall fix the</u>
> <u>fee to be charged for a license to carry or possess a pistol or</u>
> <u>revolver and provide for the disposition of such fees.</u> (Emphases
> added).

Penal Law § 400.00(14) has granted the City of New York the authority to set its

own fees to cover the costs for the issuance and renewal of licenses to possess or carry a pistol

since 1947.  At that time, the New York State Legislature considered that the then-$1.50 state-

imposed fee was "inadequate to compensate for the administrative expense entailed in the

issuance" of licenses to possess and carry handguns, particularly with respect to the need for the

New York City Police Commissioner to conduct a thorough investigation to protect the "safety

and welfare of the community."  Declaration of Michelle Goldberg-Cahn, dated July 28, 2011

("Goldberg-Cahn Dec."), Exhibit "A," at 3-4.  The legislature noted that the City of New York

was spending significantly more on its investigation than the costs received from the fees and

that it was more appropriate to have the fees defray the costs on a self-sustaining basis, rather

than impose a larger cost to the City taxpayers.[6]  <u>See</u> Goldberg-Cahn Dec., Exhibit "A," at 7-8.

---

[6] The legislative history for Penal Law § 400.00(14) contains a memorandum from the Mayor of
the City of New York, expressly stating that he requested the legislation in order for the City to
Continued…

Accordingly, since that time, the City Council has periodically adjusted the fees to more accurately reflect the changing costs to the City for processing licenses to possess handguns.[7]

**C.     Legislative History of Handgun Fees in New York City**

      (1)     Local Law 32 of 1948

After the enactment of Penal Law § 400.00(14), the City Council conducted a thorough review to determine the appropriate fee for processing licenses in order for the City to meet the costs of the critical investigation conducted by the NYPD necessary to protect the public safety.  In support of the fee, the NYPD Police Commissioner submitted a memorandum to the Mayor.  See City Defs. Rule 56.1 Statement ("City's 56.1"), ¶ 31; Goldberg-Cahn Dec., Ex. "B," at 7-9.  The Police Commissioner's letter states, in relevant part, as follows:

> I reiterate my statements made at the public hearing of the Committee on General Welfare of the council that the cost to the City of New York of investigation, processing, issuance of licenses, supervision, and maintenance of records exceeds by a large amount the present fees, and that because of the fact that the applicant for, and recipient of, a pistol license is receiving a special

recoup more of its costs – not, as plaintiffs' suggest, to discourage certain people from obtaining firearms (see Pl. Mem. at 7-8).  See Goldberg-Cahn Dec. Exhibit "A," at 2-3.

[7] It is unclear how plaintiffs arrive at their conclusion that the legislature assigned the responsibility for fixing fees to the City Council with the purpose of bypassing the Board of Estimate and thus "bel[ying]" the intent of the legislature, as expressly stated in the legislative history, to defray administrative costs.  Pl. Mem. at 7.  There is no support for this implication of some ulterior motives to the legislature.  In any event, as the Board of Estimate is now defunct, this statement is of no moment.  See Board of Estimate v. Morris, 489 U.S. 688 (1989)(declaring the structure of the Board of Estimate unconstitutional).  In the 1989 revision to the City Charter, the functions of the previous Board of Estimate were divided among the Mayor, the City Council, and other City officers and agencies.

> service, distinguished from the service which the City and Police
> Department are bound by law to perform for all the citizens, a
> licensee should be required to defray a reasonable portion of the
> cost of this special service.

Goldberg-Cahn Dec., Ex. "B," at 7-9 (emphasis added).

The Police Commissioner explained that the investigation is necessary to ensure firearms be kept out of the hands of unqualified persons. City's 56.1, ¶ 32; Goldberg-Cahn Dec. Ex., B, at 8. He further stated that "[w]e are unwilling to sacrifice our present efficient method of issuing pistol licenses in the interest of decreasing the cost of licensing fees." Id. As part of the legislative process, the Mayor required the Police Commissioner to "demonstrate that the increased fees for the issuance of pistol licenses is reasonable, and does not exceed the cost to the city of New York for the issuance and supervision of licenses." City's 56.1, ¶ 33;Goldberg-Cahn Dec., Exhibit "B," at 35-36. Accordingly, the Police Commissioner submitted a letter explaining how license applications are processed in accordance with NYPD regulations; and detailing the application, interview, fingerprinting, and investigatory process in effect at that time. Id., at 24-29. The letter stated that NYPD personnel spent an average of 13 hours per application and noted that the costs exceeded the proposed fee. City's 56.1, ¶¶ 33-34;Goldberg-Cahn Dec., Ex. "B," at 24-29. This process led to the adoption of Local Law 32 of 1948, which increased the annual fee for a handgun license to $10 for the initial license, and $5 for each renewal license. See City's 56.1, ¶ 30; Goldberg-Cahn Dec., Exhibit "B."

(2)   Subsequent Local Law Changes to the License Fees

Between 1962 and 2004, the City Council passed legislation amending the fees for pistol license applications six times, basing the amendments on the rising costs to the License Division for processing pistol license applications. See Local Law 47 of 1962, City's 56.1, ¶¶ 35-38; Goldberg-Cahn Dec., Exhibits "C," "D" (relying on cost analysis and memorandum from

Police Commissioner stating fees in effect were insufficient due to the increase in labor, services, and supply costs and new procedures adopted in 1957 that require an "extensive and thorough investigation" [8]); Local Law 78 of 1973, City's 56.1, ¶ 39; Goldberg-Cahn Dec., Ex. "E;" Local Law 42 of 1979, City's 56.1, ¶¶ 40-41; Goldberg-Cahn Dec., Ex. "F" (reviewing "cost per service unit" and setting fee at less than the cost); Local Law 37 of 1985, City's 56.1, ¶¶ 42-43; Goldberg-Cahn Dec., Ex. "G" (citing cost of processing and increasing fee to cover the cost); Local Law 51 of 1989, City's 56.1, ¶¶ 44-45; Goldberg-Cahn Dec., Ex. "H" (relying on the average cost of processing license applications to increase the fee); and Local Law 42 of 1992, City's 56.1, ¶ 46; Goldberg-Cahn Dec. Ex. "I" (increasing fee by $35).

(3)   Allocation of Fees Collected to the NYPD General Fund

Chapter 503 of the Laws of 1995 amended Admin. Code § 10-131(a)(6) to provide that all fees collected by the NYPD for license applications go directly to the City's "general fund." Previously, one of the three funds merged by this legislation was funded by assigning the monies collected from certain fees, including pistol license fees, to the pension fund. The legislation substituted an obligation for the City to fund the NYPD pension fund. See City's 56.1, ¶¶ 55-59; Goldberg-Cahn Dec., Ex. "L" (copies of L. 1995, ch. 503 with legislative history). Although subparagraph 6 of § 13-203 lists the fees as part of the pension fund, subparagraph 11 of that same provision overrules subparagraph 6 and refers to Admin. Code §

---

[8] Although the Police Commissioner does not specify the requirements he is referring to, in 1956, the State passed legislation amending the Penal Law to require applicants to investigate statements about whether the applicant had ever suffered or been hospitalized for mental illness (L. 1956 ch. 200). In 1957, a law was passed requiring fingerprints to be forwarded to the FBI (L. 1957 ch. 111). See Goldberg-Cahn Dec., Ex. "M."

13-213.1(3)(c), which requires all monies received for fees to be deposited in the general fund.[9]

Id.

        (4)    <u>Local Law 37 of 2004</u>

The City Council most recently amended the fees and the duration of firearms licenses in 2004. Local Law 37 of 2004 extended the length of a handgun license from two to three years and increased the fees from $170 for a two-year license ($255 if prorated for a three-year license), to $340 for a three-year license. City's 56.1, ¶ 47; Goldberg-Cahn Dec. Ex. "J."

The Report of the Committee on Finance of the City Council detailed the costs of the License Division. <u>See</u> City's 56.1, ¶¶ 49-50; Goldberg-Cahn Dec., Ex. "K." At the time of the report, the License Division had 40,400 total handgun licensees, 23,300 total rifle and shotgun permit holders, and 4,173 Special Patrolmen. <u>Id.</u> In 2004 alone, the License Division processed 3,900 handgun applications, 1200 rife/shotgun permit applications, and 900 Special Patrolmen applications. <u>Id.</u> The Council Report found that although the License Division incurred over $6 million in personnel costs per year for processing applications and renewals for handgun licenses and rifle/shotgun permits, the License Division only collected $3,350,000 in fees. <u>Id.</u> The Committee on Finance found that the fees collected were far less than the actual costs of licensing (including personnel costs, equipment, modernization costs, and costs to monitor compliance with the laws and rules of the City and State pertaining to guns) and

---

[9] Admin. Code § 213.1(3)(c) provides: "…on and after July first, nineteen hundred ninety-five, all moneys which otherwise would be paid to pension fund, subchapter one pursuant to the provisions of section 13-203 of this subchapter or any other provision of law, or from any other source whatsoever, shall instead be <u>paid to the general fund of the city</u> established pursuant to section one hundred nine of the New York city charter." Emphasis added.

concluded that the license fee "does not reflect the actual costs of licensing, including the expenses for equipment and other resources necessary to process applications, handle investigations, address incidents, and monitor compliance with the laws and rules associated with city and state gun laws." Id.

Prior to the introduction of Local Law 37 of 2004, NYPD, with the oversight of the New York City Office of Management and Budget ("OMB"), prepared a detailed User Cost Analysis of the cost of processing license applications processed by the NYPD License Division. See City's 56.1, ¶ 51; Lunetta Dec., ¶¶ 20-23, Ex. "D;" Declaration of Andy Shiwnarain, dated July 28, 2011 ("Shiwnarain Dec."), ¶ 3.   The OMB User Cost Analysis concluded that the average cost for each application processed by the NYPD License Division was $343.49. Lunetta Dec., Exhibit "D," at 3 (fourth page). As a result, OMB recommended that the proposed permit fee be increased to $340.00 to cover the costs of processing the license. City's 56.1, ¶ 53; Lunetta Dec., ¶¶ 32-34, Ex. "D." Accordingly, Admin. Code § 10-131(a)(2), as amended by Local Law 37, provides:  "Every applicant for a license to carry or possess a pistol or revolver in the city shall pay therefor, a fee of three hundred forty dollars for each original or renewal application for a three year license period or part thereof …."

**D.      The City's 2010 User Cost Analysis for Handgun Licenses.**

In 2010, the NYPD, working in conjunction with OMB, studied the costs to the License Division for processing handgun license applications — this time analyzing the cost to the License Division by the various license types.  NYPD prepared a User Cost Analysis for each of the different type of handgun licenses that it processes. See City's 56.1, ¶ 60; Lunetta Dec., ¶¶ 35-42, Exs. "D," "E," "F;" Shiwnarain Dec., ¶ 4.  NYPD calculated that the total cost to the

License Division for each Premises Residence pistol license initial application was $977.16. Lunetta Dec., ¶ 38, Ex. "F." For renewals, the cost was $346.92.[10] Lunetta Dec., ¶ 38, Ex. "G."

In September 2010, the New York City Council introduced legislation to change the current application fee structure for pistol licenses to charge different fees for each type of handgun license types issued by NYPD.  Lunetta Dec., ¶ 35; Goldberg-Cahn Dec., Ex. "N." This legislation was proposed shortly after NYPD made other changes to make the pistol license application process more efficient and "customer friendly" – i.e., utilizing technology to speed up the application and review process, providing copies of license applications online, accepting credit card payment, extending the hours of the License Division, among other things.  See Lunetta Dec., ¶ 37; Goldberg-Cahn Dec., Ex. "O." As explained above, the fee was increased in 2004 to defray the costs incurred by the License Division at that time.  Although not legally required to do so, City Council Int. No. 313 of 2010 proposed to charge applicants a smaller percentage of the total costs to the NYPD for firearms licenses, by specific license type.  See Shiwnarain Dec., Ex. "A."[11] Specifically, the proposal sought to amend the fee to be 7% of the

---

[10] The renewal category included Premises Residence, Limited Carry, Carry Guard, Gun Custodian, Premises Business, and Retired Law Enforcement licenses.  See Lunetta Dec., ¶ 42, Shwinarain Dec., Ex. "A." These license types have similar investigative requirements for renewals, unlike Full Carry permits, for example, where NYPD separately calculated the renewal costs.  Id.

[11] At plaintiffs' request, City defendants produced the OMB Chart (Shiwnarain Dec., Ex. "A") and the 2010 OMB/NYPD User Cost Analyses for Premises Residence pistol licenses and renewals (Lunetta Dec. Exs "F," "G") to plaintiffs on June 9, 2011 – several weeks prior to the filing of plaintiffs' motion for summary judgment.  See Goldberg-Cahn Dec., ¶ 2.  However, plaintiffs fail to refer to the cost analyses in their papers and choose to ignore the facts.  Instead, Continued…

total cost to the License Division for all handgun licenses (or a 93% discount), and 5% of the cost for rifles, shotguns, and theatrical permits.[12] Id. Ultimately, the City Council Committee on Finance declined to move forward with the proposed legislation. See City's 56.1, ¶ 56; Goldberg-Cahn Dec., Exs. "P," "Q." Instead, the current $340 fee remains, which although in 2004 was designed to cover the full costs associated with processing, for the initial applications, represents only 34.79% of the costs incurred as of 2010 - and a 65.21% discount to the applicant. See City's 56.1, ¶¶ 67-68; Lunetta Dec., ¶ 19.

## ARGUMENT

### Standard for Summary Judgment

"The purpose of the summary judgment mechanism is to allow the prompt resolution of actions in which there is no genuinely disputed issue as to any material fact." In re Dana Corp., 574 F.3d 129, 147 (2d Cir. 2009). The Court must "view the evidence in the light

---

plaintiffs argue - with no support, that the $340 license fee exceeds the costs incurred by the License Division.

[12] Plaintiffs make much about a statement in the Committee Report accompanying Intro. 313 indicating the fee decrease proposal was "'so that the fees more accurately reflect the cost to the City for issuing the various types of permits and licenses.'" Pl. Mem. at 9 (citing the Comm. Rpt.). However, both the Committee Report and testimony make it clear that the proposal was about amending the fees to vary by the various pistol license types – which had not previously been done. Moreover, First Deputy Criminal Justice Coordinator Arkadi Gerney testified that the proposal was "going above and beyond to provide a more granular set of fees" by various license types. Goldberg-Cahn Dec., Ex. "P" (Tr. at 37, see also Tr. at 35-38). In any event, as set forth above and explained in more detail below, the undisputed facts are clear that the cost to the License Division for handgun license processing exceeds the current fees. See Shiwnarain Dec., Exhibit "A" (OMB Rpt 2010); Lunetta Dec., Exs. "F," "G." (User Cost Analyses).

most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995)(internal quotations and citations omitted). Moreover, "[i]n moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found, 51 F.3d 14, 18 (2d Cir. 1995). Conclusory assertions contained in an affidavit or verified pleading, are not sufficient to create a genuine issue of fact. Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004).

The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment, the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587 (1986)("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue' for trial."). Thus, when one party presents evidence to support its version of the facts that, although disputed by the other party, is not supported by any evidence, there is no genuine issue of material fact. See Scott v. Harris, 550 U.S. 372, 380-381 (2007). Accordingly, any stated disputes in facts that plaintiffs have not supported with admissible evidence, and City defendants have supported, are not "genuine disputes," and do not serve to defeat City defendants' cross-motion for summary judgment.

## POINT I

## NEW YORK CITY'S LICENSE FEE IS USED TO DEFRAY ADMINISTRATIVE COSTS AND IS CONSTITUTIONALLY VALID

**A.   Heller and McDonald Permit Handgun Licensing Schemes**

In concluding that the District of Columbia's outright ban on the possession of handguns in the home violated the Second Amendment, the Supreme Court in District of Columbia v. Heller, 554 U.S. 570, 635 (2008), expressly provided that certain regulations are "presumptively valid," including prohibitions on possession by certain categories of people (such as felons, mentally ill persons), in certain places (such as schools and other sensitive places), and condition qualifications on commercial sale. 554 U.S. at 626-27, n. 26 ("Nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill . . .; our list does not purport to be exhaustive."). The Supreme Court in McDonald v. City of Chicago, - U.S. -, 130 S. Ct. 3020, 3047 (2010) affirmed these presumptively lawful prohibitions.   Indeed, the Heller plaintiff himself conceded that the licensing law is permissible and the Supreme Court did not address it. As stated in Heller:

> Respondent conceded at oral argument that he does not 'have a problem with . . . licensing' and that the District's law is permissible so long as it is 'not enforced in an arbitrary and capricious manner.' Tr. of Oral Arg. 74-75.  We therefore assume that petitioners' issuance of a license will satisfy respondent's prayer for relief and do not address the licensing requirement."

554 U.S. at 631.  Accordingly, the Supreme Court ordered that Mr. Heller be issued a license unless he was not qualified for the issuance thereof.  Indeed, in McDonald, the Supreme Court emphasized that the Second Amendment "limits, but by no means eliminates," governmental discretion to regulate activity falling within the scope of the right and that incorporation "does not imperil every law regulating firearms." 130 S. Ct. at 3046, 3048; see also Heller v. District

of Columbia, (Heller II) 698 F. Supp. 2d 179, 187-88 (D.D.C. 2010), appeal pending, No. 10-7036 (D.C. Cir.)(finding firearm licensing schemes are constitutional and "that such requirements are not unconstitutional as a general matter."). Id. at 189-90 (citing Heller). As the D.C. District Court noted in Heller II, "several other courts have upheld registration and licensing requirements in the wake of Heller, concluding that because registration requirements only regulate, rather than prohibiting [sic], the possession of firearms, they do not infringe the Second Amendment right." Heller II, 698 F. Supp.2d at 190 (citations omitted). Thus, an investigation undertaken by the government to ensure that citizens who do not fall into categories of people prohibited from possessing firearms, such as felons or the mentally ill, is both required and appropriate under the framework established by the Supreme Court in Heller and McDonald. If governments cannot review applications to determine whether an applicant is a felon or mentally infirm, then the Supreme Court's finding in Heller that laws prohibiting mentally ill, or felons, or persons in other categories of prohibited from possessing firearms, are "presumptively lawful," has no meaning.

**B.      License Fees, Even for the Exercise of a Constitutional Right, Are Permissible**

It is well-settled that states and localities can impose license fees on individuals seeking to exercise their constitutional rights. See Cox v. New Hampshire, 312 U.S. 569, 577 (1941)(finding that government can impose fee on certain kinds of expressive activity as long as the charge does not exceed the administrative costs of regulating the activity); National Awareness Foundation v. Abrams, 50 F.3d 1159, 1165 (2d Cir. 1995)(holding that licensing fee may reflect administrative costs and costs of enforcing the regulation); Gasparo v. City of New York, 16 F. Supp.2d 198, 216 (S.D.N.Y. 1998). The fees, however, must be used to defray the administrative costs of processing license applications. Cox, 312 U.S. at 577; National Awareness, 50 F.3d at 1165; Eastern Conn. Citizens Action Group v. Powers, 723 F.2d 1050,

1056 (2d Cir. 1983)(striking down license fee that was in excess of costs as impermissible); Gasparo, 16 F. Supp.2d at 216; Mastrovincenzo v. City of New York, 435 F.3d 78, 83, 100 (2d Cir. 2006)(upholding $200 annual licensing fees for street vending as constitutional); Turley v. New York City Police Department, 988 F. Supp. 667, 672 (S.D.N.Y. 1998), aff'd in part, rev'd in part, 167 F.3d 757, 758 (2d Cir. 1998)(reiterating that fees for First Amendment activity permissible if justified by costs); Mobile Sign, Inc. v. Town of Brookhaven, 670 F. Supp. 68, 74 (E.D.N.Y. 1987)("Licensing or permit fees imposed on the exercise of first amendment rights generally are constitutional if they are designed only to cover the administrative costs involved in the license or permit").

Although plaintiffs seem to acknowledge that this is the state of the law, plaintiffs argue that states and localities may not impose any fees on the exercise of certain rights. See Pl. Mem. at 15-16. This is plainly incorrect, as the jurisprudence has developed to allow states and localities to charge permitting fees for the exercise of constitutional rights, as long as those fees do not exceed the costs thereof. Plaintiffs spend much of their brief arguing that the fee must be "nominal," conflating "nominal" with small or minimal. Pl. Mem. at 15-18, 24. However, it is well-settled that a nominal fee is one used "to defray the expenses of policing the activities in question." Murdock v. Pennsylvania, 319 U.S. 105, 113 (1943). Defray, as is clear from the case law regarding what constitutes an appropriate license fee, means "to cover." See Cox v. New Hampshire, 312 U.S. at 577 (upholding fee for parade permits because the fee was "not a revenue tax, but one to meet the expense incident to the administration of the [statute]...."); National Awareness, 50 F.3d at 1165-66; see also Webster's 3d International Dictionary (1972)(defining "defray" as "to pay or to provide for the payment of in money or its equivalent" and "to meet the charges for or expense of")(Goldberg-Cahn Dec. Ex. "T."). In National

Awareness, the Second Circuit analyzed whether an $80 annual registration fee for charitable organizations and professional solicitors/fundraisers seeking to engage in fundraising activities in New York state constituted an unconstitutional tax and prior restraint on protected speech.[13]  50 F.3d at 1161.  The Court reiterated the well-established principle that while the exercise of constitutionally-protected activities may not be taxed, it may be regulated with fees that "meet the expenses incident to the administration of a regulation and to the maintenance of public order in the matter regulated." Id. at 1164-65.  After reviewing the record, the Second Circuit concluded that the $80 annual fee "is a nominal fee that serves the legitimate purpose of defraying the expenses incident to the administration and enforcement of" the registration fee statute. Id. at 1166 (emphasis added).[14]

Moreover, plaintiffs' claim that the fee exceeds the cost of the license is not a constitutional challenge per se, as plaintiffs can appropriately seek state court redress in a declaratory judgment action for their claim that the fees are an unlawful tax. See, e.g., Suffolk

---

[13] City defendants do not believe that analogy to the prior restraint doctrine of the First Amendment and the related case law is appropriate in the context of setting forth the level of review applicable to Second Amendment challenges, and refer the Court to State-Intervenor's Memo of Law, dated July 28, 2011, at Point III(C). However, to the extent that there is a well-developed body of First Amendment jurisprudence regarding the validity of permit fees, we look to those cases for guidance on plaintiffs' challenge to the licensing fee at issue here.

[14] In fact, the Second Circuit in National Awareness upheld not only the costs to the New York Office of Charities Registration ("OCR"), that collected the fee, but also the Charities Bureau of the New York State Office of the Attorney General, who not only provided support services to OCR, but also enforced the statute at issue.  50 F.3d at 1161.  Thus, the Court upheld both processing and enforcement costs attendant to the statute as constitutional under the First Amendment. Id.

County Builders Ass'n v. County of Suffolk, 46 N.Y.2d 613, 619 (1979)(declaratory judgment proceeding reviewing county's regulatory fees finding fees must be reasonably necessary to serve regulatory purpose); Nitkin v. Admin. of Health Svcs. Admin., 399 N.Y.S.2d 162, 163 (N.Y. Sup. Ct., N.Y. County 1975), aff'd 55 A.D.2d 566 (1st Dep't 1976), aff'd 43 N.Y.2d 673 (1977)(striking down licensing fee as a tax because the fees exceeded the costs of the regulatory program); American Ass'n of Bioanalysts v. N.Y. State Dep't of Health, 859 N.Y.S.2d 892 (N.Y. Sup. Ct., Albany County 2005), aff'd 33 A.D.3d 1138 (3d Dep't 2006).

**C.     The Fee for Premises Residence Firearms Licenses Was Established to Defray the Costs of Licensing and Continues to Cover Only a Portion of Those Costs**

Relying on a nullified provision of law, plaintiffs baldly assert that the fee established in Admin. Code § 10-131(a)(2) is a tax because the monies collected are allegedly paid to the NYPD Pension Fund. See Pl. Mem. at 8, 15-19. Plaintiffs are incorrect. Since 1995, Admin. Code § 10-131(a)(6) has expressly provided that the money collected by the NYPD in connection with its licensing of handguns is deposited into the New York City General Fund. Admin. Code § 10-131(a)(6) ("The fees prescribed by this subdivision shall be collected by the police commissioner, and shall be paid into the general fund of the city. . . .") (emphasis added). As set forth above, state law amended the Admin. Code to shift funds collected for license fees from the NYPD Pension Fund to the City's General Fund.[15]  See L. 1995 Ch. 503 (Goldberg-Cahn Decl., Ex. "L"). Plaintiffs mistakenly cite to a different provision of the Admin. Code to support their contention – Admin. Code § 13-203(6) (Pl. Mem. at 8) – even though section 13-

---

[15] Prior to 1995, the fees collected for handgun licensing was one of a group of fees previously allocated to the pension fund in order to ensure a funding stream – not so that the pension fund could profit from fees. In any event, nothing in prior allocation to the pension fund in any way indicates that the fees were not meant to defray costs.

203(6) specifically references Admin. Code § 10-131(a)(6), and that § 13-213.1(c) specifically provides that funds listed in § 13-203 targeted to the pension fund should instead be paid to the General Fund.[16]   Accordingly, plaintiffs' are incorrect as a matter of law.   In any event, the undisputed supported facts establish that the collected fees are deposited into the City's General Fund.  City's 56.1, ¶¶ 72-72; Lunetta Dec., ¶¶ 44-45, Ex. "I."

Plaintiffs contend - again without support - that the fee constitutes an unlawful tax, because it is not used to support the costs of licensing.  See Pl. Mem., at 8, 15-19.  However, the undisputed facts reflect that the costs for processing Premises Residence pistol license applications exceeds the $340 Premises Residence license fee set forth in Admin. Code § 10-131(a)(2).   The legislative history of the $340 fee codified at Admin. Code § 10-131(a)(2) reflects that the fee was passed by the City Council to cover the actual costs of processing, investigating, and issuing the handgun licenses.  See Committee of Finance Report, at 2700 (Goldberg-Cahn Dec., Ex. "K").  In addition, the User Cost Analysis performed in 2003 (prior to the 2004 local law amendment) reflects that the average cost to the City for each pistol license application was $343.49.  See Lunetta Dec., Ex. "D," at 3 (fourth page).  Moreover, the User Cost Analysis for 2010 reflects that the cost to the City for each Premises Residence pistol application was $977.16; and for renewals was $346.92.  See Lunetta Dec., ¶ 38, Exs. "F," "G." Thus, plaintiffs' contention that the $340 fee is "impermissible because it does not actually serve to defray the costs of issuing handgun licenses" is plainly wrong.  Pl. Mem. at 18.  As supported by the legislative record for over 60 years, the focus has always been on ensuring that the licensing fee is at or below administrative cost.  See City's 56.1, ¶¶ 30-54.

---

[16] Interestingly, paragraph (6) of subdivision (a) of § 10-131 is part of the very same subdivision that sets forth the fee challenged by plaintiffs in this action.  See Admin. Code § 10-131(a)(2).

The facts show that the fee charged by the License Division to process applications for the issuance and renewals of premises residence handgun licenses is utilized to defray the regulatory costs incurred by the License Division.  Plaintiffs do not dispute the User Cost Analyses conclusions – and, indeed, plaintiffs cannot, as plaintiffs have failed to put forward any facts on this issue.  Nevertheless, the accounting methodology employed by NYPD, with the oversight of OMB, is consistent with other cases upholding license and permit fees — even in the context of constitutional challenges.  In National Awareness, for example, the Court determined it was appropriate for the fee calculation to include the salaries and fringe benefits of the personnel responsible for enforcing the statutes at issue, including supervisors, as well as related building expenses.  Id. at 1163-67.  See also Turley, 988 F. Supp. at 673 ("[T]he City may consider fixed costs, including the salary and fringe benefits of those who administer and enforce the regulatory scheme."); Mobile Sign, Inc., 670 F. Supp. at 78 (upholding permit fee where fee calculations included cost of supervisor's time, secretarial time, and office expenses).  Plaintiffs' citation to Chesapeake B & M, Inc. v. Hartford County, 58 F.3d 1005, 1013 (4th Cir. 1995) for the proposition that "outrageously high licensing fees" do not further a substantial governmental interest is misguided and not applicable to the license fee challenged herein.  Pl. Mem. at 17.  Because the license fee here is directly connected to the cost of the licensing activity, reliance on this Fourth Circuit decision is misplaced.  The Sixth Circuit recently rejected a First Amendment challenge to a $3,000 licensing fee in 729, Inc. v. Kenton County Fiscal Court, 402 Fed. Appx. 131 (6th Cir. 2010), by examining the costs involved in the processing of the license, including hourly wages of police officers and other staff, as well as equipment and supplies, and dividing those costs among the number of applications processed.  402 Fed. Appx. at 134-35.  The Sixth Circuit in 729, Inc., did not find that a license fee as high as $3,000 was

prohibitive or excessive, since it was justified by the cost of licensing the First Amendment protected activity.  Id.  Accordingly, the size of a licensing fee does not render it impermissible where it does not exceed the administrative cost.

Plaintiffs ignore the 2004 City Council Committee Report and instead rely on the absence of a reference to the administrative cost as the purpose of the legislation in the "FIS History" entry on the Fiscal Impact Statement ("FIS") for the 2004 law.  (Pl. Mem., at 8; Pl. Ex. 22).  Plaintiffs' reliance on the FIS is misplaced.  The FIS is simply a statement of the impact of the proposed legislation on the City's fisc.  See Pl. Ex. 22.  Section 33(b) of the New York City Charter requires the preparation of an FIS for all laws voted on by the City Council, and mandates that the FIS contain an estimate of the fiscal impact of the law and expenditures of the City.  The "FIS History" on the FIS cited by plaintiffs simply sets forth the history of the financial impact on the City (in this case, that there had been no increase in the fees for handgun licenses since 1992) — and does not purport to serve as the legislative purpose or intent.  See Pl. Ex. 22.

### POINT II

### THE LICENSE FEE AT ISSUE HERE DOES NOT INFRINGE ON PLAINTIFFS' SECOND AMENDMENT RIGHTS

**A.**   **This Court Need Not Engage in a Constitutional Scrutiny Analysis to Uphold the Validity of the Fee Provision in Admin. Code § 10-131(a)(2) As Applied to Premises Residence Licenses**

Although plaintiffs devote an entire brief point setting forth the scope of the Second Amendment right to keep and bear arms in the home and noting there are constitutional levels of scrutiny to apply in Second Amendment challenges (Pl. Mem. at 11-14), plaintiffs do not advocate for any particular level of scrutiny applicable to their fee challenge herein, or even attempt to analyze the premises residence license fee statute pursuant to any level of

constitutional scrutiny.  All that plaintiffs say on this point is that "the Court must apply rules of scrutiny in order to resolve this case.  The questions presented trigger the application of well-established rules of scrutiny."  Pl. Mem. at 14.  Having advanced no argument of their own, plaintiffs simply ask this Court to declare the premises residence license fee unconstitutional pursuant to the Second Amendment with nothing more.[17]   However, as set forth above, the question with respect to license fees is whether the fee exceeds the cost and is thus an impermissible tax, not whether the license fee for the possession of a premises residence license violates the Second Amendment.  Nothing in <u>Heller</u> or <u>McDonald</u> recognizes a right to have a license to possess a firearm in one's home free from all regulation.  As set forth in Point I(A), <u>supra</u>, even the <u>Heller</u> plaintiff conceded that he could only obtain a gun license if he was not "disqualified" from doing so.  554 U.S. at 635.  In fact, plaintiffs herein are not challenging the constitutionality of New York City regulations pertaining to the issuance of firearm licenses, nor are they challenging the constitutionality of Penal Law Article 400.  Thus, it is not necessary to engage in a further constitutional scrutiny analysis.  Rather, the well-settled rule that fees are permissible if they do not exceed the costs attendant thereto applies here.[18]  As City defendants

---

[17] Plaintiffs do, however, argue for a level of scrutiny in the context of their claim that Penal Law § 400.00(14) violates plaintiffs' right to equal protection under the U.S. Constitution.  <u>See</u> Pl. Mem. at 21-25.

[18] The New York State Supreme Court recently upheld the $340 fee required to apply for a carry pistol permit. <u>See</u> <u>Lederman v. NYPD License Division</u>, 2011 NY Slip Op 30765U; 2011 N.Y. Misc. LEXIS 1343 (Sup. Ct., N.Y. County, Mar. 31, 2011).  Rejecting the petitioner's Second Amendment challenge to the license fee, the Court found:

Continued...

have demonstrated in Point I, <u>supra</u>, the cost of a Premises Residence license exceeds the $340 fee.  <u>See</u> Lunetta Dec., ¶¶ 19, 35-43; Exs. "D," "F," "G;" Goldberg-Cahn Dec. Ex. "K;" Shiwnarain Dec., Ex. "A."   Accordingly, plaintiffs' Second Amendment claim fails and summary judgment should be granted to City defendants.

**B.     If a Scrutiny Analysis is Required, Intermediate Scrutiny is Applicable to the Fee Challenge**

In the event that this Court finds it necessary to engage in a scrutiny analysis of plaintiffs' challenge to the $340 fee for a Premises Residence license, City defendants urge this Court to review Admin. Code § 10-131(a)(2) utilizing the well-established constitutional standard of intermediate scrutiny.  First, although most of the First Amendment cases do not engage in scrutiny analysis and simply analyze whether the fees exceed the costs, intermediate scrutiny appears to be the standard applied to the cases.  For example, in <u>Forsyth County v. Nationalist Movement</u>, 505 U.S. 123, 130-31 (1992), the Supreme Court, citing <u>Cox v. New Hampshire</u>, 312 U.S. at 569, specifically applied intermediate scrutiny to the permit fees (and permit regulations) imposed prior to authorizing public speaking, parades, or assemblies in a public forum.  While engaging in intermediate scrutiny analysis, the Supreme Court found that the permit fee regulation was sufficient and narrowly tailored depending on the amount of discretion vested in the administrator.  <u>Forsyth County</u>, 505 U.S. at 130-133.  The Court found

---

By statute, NYPD is allowed to charge an application fee for processing an application for a gun carrying license. As explained by respondent and evident from the Penal Law, such fees defray the cost of the investigation necessary. Lederman presents no legal authority for why he should obtain a refund of these fees. The mere fact that they are costly (upwards of $340) does not make them unfair nor is it unfair to make them non-refundable if the applicant is denied the license applied for.  (<u>Lederman</u>, 2011 N.Y. Misc. LEXIS 1343, at **9-11 (Mar. 31, 2011)).

that if the permit fee and permitting scheme "does not prescribe adequate standards for the administrator to apply when he sets a permit fee …," such "discretion has the potential for becoming a means of suppressing" the right. Id. at 130-131 (citing Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 649 (1981)).  Here, the License Division has no discretion in setting the fee – as detailed above, the fee is set by the City Council through legislation.  Other cases that have upheld permit fees in the First Amendment context similarly adopt an intermediate scrutiny level of analysis.  See, e.g., Coe v. Town of Blooming Grove, 567 F. Supp.2d 543, 562 (S.D.N.Y. 2008)(applying intermediate scrutiny and invalidating insurance requirement due to municipal discretion to set the amount).[19]

Second, a majority of courts to address general challenges under the Second Amendment have concluded that intermediate scrutiny is the appropriate level of review – even when reviewing statutes or laws that may restrict the possession of handguns in the home.  See, e.g., United States v. Reese, 627 F.3d 792, 800 (10th Cir. 2010), cert. denied, 179 L. Ed. 2d 1214; 2011 U.S. LEXIS 3768 (May 16, 2011) (applying intermediate scrutiny to statute prohibiting gun possession – even in the home – for those who have an outstanding order of protection [as opposed to a criminal conviction]); United States v. Skoien, 614 F.3d 638 (7th Cir. 2010)(en banc)(applying intermediate scrutiny to law prohibiting the possession of firearms by

---

[19] But see Eastern Conn. Citizens, 723 F.2d at 1056-57.  Notably, Eastern Connecticut Citizens was decided before the Supreme Court held that intermediate scrutiny, not strict scrutiny, is the proper level of review for content-neutral time, place, and manner restrictions on speech.  See Ward v. Rock Against Racism, 491 U.S. 781, 797-99 (1989); Coe v. Town of Blooming Grove, 567 F. Supp. 2d 543, 565 (S.D.N.Y. 2008).  Thus, the Second Circuit's use of strict scrutiny to review whether an insurance requirement infringed upon free speech is no longer appropriate.

any person convicted of misdemeanor domestic violence crime); United States v. Chester, 628 F.3d 673, 677 (4th Cir. 2010), cert. denied, 2011 LEXIS 2138 (Mar. 21, 2011)(applying intermediate scrutiny); United States v. Marzzarella, 614 F.3d 85, 97 (3d Cir. 2010)(applying intermediate scrutiny to law limiting possession of firearms with obliterated serial number because the law did not "severely limit the possession of firearms"); Osterweil v. Bartlett, 2011 U.S. Dist. LEXIS 54196, **31-32 (N.D.N.Y. May 20, 2011)(adopting intermediate scrutiny to N.Y. state's residency requirement for license to possess firearm); United States v. Oppedisano, 2010 U.S. Dist. LEXIS 127094 (E.D.N.Y. Nov. 30, 2010)(using intermediate scrutiny to challenge of federal statute prohibiting persons convicted of certain crimes from possessing firearms).  As the District Court in Osterweil recently noted: "Intermediate scrutiny application which asks whether the law is 'substantially related to an important government objective,' Clark, 486 U.S. at 461, provides the appropriate analysis when a law limits 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home,' Heller v. District of Columbia, 698 F. Supp.2d 179, 188 (D.D.C. 2010)(quoting Heller, 128 S. Ct. at 2821)." Osterweil, 2011 U.S. Dist. LEXIS 54196, at *30.[20]  Accordingly, intermediate level scrutiny is appropriate in analyzing Second Amendment challenges – even those that touch upon the claimed "core" Second Amendment right to self defense in the home.  License fees – even for

---

[20] One commentator recently observed that while there has been "disarray in the lower courts" regarding scrutiny levels, "[a]t the appellate level, there has been something of a trend toward a form of intermediate scrutiny requiring that the challenged regulation be substantially related to an important governmental objective." L. Rosenthal & J. Malcolm, Colloquy Debate: McDonald v. Chicago: Which Standard of Scrutiny Should Apply to Gun Control Laws?, 105 N.W. U.L. Rev. 437, 439, n.13 (2011)(citing Reese, Skoien, Chester, and Mazzarella).

Premises Residence licenses – do not touch on the "core" of the protected right as they are simply a part of the regulatory process that is necessary for adequate investigation to ensure that dangerous weapons are not licensed to those who pose a danger to the public. Thus, intermediate scrutiny is the applicable standard of review for the constitutional challenge to the license fee provision presented herein.

## C.      The License Fee Passes Intermediate Scrutiny

Utilizing the principles employed in intermediate scrutiny analysis, it is clear that the permit fee at issue herein serves an important or substantial government interest in public safety attendant to regulating handgun possession. Intermediate scrutiny essentially requires that the government interest be important and that the fit between the regulation and the government's interest be reasonable. "To withstand intermediate scrutiny, a statutory classification must be substantially related to an important governmental objective." Clark v. Jeter, 108 S.Ct. 1910, 1914 (1988). As noted by the Third Circuit in Marzzarella:

> Although these standards differ in precise terminology, they essentially share the same substantive requirements. They all require the asserted governmental end to be more than just legitimate, either "significant," "substantial," or "important." See, e.g., Turner Broad. Sys., 512 U.S. at 662, 114 S. Ct. 2445; Ward, 491 U.S. at 791, 109 S. Ct. 2746. They generally require the fit between the challenged regulation and the asserted objective be reasonable, not perfect. See, e.g., Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 556, 121 S. Ct. 2404, 150 L. Ed. 2d 532 (2001); Fox, 492 U.S. at 480, 109 S. Ct. 3028, 106 L. Ed. 2d 388. The regulation need not be the least restrictive means of serving the interest, see, e.g., Turner Broad. Sys., 512 U.S. at 662, 114 S. Ct. 2445; Ward, 491 U.S. at 798, 109 S. Ct. 2746, but may not burden more speech than is reasonably necessary, see, e.g., Turner Broad. Sys., 512 U.S. at 662, 114 S. Ct. 2445; Ward , 491 U.S. at 800, 109 S. Ct. 2746.

614 F.3d at 97-98; see also Osterweil, 2011 U.S. Dist. LEXIS 54196, at *27 (quoting Marzzarella). Courts have consistently found that "there is no question that the government has a

substantial interest in preventing gun violence, including gun violence in the home." <u>United States v. Elkins</u>, 2011 U.S. Dist. LEXIS 47105, * 13 (W.D. Va. May 2, 2011); <u>see also</u> <u>Reese</u>, 627 F.3d at 803-04 (applying intermediate scrutiny, the court found that the government had a substantial interest in keeping firearms out of the hands of people who have been found to pose a credible threat to the physical safety of a family member).  The City's interest here in keeping deadly weapons out of the hands of dangerous people is vital.  <u>See, e.g.</u>, M. Wright & G. Wintemute, <u>Felonious or Violent Criminal Activity that Prevents Gun Ownership Among Prior Purchasers of Handguns: Incidence and Risk Factors,</u> J. of Trauma, Injury, Infection, and Critical Care, (2010)(concluding convicted misdemeanants and those with arrests but no convictions have higher rates of committing violent crimes than those with no arrest history)(Goldberg-Cahn Dec., Ex. "R"); D. Webster, J. Vernick, & L. Hepburn, <u>Relationship Between Licensing, Registration, and Other Gun Sales and the Source State of Crime Guns</u>, Injury Prevention, at 184-89 (2001)(Goldberg-Cahn Dec., Ex. "S")(finding states that conduct background investigations of gun license applicants had lower proportions of crime coming from guns purchased in state).  Because the statutory fee is less than the costs of the critical handgun application investigatory process, the fee is sufficiently tailored to defray part of the costs of ensuring that firearms do not end up in the hands of dangerous persons.[21]  Thus, the fee for a Premises Residence license passes constitutional muster.

---

[21] Again, it is important to distinguish the right in the First Amendment from that set forth in the Second Amendment.  It is undisputed that guns are inherently dangerous, whereas, speech – in and of itself – is not.  The public safety interests implicated by the Second Amendment differ markedly from the First Amendment.  <u>See</u> <u>United States v. Masciandaro</u>, 638 F.3d 458, 471 (4th Cir. 2011), <u>Skoien</u>, 614 F.3d at 642.

**D.      The Fee Statute Also Survives the "Substantial Burden" Test**

Some recent cases have employed a "substantial burden" standard of review.  In

Nordyke v. King, 2011 U.S. App. LEXIS 8906 (9th Cir. May 2, 2011), the Ninth Circuit recently

applied "a substantial burden framework" in upholding a county ordinance prohibiting the

possession of firearms on county property, and noted, as follows:

> Applying strict scrutiny to every gun regulation would require
> courts to assess the effectiveness of a myriad of gun-control laws.
> Whenever a law is challenged under the Second Amendment, the
> government is likely to claim that the law serves its interest in
> reducing crime. . . . Because the Supreme Court has already held
> that "the Government's general interest in preventing crime" is
> "compelling," United States v. Salerno, 481 U.S. 739, 754, 107 S.
> Ct. 2095, 95 L. Ed. 2d 697 (1987), the question, under strict
> scrutiny, would be whether the regulation is narrowly tailored to
> that interest.....
>
> By contrast, the substantial burden test, though hardly mechanical,
> will not produce nearly as many difficult empirical questions as
> strict scrutiny. See Volokh, supra, at 1959-60 (arguing that it is
> easier to determine whether a law substantially burdens the right to
> bear arms than to figure out whether a law "will reduce the danger
> of gun crime"). Indeed, courts make similar determinations in
> other constitutional contexts. See, e.g., Planned Parenthood of Se.
> Pa. v. Casey, 505 U.S. 833, 112 S. Ct. 2791, 120 L. Ed. 2d 674
> (1992) (holding that pre-viability abortion regulations are
> unconstitutional if they impose an "undue burden" on a women's
> right to terminate her pregnancy); Clark v. Cmty. for Creative
> Non-Violence, 468 U.S. 288, 293, 104 S. Ct. 3065, 82 L. Ed. 2d
> 221 (1984)(stating that content-neutral speech regulations are
> unconstitutional if they do not "leave open ample alternative
> channels for communication").

2011 U.S. App. LEXIS 8906, at *5.  With these considerations in mind, the Ninth Circuit held

that "only regulations which substantially burden the right to keep and to bear arms trigger

heightened scrutiny under the Second Amendment." Id. at *7.  While City defendants maintain

that intermediate scrutiny is applicable here, the "substantial burden" test provides for an

alternative framework to review the constitutionality of the fee provision challenged herein.

Whether the Court labels it "intermediate scrutiny," "reasonableness,"[22] "undue burden," or otherwise, it cannot be disputed that a license fee that does not exceed the cost of licensing is "reasonable," and is sufficiently "tailored" to serve significant or important governmental interests. Clearly, a license fee that is less than the cost of the licensing itself is reasonable and appropriately tailored to meet the important governmental objective of safety in investigating applicants seeking authorization to possess a firearm. As was made clear by the Supreme Court in <u>McDonald</u>, certain limitations on firearms are "presumptively lawful" (130 S. Ct. at 3047), necessitating a local licensing scheme. In order for the City to conduct its investigation to protect the public safety, there are attendant costs. Plaintiffs offer no authority to support the notion that the remainder of the taxpayers must bear the costs and burden for the exercise of plaintiffs' Second Amendment rights. Indeed, a license fee is not a severe or substantial burden at all. In <u>Planned Parenthood v. Casey</u>, the Supreme Court upheld as constitutional regulations that had the "effect of increasing the cost or decreasing the availability of abortions," despite that the right to obtain an abortion is a fundamental right. <u>See Casey</u>, 505 U.S. 833, 874, 893-94 (1992); <u>Gonzales v. Carhart</u>, 550 U.S. 124, 146 (2007); <u>see also</u> <u>Nordyke</u>, at *21. Thus, as long as such regulations do not impose a "substantial" or "undue burden" on the fundamental right, regulations that make it more expensive to exercise a fundamental right, have been upheld. <u>Id.</u>

---

[22] <u>See, e.g.</u>, <u>Board of Trustees of State University of New York v. Fox</u>, 492 U.S. 469, 480 (1989); <u>Parker v. District of Columbia</u>, 478 F.3d 370, 399 (D.C. Cir. 2007), <u>aff'd</u>, <u>Heller</u>, 554 U.S. 570; <u>Nordyke</u>, at **47-49 (Gould, J., concurring)(applying "reasonable review" test to incidental burdens on the Second Amendment).

In any event, as all of the named plaintiffs allege that they have paid the $340 licensing fee and that they will each "need to pay the $340 fee in order to renew [their] license in the future," none of the plaintiffs have established that Admin. Code § 10-131(a)(2) in any way poses a substantial or undue burden on their right to possess firearms in the home for the purpose of self-defense. See Pls' 56.1 Statement, at ¶¶ 9-15. None of the plaintiffs have stated that they have not been able to pay the fee, nor have they alleged that they will not be able to pay the fee. Moreover, neither SAF nor NYSRPA have put forward any evidence to support a claim that members of either organization have not been able to pay the licensing fee to the License Division for the possession of a Premises Residence handgun license in the City of New York, despite saying so in the Complaint. Compare Pls' 56. 1 Statement, Exs. 8 and 9 with Complaint, ¶¶ 48, 53. Because plaintiffs commenced this case as an "as-applied" challenge to the license fee statute (see Complaint, ¶ 74; "Wherefore Clause"), plaintiffs fail to establish that the fee statute, as applied to them, constitutes an unconstitutional burden.[23]

**E.   Admin. Code § 10-131(a)(2) Survives Strict Scrutiny Analysis**

Finally, while City defendants do not concede that strict scrutiny is applicable to the Second Amendment challenge raised here, Admin. Code § 10-131(a)(2) passes constitutional

---

[23] Although irrelevant to any analysis of the propriety of the license fee, plaintiffs assert – again, with no support – that "many well-made handguns" cost approximately $300. See Pl. Mem. at 17; but see http://www.thegunsource.com/items-5886-1-.aspx (selling firearms in prices ranging from $100 to $2,972.99)(last visited July 19, 2011). While plaintiffs purport to claim that the alleged $300 cost for a firearm constitutes "the cost of engaging in the activity at issue," (Pl. Mem. at 17) plaintiffs fail to account for other associated costs, such as ammunition, target practice fees, lock-safe devices, handgun parts, holsters, etc.

muster even under strict scrutiny.[24]   At the outset, strict scrutiny should not apply here because the license fee statute does not impinge on the "core" of the Second Amendment as it does not establish or purport to establish a prohibition or ban on the exercise of plaintiffs' Second Amendment right to possess a handgun in the home for self-defense.  Compare Heller (ban on guns in the home, weapons must be completely disassembled); with Ezell v. City of Chicago, 2011 U.S. App. LEXIS 14108 (7th Cir. July 6, 2011)(applying more rigorous scrutiny "if not quite 'strict scrutiny'" to Chicago's absolute prohibition on firing ranges in the context of law requiring training at a firing range to qualify for a premises gun license).  In this case, the license fee requirement does not amount to a ban or prohibition on the right to have a firearm in the home.  The license fee for Premises Residence licenses is simply a law that "merely regulate[s] rather than restrict[s]" the right to possess a firearm in the home and is a minimal, or at most, modest burden on the right.  Ezell, 2011 U.S. App. LEXIS 14108, at *60.[25]  Moreover, Premises

---

[24] In arguing for strict scrutiny – albeit in the context of their equal protection claim – plaintiffs urge that the "apparent legislative purpose" to deter handgun ownership with high license fees "compels the application of strict scrutiny."  Pl. Mem. at 21.  However, the legislative history of Penal Law § 400.00(14) belies this assertion, as it is clear that the legislation was passed for the purpose of establishing a license fee commensurate with the City's cost.  See Goldberg-Cahn Dec., Exhibit "A," at 2-3.   The statement about deterring gun ownership was made by one member of the legislature in 1938, and even he relied primarily upon recoupment of administrative expenses as the rationale for the legislation.  Additionally, the legislative history of the nine local laws passed in the subsequent 60 years supports that the fees were set based on calculations of administrative cost.

[25] In Ezell, the Seventh Circuit recently applied what appears to be something between intermediate and strict scrutiny in issuing a preliminary injunction against a Chicago ordinance that banned firing ranges within City limits (while requiring training at a firing range to obtain a Continued…

Residence licensees are authorized to possess an assembled firearm in their home and to transport the weapon to a firing range to engage in target practice in a controlled environment. See 38 RCNY §§ 5-01(a); 5-22(a)(14). Even under the more exacting test of strict scrutiny, because the $340 triennial permit fee is less than the cost of licensing, it meets the least restrictive means test.

**POINT III**

**PENAL LAW § 400.00(14) DOES NOT VIOLATE PLAINTIFFS' EQUAL PROTECTION RIGHTS**

Plaintiffs' equal protection argument fails as a matter of law. Because plaintiffs are not members of any suspect class, and the Penal Law does not "substantially" or "severely" burden plaintiffs' fundamental right, heightened review of plaintiffs' equal protection claim is not applicable, and rational basis review applies. See Nordyke, 2011 U.S. App. LEXIS, at **45-46 (citing Romer v. Evans, 517 U.S. 620 (1996)). In Nordlinger v. Hahn, 505 U.S. 1, 13-14 (1992) the Court found that different fees for different districts (based on nothing but historical happenstance) does not violate Equal Protection — protecting reliance interests is itself a rational legislative purpose. Thus, as long as the higher fee serves the rational purpose of defraying costs, charging a lower fee in other areas does not violate equal protection.

---

license). The Court cited no precedent for its use of this novel "strong public interest justification" test, and it is unclear why intermediate scrutiny would not have provided a sufficient analytical framework. 2011 U.S. App. LEXIS, at **71-79 (Rovner, J., concurring). Ezell is clearly distinguishable from this case because there, the ordinance was impossible to satisfy within City limits; whereas here, there is no allegation that applicants (or even plaintiffs) cannot pay the fee — only a claim that it is too onerous.

In a variety of contexts, state law acknowledges that New York City, as a uniquely dense urban area, merits special treatment. See, e.g. N.Y. Alco. Bev. Cont. Law § 83 (Consol. 2011)(providing that the annual fee for a license to sell wine at retail shall be $640.00 in New York City, and $145.00 in localities having a population under one hundred thousand); N.Y. Educ. Law § 305 (Consol. 2011)(permitting schools in New York City to extend pupil transportation contracts by an amount based on the costs of: conducting criminal background checks and training sessions for school bus attendants; installing air pollution filters and global positioning systems on buses; and providing necessary administrative services); N.Y. County Law § 308(a) (Consol. 2011)(allowing New York City to impose a thirty cent surcharge on wireless communication services to finance public safety communications networks); N.Y. Agric. & Mkts. Law § 96(b) (Consol. 2011)(disallowing the licensure of slaughterhouses within fifteen hundred feet of a residential dwelling in New York City due to public health and safety concerns); N.Y. Gen. Mun. Law § 122 (Consol. 2011)(criminalizing denial of transportation to a hospital when a person calls an ambulance service, except in New York City, where a properly informed physician may determine that hospital care is not needed); N.Y. Tax Law § 1212(A) (Consol. 2011)(authorizing New York City to impose an eight percent tax on parking services in order to diminish vehicular traffic, thereby protecting public health and safety).

For the remainder of this point, City defendants adopt the arguments set forth in Point II of State-Intervenor's Memorandum of Law in Support of their Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment.

## CONCLUSION

For the reasons set forth above, the Court should grant City defendants' cross-motion for summary judgment in its entirety, and deny plaintiffs' motion for summary judgment, together with such other and further relief as this Court deems just and proper.

Dated:      New York, New York
            July 28, 2011

                              MICHAEL A. CARDOZO
                              Corporation Counsel of the City of New York
                              Attorney for City Defendants
                              100 Church Street, Rm. 5-171
                              New York, New York 10007
                              Email:  migoldbe@law.nyc.gov
                              (212) 788-0758

                   By:        _____
                              Michelle Goldberg-Cahn
                              Assistant Corporation Counsel

GABRIEL TAUSSIG,
MICHELLE GOLDBERG-CAHN,
            Of Counsel.