UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHUI W. KWONG; GEORGE GRECO; GLENN HERMAN; NICK LIDAKIS; TIMOTHY S. FUREY; DANIELA GRECO; NUNZIO CALCE; SECOND AMENDMENT FOUNDATION, INC.; and THE NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC., | No. 11 Civ. 2356 (JGK) (DCF)  ECF Case |

                                        Plaintiffs,

                -against-

MICHAEL BLOOMBERG, in his Official
Capacity as Mayor of the City of New York; and
CITY OF NEW YORK,

                                        Defendants,

                -and-

ATTORNEY GENERAL OF THE STATE OF
NEW YORK,

                                        Intervenor.

**PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT
AND OPPOSITION TO THE CITY AND STATE'S CROSS-MOTIONS**

David D. Jensen
*david@djensenpllc.com*

**DAVID JENSEN PLLC**
61 Broadway, Suite 1900
New York, New York  10006
Tel:  212.380.6615
Fax:  917.591.1318

TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................. 1

RELEVANT UNDISPUTED FACTS ................................................................................... 3

POINT I:  PLAINTIFFS' CLAIMS ARE PROPERLY BEFORE THE COURT ........................ 6

    A)    The Claim is Justiciable ..................................................................... 6

    B)    While the Court Need Not Address the Issue, SAF and NYSRPA
        Plainly Have Standing ..................................................................... 8

    C)    There is No Exhaustion Requirement ............................................. 10

POINT II:  REVIEW STANDARDS DEPEND UPON THE NATURE OF THE
RESTRICTION AT ISSUE .......................................................................................... 10

    A)    It is More Clear than Ever that First Amendment Jurisprudence Provides
        the Analytic Framework ................................................................. 10

    B)    Burden Analysis Does Not Apply to *All* Laws that Pertain to
        Constitutionally Protected Conduct ............................................... 12

    C)    The Level of Means-End Scrutiny Depends on the Nature,
        Character, and Purpose of the Burden ........................................... 12

    D)    *Nordyke*'s "Substantial Burden" Test ............................................. 15

POINT III:  THE RECURRING $340 FEE IS PROHIBITIVE ...................................... 16

    A)    The Cities' Cases Do *Not* Establish that "Attendant Cost" is the
        Only Limiting Factor ..................................................................... 16

    B)    Fees on the Basic Ability to Exercise a Fundamental Right Must
        be "Nominal" – *i.e.* Not Prohibitive ............................................. 21

    C)    The City's Proffered Evidence Does Not Establish the Absence of
        Issues of Fact ................................................................................. 22

POINT IV:  THE EQUAL PROTECTION CLAUSE INVALIDATES THE DIFFERENTIAL BURDEN
IMPOSED ON NEW YORK CITY RESIDENTS ............................................................... 23

    A)    A Strict Standard of Judicial Scrutiny Applies To the Disparate
        Fee Protection ................................................................................. 24

    B)    Section 400.00(14)'s Disparate Burden Fails Equal Protection Review ............. 29

    C)    Geographic Considerations Do Not Justify Substantial Disparate
        Burdens on Fundamental Rights ..................................................... 31

CONCLUSION .......................................................................................................... 35

**TABLE OF AUTHORITIES**

**CASES**

Affronti v. Crosson, 95 N.Y.2d 713, 723 N.Y.S.2d 757 (2001) ............................................. 28, 32

Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252 (1977) ............................................ 8

Bach v. Pataki, 289 F. Supp. 2d 217 (N.D.N.Y. 2003), aff'd 408 F.3d 75 (2d Cir. 2005) ...... 14-15

Barefoot v. Wilmington, 306 F.3d 113, 122 (4th Cir. 2002) ............................................ 32

Board of Airport Commissioners v. Jews for Jesus, Inc., 482 U.S. 569 (1987) .......................... 12

Cantwell v. Connecticut, 310 U.S. 296 (1940) ............................................ 12

CFCU Cmty. Credit Union v. Hayward, 552 F.3d 253 (2d Cir. 2009) ............................................ 4

Citizens United v. FEC, 130 S. Ct. 876 (2010) ............................................ 9

Cmty. Hous. Mgmt. Corp. v. New Rochelle, 381 F. Supp. 2d 313 (S.D.N.Y. 2005) .................. 21

Cox v. New Hampshire, 312 U.S. 569 (1941) ............................................ 16-18

District of Columbia v. Heller, 554 U.S. 570 (2008) ............................................ 11-12, 15

Doe v. Reed, 130 S. Ct. 2811 (2010) ............................................ 9

Eastern Connecticut Citizens Action Group v. Powers, 723 F.2d 1050 (2d Cir. 1983) ............... 20

Ezell v. Chicago, no. 10-3525, 2011 U.S. App. LEXIS 14108 (7th Cir. Jul. 6, 2011) .......... passim

Florida East Coast Railway v. Martinez, 761 F. Supp. 782 (M.D. Fla. 1991) ............................ 7

Florida v. United States Dep't of Health & Human Services, 716 F. Supp. 2d 1120
    (N.D. Fla. 2010) ............................................ 6

Forsyth County v. Nationalist Movement, 505 U.S. 123 (1992) ...................................... 10, 21-22

Gasparo v. City of New York, 16 F. Supp. 2d 198 (E.D.N.Y. 1998) ............................................ 21

Gen. Motors Corp. v. Turley, 519 U.S. 278 (1997) ............................................ 6

Harris v. Bush, 106 F. Supp. 2d 1272 (N.D. Fla. 2000) ............................................ 7

Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982) ............................................ 9

Heller v. District of Columbia, 698 F. Supp. 2d 179 (D.D.C. 2010) ("Heller II") ........... 15, 26, 29

Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333 (1977) ............................................ 9

Ill. State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173 (1979) ............... 29, 31, 34-35

Jackson v. Ogilvie, 403 U.S. 925 (1971) ............................................ 35

Kail v. Rockefeller, 275 F. Supp. 937 (E.D.N.Y. 1967) ............................................ 32

L.A. County Bar Ass'n v. Eu, 979 F.2d 697 (9th Cir. 1992) ............................................ 32

Lakewood v. Plain Dealer Pub'g Co., 486 U.S. 750 (1988) ............................................ 12

Mastrovincenzo v. City of New York, 435 F.3d 78 (2d Cir. 2006) ............................................ 20

McDonald v. Chicago, 130 S. Ct. 3020 (2010) ....................................................... 12, 15

McGowan v. Maryland, 366 U.S. 420 (1961) .............................................................. 32

Missouri v. Lewis, 101 U.S. 22 (1879)........................................................................ 33

Mobile Sign, Inc. v. Brookhaven, 670 F. Supp. 68 (E.D.N.Y. 1987)........................... 20

Murdock v. Pennsylvania, 319 U.S. 105 (1943)..................................................... passim

Nat'l Awareness Found. v. Abrams, 812 F. Supp. 431 (S.D.N.Y. 1993),
    aff'd 50 F.3d 1159 (2d Cir. 1995)....................................................................... 18

National Awareness Found. v. Abrams, 50 F.3d 1159 (2d Cir. 1995) ................... 17, 19

Nordlinger v. Hahn, 505 U.S. 1 (1992)................................................................. 28, 32

Nordyke v. King, 644 F.3d 776, __ 2011 U.S. App. LEXIS 8906 (9th Cir. 2011) .............. passim

Ocampo v. United States, 234 U.S. 91 (1914)............................................................. 33

Osterweil v. Bartlett, no. 1:09-cv-825, 2011 U.S. Dist. LEXIS 54196
    (N.D.N.Y. May 20, 2011) ........................................................ 10, 26, 29, 34

Patsy v. Bd. of Regents, 457 U.S. 496 (1983) ............................................................. 10

People v. Hughes, 83 A.D.3d 960, 921 N.Y.S.2d 300 (2d Dep't 2011)........................ 28

People v. Kuri, 132 Misc. 2d 1036, 506 N.Y.S.2d 245 (Bronx County Crim. Ct. 1986)............. 15

People v. Perkins, 62 A.D.3d 1160, 880 N.Y.S.2d 209 (3d Dep't 2009) ..................... 28

People v. Richter, 206 Misc. 304, 133 N.Y.S.2d 685 (N.Y. County Ct. 1954)........... 33

Peruta v. County of San Diego, 758 F. Supp. 2d 1106 (S.D. Cal. 2010)......... 26, 29, 34

Peterson v. Lacabe, no. 10-cv-00059, 2011 U.S. Dist. LEXIS 23070
    (D. Colo. Mar. 8, 2011)........................................................................... 34

Ragin v. Harry Macklowe Real Estate Co., 6 F.3d 898 (2d Cir. 1993) ........................ 9

Ruston v. Town Bd., 610 F.3d 55 (2d Cir. 2010) ....................................................... 32

Salem Inn, Inc. v. Frank, 381 F. Supp. 859 (E.D.N.Y. 1974)...................................... 34

Salsburg v. Maryland, 346 U.S. 545 (1954) ............................................................... 33

San Diego Gun Rights Committee v. Reno, 98 F.3d 1121 (9th Cir. 1996) .................... 7

Sanger v. Reno, 966 F. Supp. 151 (E.D.N.Y. 1997)..................................................... 7

Somers v. Camarco, 308 N.Y. 537 (1955)................................................................. 32

Tolub v. Evans, 58 N.Y.2d 1, 457 N.Y.S.2d 751 (1982).............................................. 32

Turley v. New York City Police Department, 988 F. Supp. 667 (S.D.N.Y. 1997),
    aff'd in part and rev'd in part on other grounds, 167 F.3d 757 (2d Cir. 1999)......... 20

United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,
    517 U.S. 544 (1996)................................................................................ 9

United States v. Chester, 628 F.3d 673 (4th Cir. 2010)....................................25-26, 29

United States v. Elkins, no. 2:10CR00017, 2011 U.S. Dist. LEXIS 47105
(W.D. Va. May 2, 2011) .................................................................... 25, 29

United States v. Marzzarella, 614 F.3d 85 (3d Cir. 2010) ..................................... *passim*

United States v. Masciandaro, 638 F.3d 458 (4th Cir. 2011) ...................... 14-15, 26, 29

United States v. Miller, 604 F. Supp. 2d 1162 (W.D. Tenn. 2009) ........................ 25, 29

United States v. Oppedisano, no. 09-CR-0305, 2010 U.S. Dist. LEXIS 127094
(E.D.N.Y. Nov. 30, 2010) ................................................................... 25, 29

United States v. Reese, 627 F.3d 792 (10th Cir. 2010); ........................... 14, 25, 27, 29

United States v. Skoien, 614 F.3d 638 (7th Cir. 2010) .......................................... 25, 29

United States v. Walker, 709 F. Supp. 2d 460 (E.D. Va. 2010) ........................ 25-26, 29

United States v. Williams, 514 U.S. 527 (1995) ......................................................... 6

Wal Juice Bar, Inc. v. Oak Grove, 211 Fed. Appx. 358 (6th Cir. Oct. 23, 2006) ........................ 10

Wiesner v. Rosenberger, no. 98 Civ. 1512, 1998 U.S. Dist. LEXIS 15666
(S.D.N.Y. Oct. 3, 1998) ......................................................................... 32

Wilson v. Cook County, 943 N.E.2d 768, 407 Ill. App. 3d 759 (Ill. Ct. App.),
review granted 949 N.E.2d 1104 (Ill. 2011) ..................................... 27, 29

Woollard v. Sheridan, no. 10-2068, 2010 U.S. Dist. LEXIS 137031
(D. Md. Dec. 29, 2010) ........................................................................... 8

## STATUTES

28 U.S.C. § 1341 ................................................................................................. 21

Haw. Rev. Stat. § 134-2 ...................................................................................... 3

Mich. Comp. Laws § 28.422 ................................................................................ 3

N.C. Gen. Stat. § 14-404 ...................................................................................... 3

N.Y.C. Admin. Code § 10-131 ............................................................................ 7

NYC Admin. Code § 10-131 ............................................................................ 6, 9

N.Y. Penal Law § 400.00 ............................................................................... *passim*

## OTHER AUTHORITIES

1984 N.Y. "Bill Jacket," S. 739-8673 (N.Y. 1984) ........................................... 5

Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense:
An Analytical Framework and a Research Agenda, 56 UCLA L. Rev. 1443 (2009) ........ 16, 21

<u>**INTRODUCTION AND SUMMARY OF ARGUMENT**</u>

The Second Amendment – not the City or State of New York – guarantees the right of American citizens to keep and bear arms.

The laws of New York restrict this right by requiring people to obtain licenses in order to keep handguns in their homes.  As previously explained, this restriction is rather unique in the American landscape.  Only one other State requires a license, and its fee is $10.  The City's fee of $340 substantially exceeds the analogous licensing fees of *all* other U.S. jurisdictions.

The essential defect in the City's argument in support of the $340 fee lies in its contention that the issue is whether or not the City (or State) can charge for "benefits" that they provide.  The City goes so far as to assert that "Plaintiffs offer no authority to support the notion that the remainder of the taxpayers must bear the costs and burden for the exercise of plaintiffs' Second Amendment rights."  City Br.[1] p. 30.  But this is not the issue at all, for Plaintiffs – and all Americans who are not disqualified – *already have* the right to keep and bear arms.  The City's regulations do not create this "benefit"; rather, the federal Constitution recognizes and affirmatively protects this *right* against infringement.

From this erroneous premise, the City then proceeds to rely upon cases that concern fees imposed on protected activities that are *commercial* or that involve the use of *public venues* and *public facilities*.  While these cases generally support the imposition of "cost"-based user fees *on those activities*, they do not support the proposition that "costs" can be shifted when the issue is the basic ability to exercise an enumerated constitutional right.  To put it simply, it is one thing to say that someone needs to pay to use the Central Park Bandshell, and it is another thing to say that someone needs to pay just to speak.

---

[1] City Defendants' Memorandum of Law (Doc. No. 22).

The City and State both devote much of their briefing – and for that matter, much of their Undisputed Fact Statements – to a policy-laden defense of the efficacy of the Sullivan Law and its implementation in New York City.  However, as both acknowledge that this lawsuit does not challenge *anything* except for the $340 license fee, the arguments are misplaced.  The general task of weighing the costs and benefits of a regulatory approach falls to the legislature.

Although it is manifest that the City cannot condition the basic ability to exercise a fundamental right on a recurring $340 payment, it is also clear that Penal Law § 400.00(14) cannot survive equal protection scrutiny.  This provision provides that one set of citizens will pay a license fee in the nominal range of $3 to $10, while another set will pay a license fee that is unbounded by statute, and can be as high as the City can justify in a cost study (presently, $977.16).  The lack of any protection against a greater-than-nominal fee is a severe burden for any New York City resident who seeks to exercise his or her right to keep and bear arms.  No legitimate interest – let alone a compelling one – is served by allowing the imposition of high license fees on New York City residents alone.

After reviewing the facts that are pertinent to the resolution of this case, Plaintiffs address the collateral objections thrown by the City and State – justiciability, standing, and exhaustion. These distractions are no bar.  Plaintiffs then move to the merits.  The standard of review is the beginning of this discussion, for the City and State confuse the issue by arguing (without authority) that First Amendment principles do not apply, and also that intermediate scrutiny should categorically apply to laws burdening the right to keep and bear arms.

<u>R</u>ELEVANT <u>U</u>NDISPUTED <u>F</u>ACTS

**1.  New York City's $340 Fee Substantially Exceeds the**
    **Fee of Any Other Jurisdiction in the United States**

The City's $340 license fee exceeds the fees of *all* other U.S. jurisdictions by multiples of 3 to 340.  <u>See</u> Plaintiffs Br.[2] pp. 9-10.  The State asserts that laws that regulate the *purchase* of handguns in Hawaii, Maryland, Michigan, New Jersey, and North Carolina are analogous.  <u>See</u> State Br.[3] pp. 17-18 n.4.  Even so, these jurisdictions impose fees of $0, $10, $1, $2, and $5. Plaintiffs Br. p. 10; Haw. Rev. Stat. § 134-2(i);[4] Mich. Comp. Laws § 28.422(6); N.C. Gen. Stat. § 14-404(e).  So, the $340 fee still substantially exceeds that of any other jurisdiction.

**2.  State Law Allows All Localities to Set Their Own Fees,**
    **but Bounds Most to a Nominal Amount of $3 to $10**

In 1938 the State amended the handgun license law to permit each locality to set its own fee within a permissible range (from $0.50 to $1.50).  The legislative history shows that this 1938 amendment sought to address concerns that the license fee did not adequately defray associated costs, at least in some parts of the State, by allowing individual localities to raise their fee as high as $1.50.  Plaintiffs Br. pp. 6-7.

In 1947, the legislature amended this provision to *eliminate* the requirement that the City – alone – set its fee within this permissible range, or any stated range.  Plaintiffs Br. pp. 7-8.

The State mischaracterizes the nature of the legislative classification at issue, asserting that the issue is "permit[ting] localities to charge 'different fees.'"  State Br. p. 19.  This is not the issue, for State law has allowed localities to set their own fees since 1938.  The issue is the 1947 change that burdens City residents with a fee bounded only by the claimed costs.

---

[2] Plaintiffs' Memorandum of Law (Doc. No. 14).
[3] Intervenor's Memorandum of Law (Doc. No. 27).
[4] Hawaii law forbids the issuing agency from collecting a fee, but allows the agency to "pass through" the amount that the FBI charges for a background check.  Haw. Rev. Stat. § 134-2(i).

### 3. The *Stated* Legislative Purposes Are Recovering Costs, <u>Generating Revenue, and Discouraging Gun Ownership</u>

The City and State both emphasize that *one* of the stated purposes of the disparate fee structure was to attempt to make the City's handgun licensing program "self-sustaining."  City Br. p. 6; State Br. pp. 8, 19 n.5.

However, according to the original (1947) Sponsor's Memorandum there were two *other* stated purposes for the 1947 change:  first, to make "the possession of fire-arms for personal use . . . [a] basis for revenue raising taxes"; and second, to allow the City to use "a higher fee . . . [to] tend to discourage a great number of possible applicants."  Plaintiffs Br. pp. 7-8.  Hence, the 1947 amendment expressly contemplated that higher license fees could be used for revenue purposes and for the purpose of discouraging lawful gun ownership.

Perhaps it is not surprising that the City and State attempt to erase these details from the legislative history.  The State objects that the Court cannot consider the Sponsor's Memorandum because "statements of individual legislators do not constitute the intent and motives of the legislature as a whole."  State Br. p. 28 n.7.  This objection is incredible, for both the City and State submit *the very same Sponsor's Memorandum* into evidence and rely on it to articulate (one of) the legislative purposes of the disparate fee structure.  <u>See</u> State Br. p. 8 (quoting the same Sponsor's Memorandum, Doc. No. 25-6 pp. 7-8); City Br. p. 6 (relying on the same Sponsor's Memorandum, Doc. No. 18-1 pp. 7-8).   In any event, the objection lacks merit because the Sponsor's Memorandum is *not* the statement of an individual legislator.  "In New York, while not determinative, a legislator's sponsor memo submitted contemporaneously with the legislation is entitled to considerable weight in discerning legislative intent."  <u>CFCU Cmty. Credit Union v. Hayward</u>, 552 F.3d 253, 263 (2d Cir. 2009) (quotations omitted).

The City takes a different tack – it contends that because a letter from the former Mayor only states the purpose of allowing the City to recover expenses, then this must be the only legislative purpose, regardless of what the Sponsor's Memorandum says.  See City Br. pp. 6-7 n.6; but see id. p. 6 (citing the Sponsor's Memorandum).  The City offers no support for its *sub silencio* propositions that the letter from the Mayor is the exclusive source of statutory intent, nor that it should control over the Sponsor's Memorandum.  The State's objection to relying on statements of individual legislators would appear to govern – especially given that the Mayor is not a member of the State legislature in the first place.  See State Br. p. 28 n.7 (and citations).

### 4.  Fees Do Not Defray Costs Anywhere in New York

According to the evidence submitted by the City and State (which Plaintiffs accept as true for purposes of Plaintiffs' Motion) New York State's handgun license fees do not fully cover the costs of administering New York State handgun licenses – anywhere in the State.  At the time the State increased the fee range to its present level ($3 to $10) in 1984, the cost of administering handgun licenses *outside* New York City was far higher, "[i]n some cases . . . as much as" $250 per license.  1984 N.Y. "Bill Jacket," S. 739-8673 (N.Y. 1984), at 7 (Doc. No. 25, Ex. H, at 36); State Br. pp. 8-9.  Indeed, the legislative materials surrounding the 1984 revision to § 400.00(14) reflected the legislature's explicit understanding that the fees of New York City and Nassau County (then $76 and $51, respectively) "more closely approximate the actual costs involved in license processing" than the $3 to $10 range that the legislature provided for the rest of the State.  See id. at 6-7.  Nevertheless, the State set the maximum fee at $10.

Similarly, the City claims that it presently spends $977.16 for each new handgun license.  See City Br. p. 11-12, 20.  However, the City's license fee is "only" $340.

Other issues aside, it is plain that New York State handgun license fees do not fully cover the costs associated with issuing handgun licenses – both inside and outside of the City

## REPLY AND OPPOSITION

### POINT I

### PLAINTIFFS' CLAIMS ARE
### PROPERLY BEFORE THIS COURT

**A) The Claim is Justiciable**

The past and future payment of the $340 fee plainly establishes the standing of the individual Plaintiffs to challenge the laws that authorize the fee's imposition.  See, e.g., Gen. Motors Corp. v. Turley, 519 U.S. 278, 286-87 (1997) (person paying tax has standing to challenge it as being allegedly under-inclusive); see also United States v. Williams, 514 U.S. 527, 540 n.10 (1995); United States v. Butler, 297 U.S. 1, 61 (1936); Florida v. United States Dep't of Health & Human Services, 716 F. Supp. 2d 1120, 1146 (N.D. Fla. 2010) (standing to challenge tax obligation beginning in 2014).  The $340 fee is an imminent and discrete injury; this injury is traceable to the Defendant City's administration of both Penal Law § 400.00(14) and NYC Admin. Code § 10-131(a); and, this Court's order overturning either or both of the challenged provisions will redress Plaintiffs' claimed injuries.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); State Br. pp. 12 (standing factors).

The State claims that Plaintiffs' equal protection claim presents no Article III case or controversy because "Plaintiffs' actual grievance is not that the State statute is being applied to them, but rather is that the New York City fee is allegedly too high" and "[n]one of the Plaintiffs have sustained a direct injury as a result of the operation of § 400.00(14)."  State Br. p. 11. However, this is just a mis-statement of Plaintiffs' claim.  There can be no dispute that the payment of $340 is an actual injury, and that the City could not charge a fee of more than $10 but for Penal Law § 400.00(14)'s exemption of the City from the otherwise-applicable fee limits. This is a discrete and concrete injury that is traceable to the classification drawn in § 400.00(14).

The State searches widely to locate cases that (allegedly) support its Article III argument, but the authorities it cites are inapposite.  The State's primary reliance (p. 11) on Florida East Coast Railway v. Martinez, 761 F. Supp. 782 (M.D. Fla. 1991), is misplaced because that case concerned the issue of whether the Governor, Attorney General, and Department of Transportation were personally involved in enforcing the statutes and were thus *proper defendants* in the dispute.  See id. at 784.  The court expressly observed that the local officials who carried out the statutes were proper defendants.  See id.  Likewise, the court in Harris v. Bush, 106 F. Supp. 2d 1272 (N.D. Fla. 2000), ruled that the Governor was not a *proper defendant* because he did not actually enforce the State laws at issue.  See id. at 1276-77.  This line of authority is irrelevant in the present case because the Attorney General is not a Defendant, and there can be no dispute that the City Defendants impose the fee under the authority of both N.Y.C. Admin. Code § 10-131(a) and Penal Law § 400.00(14).  See N.Y.C. Admin. Code § 10-131(a)(1) ("The police commissioner shall grant and issue licenses hereunder pursuant to the provisions of article four hundred of the penal law.").

The other decisions cited by the State are also irrelevant.  The decision in Sanger v. Reno, 966 F. Supp. 151 (E.D.N.Y. 1997), concerned *ripeness*, not standing, and the court found that the claims were not ripe because no one had threatened to enforce the statute against the plaintiffs.  See id. at 166-67.  Similarly, the court in San Diego Gun Rights Committee v. Reno, 98 F.3d 1121 (9th Cir. 1996), found a lack of standing because the plaintiffs did not have any concrete plans to engage in the conduct proscribed by the statute.  See id. at 1127.  In the present case, plaintiffs hold licenses, have paid the $340 fee, and that the City requires them to continue paying the fee in the future in order to keep their licenses in force.  The issue is not hypothetical!

**B) While the Court Need Not Address the Issue, SAF and NYSRPA Plainly Have Standing**

There is no need to address the associational standing of SAF and NYSRPA because the individual Plaintiffs plainly have standing.  See Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264 (1977); see also Woollard v. Sheridan, no. 10-2068, 2010 U.S. Dist. LEXIS 137031, *2-3 n.1 (D. Md. Dec. 29, 2010).  Although the Court indicated that it agreed with this basic principle at the July 5, 2011 hearing, the State nonetheless challenges the standing of SAF and NYSRPA.  The Court can summarily dispose of this argument with a citation to Arlington Heights and need not address this Point I.B) further.

To the extent the Court finds it necessary or useful to do so, it is manifest that SAF and NYSRPA have associational standing because both organizations spend their resources, time, and energy dealing with issues that arise from the City's $340 fee.  For example, SAF and NYSRPA receive inquiries from both their members and the general public regarding the fees that are required to obtain handgun licenses in New York City, including whether there are any alternatives to paying the fees, and both organizations spend time and energy responding to these inquiries.  Plfs. Counter-56.1[5] ¶¶ 1-2, 5-6.  Members have contacted both SAF and NYSRPA in the past to complain about the excessive and disproportionate nature of the fees, and to request that the organizations take action, and both organizations must respond to these inquiries.  Id. ¶¶ 1-2, 5-6.  Both SAF and NYSRPA have published materials regarding the fee.  Id. ¶ 3, 7. NYSRPA has provided testimony to the New York City Council in favor of lowering the fees and has incurred costs in connection with doing so, as well as expending the time and resources of its representatives.  Id. ¶ 8.  This is more than enough to establish injury in fact on the part of both organizations.  There is no basis for the State's claim (State Br. p. 14) that the organizations

---

[5] Plaintiffs' Counter-Statement of Undisputed Material Facts, submitted herewith.

need to *themselves* apply for licenses in order to have standing.  See Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982) ("perceptible impairment" to organizational resources resulting from the unconstitutional laws is "actionable injury in fact"); accord Ragin v. Harry Macklowe Real Estate Co., 6 F.3d 898, 905 (2d Cir. 1993).

SAF and NYSRPA also have standing to seek relief on behalf of their members because: (1) their members otherwise have standing to sue; (2) the interests they seek to protect – Second Amendment rights – are germane to their purpose; and (3) the claim for declaratory and injunctive relief does not require the participation of individual members in the lawsuit.  See United Food & Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 553 (1996); Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977).

There is no basis for the State's claim that SAF and NYSRPA do not have standing because the Complaint styles the challenge as being "as-applied," and indeed, the State's argument appears to be based on misconceptions about the nature of facial and as-applied challenges.  A statute is invalid "as-applied" if it is invalid in specific circumstances, and it is "facially" invalid if the deficiencies go beyond the circumstances presented.  See Doe v. Reed, 130 S. Ct. 2811, 2817 (2010).  The terms "facial" and "as-applied" are not pleading requirements, but instead relate to the breadth of relief.  See Citizens United v. FEC, 130 S. Ct. 876, 893 (2010).  "The label is not what matters."  Doe, 130 S. Ct. at 2817.

This action challenges *only* the fee for a Residence Premises license.  This Court's decision will not affect all applications of the fee ordinance (NYC Admin. Code § 10-131(a)).  Thus, the case is "as-applied" in the sense that it does not seek a declaration that the City cannot charge $340 for *any* license, but is "facial" in that it seeks relief beyond the circumstances presented.  See Doe, 130 S. Ct. at 2817; Citizens United, 130 S. Ct. at 893.

**C) <u>There is No Exhaustion Requirement</u>**

It is well established that a plaintiff need not exhaust State remedies before invoking a federal court to review the constitutionality of State action.  <u>See, e.g.</u>, <u>Patsy v. Bd. of Regents</u>, 457 U.S. 496, 501 (1983); <u>Wal Juice Bar, Inc. v. Oak Grove</u>, 211 Fed. Appx. 358, 361 (6th Cir. 2006).  Hence, the City's argument that this suit "is not a constitutional challenge per se, as plaintiffs can appropriately seek state court redress" (City Br. p. 18) is misplaced, and the City's citation to state-court decisions reviewing fees under State law (City Br. pp. 18-19) is wholly inapposite.  <u>See also</u> State Br. p. 23.  Indeed, if the City's contention were correct, then there would have been no jurisdiction for the Supreme Court to decide <u>Forsyth County v. Nationalist Movement</u>, 505 U.S. 123 (1992) – the plaintiffs in that case filed suit in federal court as soon as local officials told them they would need to pay $100 to have their demonstration.  <u>Id.</u> at 127.

**POINT II**

**REVIEW STANDARDS DEPEND UPON THE NATURE OF THE RESTRICTION AT ISSUE**

**A) It is More Clear than Ever that First Amendment Jurisprudence Provides the Analytic Framework**

Plaintiffs showed in their moving papers that the Courts of Appeal for the Third, Fourth, and Tenth Circuits have all concluded that First Amendment jurisprudence supplies the basic principles of review for laws burdening the Second Amendment.  <u>See</u> Plaintiffs Br. pp. 19-21.  Since Plaintiffs submitted their motion papers, the Court of Appeals for the Seventh Circuit decided <u>Ezell v. Chicago</u>, no. 10-3525, 2011 U.S. App. LEXIS 14108 (7th Cir. Jul. 6, 2011) – another Second Amendment Foundation case – and likewise concluded that "First Amendment analogues" supply the framework of review.  <u>See id.</u> at *55.  It is now *more clear than ever* that the First Amendment supplies the rules and principles of scrutiny.  <u>See also</u> <u>Osterweil v. Bartlett</u>, no. 1:09-cv-825, 2011 U.S. Dist. LEXIS 54196, *22-26 & n.4 (N.D.N.Y. May 20, 2011).

The State claims that First Amendment principles do not apply and captions a section of its brief, "The Direct Application of First Amendment Jurisprudence in the Second Amendment Context Has Been Rejected."  State Br. p. 26.  Somewhat incredibly, the State then fails to cite a *single* case to support its claim that courts have *rejected* the application of First Amendment principles to laws burdening the Second Amendment.  See State Br. pp. 26-29.  The only authority that remotely supports this proposition is buried in a footnote – and consists of a citation to a concurring opinion and the observation that Masciandaro rejected an "overbreadth" argument made in opposition to the ban on loaded guns in National Parks.  Suffice it to say that this *hardly* shows that courts have "rejected" the application of First Amendment principles.

Instead, the State asserts that "Plaintiffs' 'prior restraint' argument is meritless" that at "its logical conclusion would mean that nearly every firearm regulation would be presumptively invalid."  State Br. pp. 28-29.  This argument is both off-topic and misconceived, for this case does not concern prior restraint principles, and in any event, the application of prior restraint principles would not imperil "nearly every" gun law or anything close to it.  "Prior restraints" are laws that condition the exercise of constitutional rights on a *grant of permission*, and the procedural protections that apply to these types laws – objective and non-discretionary standards and time limits – are pertinent only in that they reflect the background principle that people are *entitled* to obtain licenses.  See Plaintiffs Br. pp. 14-15.  Contrary to the State's "sky will fall" claim, the only gun laws that are "presumptively invalid" are licensing schemes that lack objective standards and adequate time limits.[6]

---

[6] It appears the State has confused the *procedural* protections that attend prior restraints with the *substantive* rule that prior restraints on speech are invalid.  In any event, the Court in Heller applied basic prior restraint principles when it ordered the District of Columbia to issue the plaintiff a license and registration.  See District of Columbia v. Heller, 554 U.S. 570, 635 (2008).

**B) Burden Analysis Does Not Apply to *All* Laws that Pertain to Constitutionally Protected Conduct**

Both the City and State broadly urge the Court to apply intermediate scrutiny to all aspects of Plaintiffs' claims. See City Br. pp. 2, 24-28; State Br. pp. 2, 5-6, 29-31. However, the framework of rational, intermediate, and strict scrutiny does not apply to *every* type of law that relates to protected conduct. For example, "burden" analysis does not apply when governmental action *completely prohibits* the exercise of an enumerated right – as in Heller and McDonald (handgun *bans*), and as in Board of Airport Commissioners v. Jews for Jesus, Inc., 482 U.S. 569 (1987), where LAX airport had attempted to prohibit all "First Amendment activities" on LAX property. See Plaintiffs Br. p. 13. And, the Supreme Court has emphasized that "burden" analysis does not apply to the discretionary aspects of prior restraint laws. See Lakewood v. Plain Dealer Pub'g Co., 486 U.S. 750, 768-69 (1988); Cantwell v. Connecticut, 310 U.S. 296, 304 (1940). Contrary to the City's claim that intermediate scrutiny may apply to license fees (City Br. p. 24), different judicial standards govern the imposition of fees (*infra* Point III).

**C) The Level of Means-End Scrutiny Depends on the Nature, Character, and Purpose of the Burden**

When laws impose *burdens* on the exercise of constitutional rights, the "level" or rigor of means-end scrutiny depends upon the nature, character, and apparent purpose of the burden. Plaintiffs previously explained that strict judicial scrutiny applies to substantial burdens on conduct lying close to the "core" protections of the Second Amendment, and also to laws that reflect the impermissible purpose of preventing the keeping and bearing of arms. Intermediate scrutiny applies to non-preclusive regulations on the keeping and bearing of arms, such as laws that prohibit firearms with obliterated serial numbers. See Plaintiffs Br. pp. 22-23.

The most pertinent legal development since Plaintiffs submitted their moving papers is the Seventh Circuit's decision in Ezell v. Chicago, no. 10-3525, 2011 U.S. App. LEXIS 14108

(7th Cir. Jul. 6, 2011), which applied "a more rigorous showing than [intermediate scrutiny], if not quite 'strict scrutiny'" to Chicago laws that prohibited firing ranges in the city.  Id. at *60; see also id. at *71 (Rovner, J., concurring in the judgment) ("a standard akin to strict scrutiny").  To arrive at its level of scrutiny, the Seventh Circuit analogized to the First Amendment, and also to the right to vote – the same analytic approach Plaintiffs advanced in their moving papers.  See id. at *55-59; Plaintiffs Br. pp. 21-23 & n.21.  The Seventh Circuit "extrapolate[d] a few general principles [from First Amendment doctrine] to the Second Amendment context."  Ezell, 2011 U.S. App. LEXIS 14108 at *59.  The first general principle was that "a severe burden on the core Second Amendment right of armed self-defense" would "require an extremely strong public-interest justification and a close fit between the government's means and its end."  Id.  The second was that "laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified."  Id.  The overall rigor of judicial scrutiny "depends on the relative severity of the burden and its proximity to the core of the right."  Id.  The Seventh Circuit relied on its "near strict" standard of scrutiny to enjoin enforcement of Chicago's ban on firing ranges.  Id. at *69.  Thus, Ezell represents another Circuit's concurrence in a First Amendment-based approach that ties the level of scrutiny to the nature of the burden – and it stands as an example of the circumstances under which that approach requires strict, or near-strict, judicial scrutiny.

The City and State argue that intermediate scrutiny applies, *ipso facto*, to laws that burden the right to keep and bear arms.  See City Br. p. 25 ("a majority of courts to address general challenges under the Second Amendment have concluded that intermediate scrutiny is the appropriate level of review"); State Br. p. 30-31 ("Almost uniformly, courts have applied intermediate scrutiny").  Tellingly, the State does not even cite Ezell.  The City cites Ezell only

in a footnote, contending that the Seventh Circuit's approach was "novel" – although the City otherwise relies on Seventh Circuit precedent.  City Br. p. 33 n.32; see id. pp. 25-26.

The defect in the City and State's intermediate-scrutiny-fits-all approach is that it ignores the rationale that actually governs the selection of a standard of scrutiny.  The Courts of Appeal for the Third, Fourth, Seventh, and Tenth Circuits have all explained that the standard of scrutiny is intrinsically tied to the nature and character of the burden at issue:  Strict or near-strict scrutiny applies to substantial burdens on core Second Amendment activities, while intermediate scrutiny applies to less substantial burdens.  See Ezell, 2011 U.S. App. LEXIS 14108 at *59; United States v. Masciandaro, 638 F.3d 458, 469-70 (4th Cir. 2011); United States v. Reese, 627 F.3d 792, 802 (10th Cir. 2010); United States v. Marzzarella, 614 F.3d 85, 96-97 (3d Cir. 2010).  Neither standard simply applies, *ipso facto*, whenever a law regulates "arms."[7]

Regardless, it is clear that the rational basis standard does not apply to significant disparities – and so, the City and State's repeated invocations of the rational basis standard are hard to understand.  See City Br. pp. 2, 33; State Br. pp. 16, 19-22.  So too are the State's citation to pre-Heller decisions on handgun licensing – all of which applied rational basis review *because* they found no individual (or fundamental) right to keep and bear arms.  Bach v. Pataki, 289 F. Supp. 2d 217 (N.D.N.Y. 2003), aff'd 408 F.3d 75 (2d Cir. 2005), was a Virginia resident's *pro se* challenge to the requirement that one (generally) reside within the State of New York to apply for a New York handgun license.  See id. at 219.  The court in Bach found that there was no individual right to keep and bear arms, see id. at 226, and it accordingly applied rational basis review to the residency requirement, see id. at 228.  While the issue presented in this case is not

---

[7] The State *mis*characterizes Plaintiffs' argument as being that strict scrutiny "invariably applies" to laws "that burden fundamental rights."  State Br. p. 30.  This is not Plaintiffs' argument, as the State elsewhere concedes.  See id. p. 22.

the same as that in <u>Bach</u> – this case does not concern residency requirements – the entire premise of <u>Bach</u> is that the Second Amendment does *not* secure a fundamental individual right.  The same is true of <u>People v. Kuri</u>, 132 Misc. 2d 1036, 506 N.Y.S.2d 245 (Bronx County Crim. Ct. 1986), another pre-<u>Heller</u> decision that concerned the carry of handguns, but addressed a different provision of Article 400 that limits the validity of upstate handgun licenses in New York City.  <u>See id.</u> at 1037, 506 N.Y.S.2d at 245-46.  Although that issue is also distinct, it is significant that the court in <u>Kuri</u> also applied rational basis scrutiny and upheld the geographic classification because it found *no* fundamental, right.  <u>See id.</u> at 1037, 506 N.Y.S.2d at 246.

Since these cases were decided, the Supreme Court recognized the Second Amendment as an individual right in <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008), and incorporated the right against the States in <u>McDonald v. Chicago</u>, 130 S. Ct. 3020 (2010).  The State is incorrect in suggesting that these cases supply the standard of scrutiny (State Br. p. 16, 19-21). If anything, they show why the rational basis standard no longer applies.

**D)  *Nordyke*'s "Substantial Burden" Test**

In <u>Nordyke v. King</u>, 644 F.3d 776, __ 2011 U.S. App. LEXIS 8906 (9th Cir. 2011), the Court of Appeals for the Ninth Circuit concluded that "the rigorousness of our inquiry" into gun restrictions would "depend[] upon the extent to which a challenge regulation burdens" the right to keep and bear arms.  <u>Id.</u> at *21-22.  The Ninth Circuit's approach relied substantially on the Third and Fourth Circuit's approach.  <u>See id.</u> *11 (citing <u>Marzzarella</u>, 614 F.3d 85; <u>Masciandaro</u>, 638 F.3d 458; and <u>Heller v. District of Columbia</u>, 698 F. Supp. 2d 179 (D.D.C. 2010)).  As such, it is unclear whether <u>Nordyke</u> represents a significant departure from the First Amendment-based approaches developed in the Third, Fourth, Seventh, and Tenth Circuits.  The proposition that "heightened scrutiny" applies when a burden is "substantial" is not that remarkable.

The Ninth Circuit emphasized that the attribute of its test that was different was its focus on the extent of the burden on an individual, as opposed to the degree of "fit" between the burden and the societal interest at stake.  See id. at *16-19.  Both the City and State suggest that this model might appropriately apply here (City Br. pp. 29-31; State Br. p. 5).  This test would be misplaced in the equal protection context because equal protection fundamentally considers the "fit" between a legal disparity and its claimed justification – making a focus on burden alone inappropriate.  However, the concept of "substantial burden" may provide a useful framework for analyzing the prohibitive nature of the recurring $340 fee.  See Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L. Rev. 1443, 1542-44 (2009).

### POINT III
### THE RECURRING $340 FEE IS PROHIBITIVE

Fees must be nominal *and* they must serve the purpose of defraying attendant administrative costs.  Although Plaintiffs' moving papers explicitly and repeatedly stated that fees must satisfy *both* requirements (Plaintiffs Br. pp. 15-17), the City ignores these statements and instead contends that Plaintiffs "do not advocate for any particular level of scrutiny" and "ask this Court to declare the . . . fee unconstitutional pursuant to the Second Amendment with nothing more."  City Br. pp. 22-23.  The City avers that the *only* limitation is that fees cannot exceed the documented administration and enforcement costs.  See City Br. pp. 17-18, 21-22.  Thus, the City's basic claim is that there is no constitutional issue if a cost study justifies the fee.

**A)  The Cities' Cases Do *Not* Establish that "Attendant Cost" is the Only Limiting Factor**

The City contends that the decisions in Murdock v. Pennsylvania, 319 U.S. 105 (1943), Cox v. New Hampshire, 312 U.S. 569 (1941), and National Awareness Found. v. Abrams, 50

F.3d 1159 (2d Cir. 1995), conclusively establish that a "nominal" fee is one that serves to cover attendant costs – and nothing more.  See City Br. p. 17.  However, these decisions do not support this proposition.  To the contrary, the cases show that fees must relate to the actual benefit the State provides – and that the basic ability to exercise a fundamental right is *not* such a benefit.

Cox v. New Hampshire upheld the imposition of fines on five Jehovah's Witnesses who violated State laws by conducting a "parade or procession" on public streets without obtaining a required license.  See Cox, 312 U.S. at 569-71.  The Court addressed one paragraph of its decision to the statutory license fee of "from $ 300 to a nominal amount."  See id. at 576-77.  State courts had construed this to require "a reasonable fixing of the amount of the fee" that "would take into account" anticipated public expenses, and had opined that the fee was "not a revenue tax, but one to meet the expense incident to the administration of the Act and to the maintenance of public order in the matter licensed."  Id. at 577 (quoting State v. Cox, 16 A.2d 508, 513, 91 N.H. 137, 144 (1940)).  The Supreme Court concluded there was "nothing contrary to the Constitution in the charge of a fee limited to the purpose stated."  Id.

However, two years later the Court found that the license fee at issue in Murdock v. Pennsylvania was *not* permissible.  See Murdock, 319 U.S. at 117.  The petitioners in Murdock were also Jehovah's Witnesses, but their activity was different – they distributed religious materials and solicited donations from door-to-door.  See id. at 106-07.  Local officials had convicted them of violating a local law that required peddlers to obtain licenses for fees of (*inter alia*) $1.50 per day or $7.00 per week.  See id.

The Court in Murdock focused its analysis on the fact that the activity at issue was proselytizing, which lies at the core of the First Amendment's protection.  See id. at 110-11.  The Court distinguished Cox, which had concerned parades and proceedings on streets, with the

single statement that the "*manner* in which [a religion] is practiced at times gives rise to special problems with which the police power of the states is competent to deal."  Id. at 110 (emphasis added).  The Court found the fee invalid:

> [W]e have something very different from a registration system under which those going from house to house are required to give their names, addresses and other marks of identification to the authorities. . . .  It is not a nominal fee imposed as a regulatory measure to defray the expenses of policing the activities in question.  It is in no way apportioned.  *It is a flat license tax levied and collected as a condition to the pursuit of activities whose enjoyment is guaranteed by the First Amendment.*

Id. at 113-14 (emphasis added).

Contrary to the City's claim, these decisions do *not* establish that fees are permissible so long as they do not exceed average attendant costs.  Murdock's statement about "nominal fees" contemplates that "nominal fees" *can* be permissible when they are "imposed as a regulatory measure to defray the expenses of policing the activities in question."  Murdock, 319 U.S. at 114.  But Murdock also says that States cannot lay taxes on the basic ability to exercise a constitutional right.  Cox stands only for the (much broader) proposition that a fee assessed for using public streets and venues for protected conduct can seek to recover attendant costs.  The City takes these decisions out of context when it suggests that the Court affirmatively ruled that a "nominal" fee *is* a fee calculated to defray costs.

The Second Circuit's decision in National Awareness Foundation also does not support the City's claimed proposition.  That case concerned an $80 annual registration fee imposed on professional charitable fundraisers, and the District Court explicitly analyzed the *separate* issues of whether the fee was "nominal," and also whether it served to defray attendant costs.  See Nat'l Awareness Found. v. Abrams, 812 F. Supp. 431, 433 (S.D.N.Y. 1993), aff'd 50 F.3d 1159; see also Nat'l Awareness, 50 F.3d at 1164 (discussing the *two* grounds of the District Court's ruling).

The District Court found the fee "nominal," rather than "substantial and burdensome," based on "how substantial" the fee was "when viewed in its context" – which (as explained in Plaintiffs' moving papers) was the context of professional charitable fundraising.  See Nat'l Awareness, 812 F. Supp. at 433; Plaintiffs Br. p. 16.  The District Court's decision observes that the fee applied only to "professional" charitable fundraisers, rather than to volunteers, and it frames the question of nominality as an issue of "how substantial something is *when viewed in its context*." Nat'l Awareness, 812 F. Supp. at 434 (emphasis added).

The National Awareness litigants *did not appeal* the District Court's "nominal" finding, but only the court's conclusion that the agency could include some of its claimed "enforcement" costs in the cost calculation.  See Nat'l Awareness, 50 F.3d at 1166.  Thus, the City's claim that the Second Circuit affirmatively ruled that the only limiting factor is attendant cost is wrong – that issue was not before the Second Circuit, and the District Court concluded just the opposite.

The other cases that the City relies upon (pp. 16-17, 21) did not concern fees imposed *directly* on an individual's basic ability to engage in an enumerated, fundamental right.  Instead, these decisions concerned fees imposed on the ability to engage in protected conduct *in a particular place or manner* – and particularly, in manners that were commercial or in places that were provided at public expense.  The Murdock decision explains the difference:

> It is claimed, however, that the ultimate question in determining the constitutionality of this license tax is whether the state has given something for which it can ask a return.  That principle has wide applicability.  But it is quite irrelevant here.  *This tax is not a charge for the enjoyment of a privilege or benefit bestowed by the state.  The privilege in question exists apart from state authority. It is guaranteed the people by the Federal Constitution.*

Murdock, 319 U.S. at 115 (emphasis added).  A State or local government can charge for a benefit that it makes available, but it cannot claim that basic constitutional rights are benefits that it makes available.  It is the federal Constitution that confers entitlement to constitutional rights.

This rationale explains the decisions that the City cites in support of its claim that there is no separate requirement that fees be nominal. For example, the Second Circuit's decision in Eastern Connecticut Citizens Action Group v. Powers, 723 F.2d 1050 (2d Cir. 1983), concerned fees and insurance requirements that a government agency imposed as a condition of using a government-owned facility for public gatherings. See id. at 1052. The case did not concern a fee imposed on the basic ability to peaceably assemble, as people remained free to assemble without paying the fee, so long as they did not use the government-owned facility. Similarly, the decision in Turley v. New York City Police Department, 988 F. Supp. 667 (S.D.N.Y. 1997), aff'd in part and rev'd in part on other grounds, 167 F.3d 757 (2d Cir. 1999), concerned permit fees for sound amplification devices, not fees imposed on the basic ability to speak. See id. at 668-69. And, Mobile Sign, Inc. v. Brookhaven, 670 F. Supp. 68 (E.D.N.Y. 1987), concerned a local law that regulated mobile advertisements. See id. at 70. The Mobile Sign court concluded that the law impacted only commercial speech, and then stated that such fees "*generally* are constitutional if they are designed only to cover the administrative costs involved in the license or permit." Id. at 74 (emphasis added). None of these cases concerned a fee laid on an individual's basic ability to exercise an enumerated constitutional right.

Strangely, two of the decisions that the City relies upon (pp. 16-17) do not bear on the issue of fees at all. Mastrovincenzo v. City of New York, 435 F.3d 78 (2d Cir. 2006), upheld the requirement that street vendors of "graffiti clothing" be licensed, but it no way addressed the permissibility (or amount) of the requisite license fee. See id. at 81. The City grossly mischaracterizes the decision when it claims that Mastrovincenzo stands for "upholding $200 annual license fees" (City Br. p. 17). And, the decision in Gasparo v. City of New York, 16 F.

Supp. 2d 198 (E.D.N.Y. 1998), found that there was no jurisdiction to consider the newsstand tax

by virtue of the Tax Injunction Act.  See id. at 220.[8]

### B) Fees on the Basic Ability to Exercise a Fundamental Right Must be "Nominal" – *i.e.* Not Prohibitive

Plaintiffs showed in their moving papers that the Supreme Court has disclaimed *any*

ability to lay fees on the basic ability to exercise one's right to vote, publish, or speak.  See

Plaintiffs Br. p. 16.  While this lawsuit does not contend that a State or local government cannot

impose *any* fee on the basic ability to exercise one's Second Amendment rights, it does contend

that any such fee must be nominal.  See Eugene Volokh, Implementing the Right to Keep and

Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L.

Rev. 1443, 1542-44 (2009).  Neither the City nor the State is the source of the Constitution's

right to keep and bear arms, and their interest in charging fees for the "privilege" of exercising

this right is very limited.  Plaintiffs are not seeking to use public facilities or to engage in

commercial activities with their guns.

Although the City argues that there is no separate requirement of a "nominal" fee, it

(curiously) fails to discuss the most recent Supreme Court decision to address the issue.  In

Forsyth County v. Nationalist Movement, 505 U.S. 123 (1992), a county law allowed authorities

to impose a fee of up to $1,000 for a permit to hold a public demonstration.  See id. at 126-27.  A

neo-Nazi group held a demonstration that required over $670,000 in police costs.  Id. at 128.

The next year, the group applied for a permit and were asked to pay a fee of $100.  See id. at

127.  The neo-Nazis filed suit, and the Court of Appeals for the Eleventh Circuit ruled that the

---

[8] The Tax Injunction Act, 28 U.S.C. § 1341, does not bar jurisdiction in the present case because the handgun license fee is a regulatory fee rather than a tax:  the fee falls on those subject to regulation (those who own handguns), not the general public, and it serves the ostensible purpose of defraying costs associated with licensing.  See Cmty. Hous. Mgmt. Corp. v. New Rochelle, 381 F. Supp. 2d 313, 319-20 (S.D.N.Y. 2005).  No one has made any argument to the contrary.

fee was impermissible because fees "for using public forums" must be "nominal," and the $100-$1,000 fee was not.  See id. at 128.  The Supreme Court granted certiorari to address this issue – that is, "the constitutionality of charging a fee for a speaker *in a public forum*," id. at 129 (emphasis added) – but wound up declining to resolve the question, and instead overturned the county law because of its "variable" nature.  Compare id. at 124 & id. at 137-38 (Rehnquist, C.J., dissenting).  On the issue of nominality, the Court explained simply that the fee in Murdock "was invalid because it was unrelated to any legitimate state interest."  Id. at 137.  And, as previously explained, Murdock found no relation because the "privilege" at issue was the basic ability to exercise one's fundamental rights, which is *not* a privilege or benefit that the State makes available in the first place.  See Murdock, 319 U.S. at 115.

### C) The City's Proffered Evidence Does Not Establish the Absence of Issues of Fact

All other issues aside, the City is not entitled to summary judgment because the City's proffer of evidence does not establish the *absence* of factual issues regarding the claimed costs of administering Residence Premises handgun licenses.  The City concedes there has been no discovery (City Br. pp. 1, 12-13 n.11), and if the City's affidavit submissions establish anything, it is that discovery would be essential to responding to the City's claims.  See Fed. R. Civ. P. 56(f); Supp. Dec. of David D. Jensen (attached).  If the Court concludes that the permissibility of the $340 fee turns (only) on whether the City can adequately document its claimed attendant costs, then the Court should deny the motions so that discovery can take place.  However, Plaintiffs respectfully submit that this case does not need discovery.

**POINT IV**

**THE EQUAL PROTECTION CLAUSE INVALIDATES THE
DIFFERENTIAL BURDEN IMPOSED ON NEW YORK CITY RESIDENTS**

The direct result of § 400.00(14)'s classification is that a resident of New York City who chooses to exercise his or her fundamental constitutional right and keep a handgun at home faces a license fee that (while presently $340) can be as high as the claimed administration and enforcement costs (presently $977.16), while other State residents will pay no more the nominal amount of $3 to $10 for a license issued under the same State law. It would seem beyond cavil that this differential treatment is a substantial and severe burden for a New York City resident who chooses to exercise his or her constitutional right.

Alas, it is not – according to the State. The State begins by ignoring the statutory disparity at issue and attempting to characterize § 400.00(14) as "merely permitting the variable imposition of a fee" or "permit[ting] localities to charge 'different fees.'" State Br. pp. 18, 19. This is not the issue. There is no dispute that State law allows all localities to set their own fees. The issue is that State law limits that fee to a nominal amount for most State residents, but allows the fee to be as high as the claimed administration and enforcement costs for City residents.

From the faulty premise that the issue is the basic ability of localities to set their own fees, the State goes on to argue that a law does not burden a constitutional right "'simply because it makes that right more expensive or difficult to exercise' or because it declines to use government funds to 'facilitate the exercise of that right.'" Id. (quoting Nordyke v. King, 644 F.3d 776, __ 2011 U.S. App. LEXIS 8906, *26 (9th Cir. 2011) (other citations omitted)). These arguments are wholly irrelevant. This lawsuit does not concern regulations that *indirectly* increase the costs of engaging in an activity, but instead concerns the license fee that is *directly* imposed for permission to exercise the right. This lawsuit does not concern any claim for the use

of governmental funds; Plaintiffs are not asking the City to buy them guns.  Plaintiffs are asking the City to issue them licenses that they have a *constitutional right* to obtain.

In this light, the State's argument that § 400.00(14)'s differential treatment does not "jeopardize" or "substantially burden" or "severely burden" or "impermissibly burden" the right to keep and bear arms, and thus does not trigger the application of heightened scrutiny, practically refutes itself.  State Br. pp. 16-17, 18.  While it might be true, *en arguendo*, that a State law that merely allowed localities to set their own fees would not be a substantial burden, this is not the question presented.  The question presented is whether the absence of statutory protection against a greater-than-nominal fee is a substantial difference.

### A) A Strict Standard of Judicial Scrutiny Applies To the Disparate Fee Protection

A strict standard of scrutiny applies to § 400.00(14)'s disparate fee protection because high license fees are a substantial obstacle to exercising one's right to keep a handgun in the home, and the burden directly impacts the law-abiding citizens who are at the core of the Second Amendment's protections.  The fact that an apparent purpose of the burden is to discourage the keeping and bearing of arms only strengthens the case for a heightened level of scrutiny.

The City and State both respond that intermediate scrutiny should apply.  However, the cases that the City and State cite are readily distinguished, and actually show why a strict scrutiny approach applies here.[9]

To begin, both the City and State cite United States v. Marzzarella, 614 F.3d 85 (3d Cir. 2010), where the Third Circuit found that intermediate scrutiny applied to a federal law prohibiting the possession of firearms with obliterated serial numbers.  See id. at 97; City Br. p.

---

[9] Plaintiffs do not intend to endorse the approach of *all* of these cases and note that some of the issues may ultimately be resolved differently.  Regardless, the cases still show that intermediate scrutiny does not apply to substantial burdens on the basic right to keep a handgun in the home.

26; State Br. pp. 29-31.  However, the Third Circuit concluded that intermediate scrutiny was appropriate for two reasons.  First, intermediate scrutiny was appropriate because the law "leaves a person free to possess any otherwise lawful firearm he chooses—so long as it bears its original serial number," and thus, "does not severely limit the possession of firearms."  Marzzarella, 614 F.3d at 97.  Second, "the legislative intent behind § 922(k) was not to limit the ability of persons to possess any class of firearms."  Id.  Marzzarella does *not* support the application of intermediate scrutiny where a law places a substantial burden on the possession of *all* firearms, nor where the apparent purpose is to discourage the keeping and bearing of arms.

Most of the cases that the City and State rely upon to support their claim for intermediate scrutiny concerned the validity of laws that prohibit people from possessing firearms based on their past criminal actions.  See United States v. Chester, 628 F.3d 673, 683 (4th Cir. 2010); United States v. Reese, 627 F.3d 792, 802 (10th Cir. 2010); United States v. Skoien, 614 F.3d 638, 641-42 (7th Cir. 2010); United States v. Walker, 709 F. Supp. 2d 460, 466 (E.D. Va. 2010); United States v. Miller, 604 F. Supp. 2d 1162, 1171 (W.D. Tenn. 2009); United States v. Elkins, no. 2:10CR00017, 2011 U.S. Dist. LEXIS 47105, *12-13 (W.D. Va. May 2, 2011); United States v. Oppedisano, no. 09-CR-0305, 2010 U.S. Dist. LEXIS 127094, *5 (E.D.N.Y. Nov. 30, 2010); City Br. pp. 25-26; State Br. pp. 5-6, 29-31.  Indeed, the City and State both rely upon criminal disqualification statutes to contend that intermediate scrutiny can apply to preclusive regulations that apply within the home.  City Br. pp. 25-26; State Br. pp. 5-6.

However, laws that prohibit delimited classes of people from possessing guns because of their past criminal acts are *qualitatively different* than laws that impose substantial burdens on the general, law-abiding public.  First, criminal disqualification "applies only to a narrow class of persons, rather than to the public at large."  Reese, 627 F.3d at 802.  Second, these restrictions do

not infringe on the *core* of the Second Amendment, because the core protection is "the right of a *law-abiding, responsible* citizen to possess and carry a weapon for self-defense."  Chester, 628 F.3d at 683 (emphasis added); see also Walker, 709 F. Supp. 2d at 466.  For example, in Ezell the Seventh Circuit distinguished its prior decision in Skoien – which applied intermediate scrutiny to the domestic violence prohibition – and explained that intermediate scrutiny had been "appropriate [there] because the claim was not made by a 'law-abiding, responsible citizen' as in Heller, nor did the case involve the central self-defense component of the right."  Ezell, 2011 U.S. App. LEXIS 14108 at *60 (quoting Heller, 554 U.S. at 635).

Both the City and State cite Osterweil v. Bartlett, no. 1:09-cv-825, 2011 U.S. Dist. LEXIS 54196 (N.D.N.Y. May 20, 2011).  State Br. p. 30; City Br. p. 26.  However, Osterweil concerned a different element of New York's handgun laws – the requirement that one reside in the State in order to apply for a license.  See Osterweil, 2011 U.S. Dist. LEXIS 54196 at *12-14. The court found that intermediate scrutiny was "appropriate because "the burden imposed by this law falls at least one level outside the core right recognized in Heller, *i.e.*, the right of a law abiding individual to keep and carry a firearm for the purpose of self defense in the home."  Id. at *31.  The court did not categorically adopt intermediate scrutiny.  See id. at *23, 30-31.

Similarly, the decisions in United States v. Masciandaro, 638 F.3d 458 (4th Cir. 2011), and Peruta v. County of San Diego, 758 F. Supp. 2d 1106 (S.D. Cal. 2010), concerned restrictions imposed on the *carry* of firearms in public – and they do not support the application of intermediate scrutiny to laws that substantially burden the ability to keep a handgun in the home.  See Masciandaro, 638 F.3d at 471; Peruta, 758 F. Supp. 2d at 1116; State Br. pp. 31-32.

Both the City and State cite Heller v. District of Columbia, 698 F. Supp. 2d 179 (D.D.C. 2010) ("Heller II"), as supporting the application of intermediate scrutiny (State Br. pp. 6, 30;

City Br. p. 26), but once again, the rationale of this decision does not support applying intermediate scrutiny here. Heller II applied intermediate scrutiny to the District of Columbia's (basic) requirement that firearms be registered. See id. at 190. The court reasoned that intermediate scrutiny applied because the registration "requirements only regulate, rather than prohibit[], the possession of firearms," and also observed that "the Supreme Court has held that registration and licensing schemes are permissible in other contexts so long as they do not excessively impinge on the constitutional right." Id. at 190.[10]

Finally, the Illinois appellate court applied intermediate scrutiny to the "assault weapon" ban at issue in Wilson v. Cook County, 943 N.E.2d 768, 407 Ill. App. 3d 759 (Ill. Ct. App.), review granted 949 N.E.2d 1104 (Ill. 2011); State Br. pp. 19, 30, but the court relied heavily on the rationale and methodology of both Marzzarella and Reese. See id. at 775-76, 407 Ill. App. 3d at 766-67 ("the Marzzarella court found that the proper standard of review depended on the type of law challenged and the extent of the restriction imposed"). So again, the case does not support the proposition that intermediate scrutiny categorically applies, nor that it should apply where a law substantially burdens the basic right to keep *any* handgun in the home.

Surprisingly, the State claims that Nordyke v. King, 644 F.3d 776, __ 2011 U.S. App. LEXIS 8906 (9th Cir. 2011), supports its position that the burden on New York City residents is *not* substantial. See State Br. pp. 16-18. Nordyke concerned a county ordinance that was *much less burdensome* than the classification at issue here – the county policy prohibited gun shows on county property (but nowhere else). Id. at *3. There was never any dispute that people remained free to purchase guns at gun stores, from friends and neighbors, and at gun shows held in other

---

[10] Part of Heller II's rationale for applying intermediate scrutiny was that "the Supreme Court did not explicitly hold that the Second Amendment right is a fundamental right." Heller II, 698 F. Supp. 2d at 187. Of course, the Supreme Court has since held just that. See McDonald v. Chicago, 130 S. Ct. 3020, 3042 (2010); Plaintiffs Br. pp. 11-12.

locations.   However, the Ninth Circuit nevertheless found a potential cause of action and *remanded* the case so that the District Court could determine "whether [the] ban on gun shows at the county fairgrounds *substantially* burdens the right to keep and bear arms."   Id. at *23 (emphasis added).  The Ninth Circuit explained that the ban on gun shows could be a substantial burden if it failed to "leave[] law-abiding citizens with reasonable alternative means for obtaining firearms sufficient for self-defense purposes."   Id. at *25.  The court offered the specific examples that the county ordinance might "make[] it materially more difficult to obtain firearms" or that there could be "a shortage of places to purchase guns in or near Alameda County."   Id. at *25-26.

If a policy banning gun shows from county property (alone) could be a substantial burden – depending on whether the remaining alternatives for purchasing a gun were "reasonable" and "sufficient" – then it is unavoidable that the disparity of § 400.00(14) *is* substantial.

The State's other cases do not support the claim that § 400.00(14)'s disparity is *in*substantial (State Br. pp. 17-18).   Nordlinger v. Hahn, 505 U.S. 1 (1992), and Affronti v. Crosson, 95 N.Y.2d 713, 723 N.Y.S.2d 757 (2001), did not concern fundamental rights and are irrelevant to the imposition of fees on a grant of permission to exercise a right.   See Nordlinger, 505 U.S. at 17 (property tax rates); Affronti, 95 N.Y.2d at 720, 723 N.Y.S.2d at 761 (judicial salaries).  The court in People v. Perkins, 62 A.D.3d 1160, 880 N.Y.S.2d 209 (3d Dep't 2009), upheld criminal convictions for the unlicensed possession of handguns on the finding that the basic requirement of a license was "an acceptable means of regulating the possession of firearms."   Id. at 1161, 880 N.Y.S.2d at 210; see also People v. Hughes, 83 A.D.3d 960, 961, 921 N.Y.S.2d 300, 301 (2d Dep't 2011) (quoting Perkins).  Neither decision concerned the issuance of handgun licenses, and they do not support the claim that the fee disparity is *not* substantial.

Synthesis of these cases reveals that courts apply intermediate scrutiny to laws that *regulate* the keeping and bearing of arms in a manner that does not *substantially* interfere with its exercise by law-abiding citizens.  So, laws that prohibit specific guns with specific feature or attributes generally raise intermediate scrutiny (Marzzarella, Wilson), as do laws that disenfranchise specific categories of people because of their past unlawful conduct (Chester, Reese, Skoien, Walker, Miller, Elkins, Oppedisano).  Laws that prohibit guns from specific, delimited areas trigger intermediate scrutiny (Masciandaro).  Conditions like residency requirements for the issuance of gun licenses also may trigger intermediate scrutiny, at least under some circumstances (Osterweil, Peruta), and the same appears to be true with respect to the basic requirement of registration (Heller II).

However, these cases do *not* support the much broader proposition that intermediate scrutiny *always* applies to laws burdening the Second Amendment.  More importantly, they do not support the application of intermediate scrutiny in the circumstances presented – where there is a substantial burden on the basic ability of a law-abiding citizen to keep a handgun at home.

**B) Section 400.00(14)'s Disparate Burden Fails Equal Protection Review**

The disparate fee structure of § 400.00(14) severely burdens the ability to keep a gun for self-protection in New York City.  Because this burden is substantial and implicates the "core" right to keep a handgun at home, a strict standard of judicial scrutiny applies.  In the equal protection context, strict judicial scrutiny requires a State to establish that its disparate burden is "necessary to serve a compelling interest" and is the "least drastic means to achieve the State's ends."  Ill. State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 184-85 (1979); Plaintiffs Br. pp. 23-24.  In the Second Amendment context, the Seventh Circuit has articulated the standard as requiring the State to show "an extremely strong public-interest justification and

a close fit between the government's means and its end."  Ezell v. Chicago, no. 10-3525, 2011

U.S. App. LEXIS 14108, *59 (7th Cir. Jul. 6, 2011).

In their moving papers, Plaintiffs explained that summary judgment is proper because

"no compelling interest could justify protecting one class of citizens from excessive fees, while

allowing their limitless imposition on another."  Plaintiffs Br. p. 23.  In response, the City and

State advance various interests in an attempt to justify the disparity, but none do.  While the cited

interests might justify the generic concept of "gun regulation," they lack a close fit – or any fit –

to the disparate fee that is at issue here.

### 1.  The Interest in Promoting Safety

The City and State rely largely upon generalized concepts of "public safety" to support

the fee disparity, observing that society has an interest in attempting to prevent the criminal

misuse of firearms, to otherwise prevent crime, and to prevent suicide.  See City Br. pp. 27-28;

State Br. pp. 31-32.  The State recites statistics about crimes committed with firearms and avers

that handguns are prone to criminal misuse.  See State Br. pp. 31-32.  Both the City and State

observe the interest in keeping firearms away from criminals and the mentally unstable, and

assert that New York's gun laws serve this interest.  See City Br. p. 28; State Br. pp. 30-34.

However, these considerations do not relate to § 400.00(14)'s disparate treatment of

license fees.  While these considerations might bear on the State's underlying legislative choice

to license handgun ownership, this lawsuit does not raise this issue.

### 2.  The Interest in Defraying Investigation Costs

Both the City and State cite Penal Law § 400.00(1)'s requirement that a licensing officer

conduct an "investigation" before issuing a license.  See City Br. pp. 4-5; State Br. pp. 7, 32-33.

They argue that because the "investigation" serves public safety concerns, and because costs are

associated with it, "the fee is sufficiently tailored to defray part of the costs."   City Br. p. 28;

State Br. pp. 32-34.  The State asserts that the disparate fee provision arose "in response to a plea from the City that the costs of its investigation and administration were overwhelming."  State Br. p. 34; see also City Br. pp. 6-7, 10-11.  Of course, the Sponsor's Memorandum establishes that this was only *one* of the three stated purposes for the disparate fee provision's enactment.

In any event, this interest does not justify the unequal burden that is at issue.  The question is whether the statutory *disparity* is necessary to meet a compelling government interest.  Because handgun license fees do not defray the full attendant costs anywhere in the State, the differential burden does not serve this interest.  Stated otherwise, even if the City were to definitively establish that it spends more than other licensing authorities that issue licenses pursuant to Article 400 (State Br. p. 22), there is no reason that *all* licensing authorities would not have an equal interest in recovering their full costs.

More basically, the *disparity* at issue is that § 400.00(14) sets the fee at a nominal amount ($3 to $10) for one group of citizens, but then allows the fee to be as high as the full (claimed) administrative and enforcement costs for another group.  The State cannot justify the decision to unequally burden its citizens merely by citing the interest that would underlie a burden that it implemented equally.  See Illinois State Board of Elections v. Socialist Workers Party, 440 U.S. 173, 186 (1979) ("appellant has advanced no reason, much less a compelling one, why the State needs a more stringent requirement for Chicago").

### C)  Geographic Considerations Do Not Justify Substantial Disparate Burdens on Fundamental Rights

The State argues that the unequal fee structure of § 400.00(14) does not violate the Equal Protection Clause because the classification is drawn geographically.  See State Br. pp. 19-22; see also City Br. p. 34.  However, geographic and territorial distinctions do not justify the imposition of *substantial* inequalities on the exercise of fundamental constitutional rights.

**1.  The State's Cases Do Not Apply to Significant Burdens on Fundamental Rights**

The State focuses on cases that concerned geographic and territorial classifications that did *not* involve any significant burden on the exercise of a fundamental constitutional right (State Br. pp. 19-20).  These cases are readily distinguished.  Indeed, some courts upholding these classifications have explicitly qualified that their rational-basis standard does not apply to a "geographic challenge" when the classification "impair[s] fundamental rights."  Wiesner v. Rosenberger, no. 98 Civ. 1512, 1998 U.S. Dist. LEXIS 15666, *17 (S.D.N.Y. Oct. 3, 1998); see also Barefoot v. Wilmington, 306 F.3d 113, 122 (4th Cir. 2002).

First, cases that address zoning laws and property taxes plainly do not concern fundamental constitutional rights and are not instructive.  See Nordlinger v. Hahn, 505 U.S. 1 (1992) (different property tax rates); Ruston v. Town Bd., 610 F.3d 55 (2d Cir. 2010) (real estate development); Somers v. Camarco, 308 N.Y. 537 (1955) (change in zoning laws).  These cases do not support the State's claim that "matters such as population density" can justify significantly unequal burdens on the exercise of fundamental rights (State Br. p. 20).

Likewise, cases that simply do not bear on the exercise of fundamental rights do not support the State's argument.  McGowan v. Maryland, 366 U.S. 420 (1961), upheld a Sunday-closing law that applied only in certain counties, but there is no constitutional right to buy things on Sunday, and the Court applied rational basis review.  See id. at 425-26.  And, a number of courts have applied rational basis scrutiny to consider claimed salary and caseload inequalities in the court system.  See Kail v. Rockefeller, 275 F. Supp. 937, 942 (E.D.N.Y. 1967) (unequal apportionment of judges); Affronti v. Crosson, 95 N.Y.2d 713, 720, 723 N.Y.S.2d 757, 761 (2001) (unequal judicial salaries); Tolub v. Evans, 58 N.Y.2d 1, 8, 457 N.Y.S.2d 751, 754 (1982) (disparities in law clerks' compensation); see also L.A. County Bar Ass'n v. Eu, 979 F.2d 697, 707-08 (9th Cir. 1992) (unequal apportionment of judges).  But these cases do not support the

much broader proposition (State Br. p. 20) that rational basis review applies to significant burdens on the exercise of fundamental rights, so long as they are geographically delimited.

The State's citation to cases like <u>Missouri v. Lewis</u>, 101 U.S. 22 (1879), and <u>Salsburg v. Maryland</u>, 346 U.S. 545 (1954), is similarly misplaced (State Br. p. 20), for these cases show only that States can establish procedural differences for territories of a State. The Supreme Court's decision in <u>Missouri v. Lewis</u> concerned State laws that provided two different appeals court systems for two different territories. <u>See</u> <u>Missouri</u>, 101 U.S. at 29. The Court explained that these differences in the structuring of the State court system did not deny the equal protection of the laws "if all persons within the territorial limits of the[ courts'] respective jurisdictions have an equal right, in like cases and under like circumstances, to resort to them for redress." <u>Id.</u> at 30. Other cases the State relies upon are consistent with this approach, finding geographic and territorial differences in court systems to be permissible when they are merely procedural or relate to internal matters (State Br. p. 20). <u>See</u> <u>Salsburg</u>, 346 U.S. at 553-54 (upholding different evidentiary rules in different courts); <u>Ocampo v. United States</u>, 234 U.S. 91, 98-99 (1914) (only parts of territory provided criminal defendants with a preliminary examination); <u>see also</u> <u>People v. Richter</u>, 206 Misc. 304, 305, 133 N.Y.S.2d 685, 687 (N.Y. County Ct. 1954) (no violation where a City court could order some relief that a State court could not order in the same type of proceeding). While the State attempts to extrapolate a broader principle that rational basis review applies *any* time a State draws a classification on geographic or territorial lines (State Br. pp. 19-20), these cases simply do not concern burdens on the exercise of fundamental constitutional rights.

### 2. Gun License *Residency* Requirements

The State cites decisions that addressed *residency* requirements for gun licenses – that is, requirements that people seeking licenses live in the jurisdiction – as support for the broad (and

bland) proposition that "geographic disparities in licensing statutes have survived constitutional challenges." State Br. p. 21. These decisions do not support the disparate fee structure of § 400.00(14). The decisions in <u>Osterweil</u>, <u>Peruta</u>, and <u>Peterson v. Lacabe</u> all concerned requirements that one live within the State in order to apply for a license to carry a firearm in the State. <u>See</u> <u>Peruta</u>, 758 F. Supp. 2d at 1119; <u>Osterweil</u>, 2011 U.S. Dist. LEXIS 54196 at *6-7; <u>Peterson v. Lacabe</u>, no. 10-cv-00059, 2011 U.S. Dist. LEXIS 23070, *2-3 (D. Colo. Mar. 8, 2011). That issue is markedly different from the question presented here, which (first) concerns the "core" right to possess firearms in the home, and (second) concerns a State-law classification that differentially burdens State residents who seek to exercise the same right.

### 3. Other Decisions Refute the State's "Territorial" Contention

Perhaps it is little surprise that the State ignores <u>Illinois State Board of Elections v. Socialist Workers Party</u>, 440 U.S. 173 (1979), in the portion of its brief that generally defends its ability to draw territorial classifications (State Br. pp. 19-22). The Supreme Court's decision in <u>Illinois State Board</u> concerned a state-law territorial distinction, and one that resulted in a materially greater burden to access the ballot – a fundamental right – in Chicago. <u>See id.</u> at 175-77. The Court characterized the distinction as "a geographic classification," <u>id.</u> at 183, and then ruled that the disparity could not stand unless there was a "compelling" reason that "the State needs a more stringent requirement for Chicago." <u>Id.</u> at 186. This analysis is fatal to the disparity imposed by § 400.00(14), as the State does not and cannot assert *any* objective (compelling or otherwise) that would necessitate removing the fee protection in the City alone. Certainly, geographic delineations have not otherwise excused classifications that violated the Constitution. <u>See, e.g.</u>, <u>Salem Inn, Inc. v. Frank</u>, 381 F. Supp. 859, 864 (E.D.N.Y. 1974) (geographically delimited ban on nude dancing).

Elsewhere in its briefing, the State objects that <u>Illinois State Board</u> does not control because later decisions have not applied a strict scrutiny approach when burdens have not been sufficiently substantial.  State Br. pp. 25-26.  But this is beside the point, for the burden here is substantial (*supra* Point IV.A).  It is significant that the relative burden in <u>Illinois State Board</u> was a signature requirement of 35,947 inside Chicago versus 25,000 outside Chicago.  <u>See</u> <u>Ill. State Bd.</u>, 440 U.S. at 176-78.  The Court had previously upheld a *flat* 5% signature requirement, and the Court explicitly observed that the higher Chicago requirement fell within this limitation.  <u>See</u> <u>id.</u> at 180-82 (discussing <u>Jackson v. Ogilvie</u>, 403 U.S. 925 (1971)).

The State objects to using voting and election law at all.  <u>See</u> State Br. p. 25.  Plaintiffs explained in their moving papers that while the First Amendment is the most analogous protection to the Second Amendment, voting rights are also analogous because they also concern the constitutional protection of affirmative acts.  <u>See</u> Plaintiffs Br. pp. 21-23 & n.21.  Plaintiffs are not alone in this view.  <u>See</u> <u>Ezell v. Chicago</u>, no. 10-3525, 2011 U.S. App. LEXIS 14108, *56-57 (7th Cir. Jul. 6, 2011); <u>Nordyke v. King</u>, 644 F.3d 776, __, 2011 U.S. App. LEXIS 8906, *21-22 (9th Cir. 2011).

## CONCLUSION

The issues in this case are simple and straightforward.  A locality cannot lay a prohibitive fee on the basic ability to exercise a fundamental constitutional right.  As such, the City's $340 recurring license fee – far and away the highest fee of its kind in the United States – is an unconstitutional tax on the exercise of a constitutional right.  Moreover, the legislative decision to mandate a nominal license fee of $3 to $10 for one set of citizens, while allowing the fee to fully recover all claimed attendant costs on the other, imposes a substantial and severe burden that strikes right at the "core" right to keep a handgun in one's home.  This differential burden cannot survive review under the Equal Protection Clause.

Dated:  New York, New York
        August 24, 2011

      **DAVID JENSEN** PLLC

By:  _____
      David D. Jensen, Esq.
      61 Broadway, Suite 1900
      New York, New York  10006
      Tel:  212.380.6615
      Fax:  917.591.1318
      david@djensenpllc.com
      *Attorney for Plaintiffs*